UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CINDY MOLL,

                              Plaintiff,                    **AMENDED**
       v.                                        **DECISION AND ORDER**
                                                        04-CV-805S

TELESECTOR RESOURCES GROUP, INC.,
d/b/a VERIZON SERVICES GROUP, a/k/a
VERIZON NEW YORK, INC.,

                              Defendant.

## I. INTRODUCTION

Plaintiff Cindy L. Moll ("Plaintiff") commenced this action on October 5, 2004,

alleging that Defendant Telesector Resources Group, Inc., d/b/a Verizon Services Group,

a/k/a Verizon New York, Inc. ("Verizon") discriminated against her based on her gender,

subjected her to a sexually hostile work environment, retaliated against her following her

complaints of discrimination and paid her less than male employees performing the same

duties, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§

2000e et seq., the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. §§ 290

et seq., and the Equal Pay Act ("EPA"), 29 U.S.C. §§ 206 et seq. (Docket Nos. 1, 57.)

Several of the claims set forth in Plaintiff's Complaint were dismissed by this Court's

September 28, 2005, Decision and Order on Verizon's Motion to Dismiss. (Docket No. 13.)

The remaining claims before this Court are Plaintiff's Title VII claims of disparate

treatment and retaliation relating to events occurring on or after November 23, 2002; state

law claims of disparate treatment and retaliation relating to events occurring on or after

October 5, 2001; and her EPA claim limited to events on or after October 5, 2001. Verizon has filed a Motion for Summary Judgment[1] seeking dismissal of the remaining claims in the Amended Complaint. (Docket No. 101.)  For the following reasons, Verizon's motion is granted in part and denied in part.

## II. BACKGROUND

### A.    Facts

Verizon is a provider of telecommunication products and services.  (Def. Stmt. ¶ 1.) Plaintiff was hired in June, 1990, by a predecessor of Verizon, NYNEX[2] and spent the first seven years of her employment performing secretarial tasks as a sales assistant, which was a union-represented clerical position. (Def. Stmt. ¶¶ 11-12.) At that time, she possessed a high school diploma, and later received an Associate's Degree in Business in 1999 and then a Bachelor's Degree in Business in 2006. (Def. Stmt. ¶ 11;  Pl. Aff. (Docket No. 109) ¶ 2.)

As a sales assistant, Plaintiff's duties included clerical tasks, such as typing, filing, answering telephones, compiling reports, preparing vouchers, making travel arrangements, ordering supplies, and providing support for thirteen people. (Def. Stmt. ¶ 12.) Sometime

---

[1]  In support of its Motion, Verizon filed a Local Rule 56(a) Statement of Material Facts (Docket No. 101), Local Rule 56(a) Appendix of Tabs 1 - 56 with the supporting Declaration of James S. Urban, Esq. (Docket No. 102), a Memorandum of Law (Docket No. 103), a Reply Memorandum of Law with Table A (Docket No. 112), and a Supplemental Declaration of James S. Urban, Esq. with Tabs 58 - 68 (Docket No. 113-114). In opposition, Plaintiff filed the Affidavit of Josephine A. Greco, Esq. (Docket No. 107), an opposing Memorandum of Law (Docket No. 108), and a Local Rule 56(a) Counterstatement with appended Exhibits A - TT (Docket No. 109). As part of Plaintiff's Exhibits, she includes deposition testimony from various witnesses taken in another case, Byrne v. Telesector Resources Grp., 04-CV-076S (W.D.N.Y.).

[2]  Verizon was previously known as NYNEX, which became Bell Atlantic in August, 1997 following a merger between NYNEX and Bell Atlantic. Bell Atlantic became Verizon in June, 200, when Bell Atlantic merged with GTE.  (Def. Stmt. ¶ 2.)

in 1997, Plaintiff was offered a permanent, salaried position as a Systems Analyst in the NYNEX Systems Marketing branch. She accepted the promotion and, as a result, received a salary increase to $47,400.00, 35.8 percent more than what she earned in her former clerical position. (Def. Stmt. ¶ 18.) Shortly before Plaintiff's promotion, Tom Spencer, a manager at Verizon, transferred from his position as Market Administrator to the position of Senior Systems Analyst in NYNEX Systems Marketing (later known as Verizon Enterprise Solutions Group or "ESG"), for which he received a $2,500.00 salary increase. Spencer accepted the promotion only after he negotiated a pay raise. His starting base salary as a Senior Systems Analyst was $61,300.00 in 1997. (Def. Stmt. ¶¶ 14-17.)

In January 2000, Plaintiff requested company-owned tickets to take customers to a professional hockey game in Buffalo. That request was denied, and Plaintiff did not make another request after that. (Def. Stmt. ¶ 20). Plaintiff avers that she was denied access to the tickets because she was pregnant at the time, and that the company-owned tickets were made available to her male coworkers. (Pl. Ex. J (Irving Depo.) at 143-148; Docket; Ex. K (Dean Depo.) at 149-152.) In March, 2000, Plaintiff took maternity leave from her position from Verizon, and returned on a part-time basis in August, 2000. (Def. Stmt. ¶¶ 21-22.)

At the close of 2000, a male Corporate Account Manager ("CAM"), Michael Finnegan received a rating of "Does Not Meet Position Requirements," and was demoted. His new position paid $17,000.00 less than what he previously earned as a CAM. (Def. Stmt. ¶ 26.)

As of January, 2001, the Verizon ESG Sales Engineers in the Buffalo office were Plaintiff, Tom Spencer (Sales Engineer II), and Anne Byrne (Sales Engineer I). The three

Sales Engineers reported to Sales Engineering Manager Daniel Irving. (Def. Stmt. ¶¶ 27-29.) Effective January 1, 2001, Plaintiff received a base salary increase to $51,000.00, up 7.14 percent from the year before. (Def. Stmt. ¶ 31). At that time, Plaintiff had the lowest base salary in her group. Spencer earned a base salary of $66,500.00, and Byrne earned a base salary of $57,900.00. (Pl. Ex. N.)

In April, 2001 Anne Byrne, who is female, was promoted to the position of Sales Engineer II. (Def. Stmt. ¶ 33). Around that time, Plaintiff returned to work on a full-time basis from maternity leave/gradual return to work, and received a base salary increase of 4.71 percent to $53,400.00. (Def. Stmt. ¶¶ 34-35.)

In June, 2001, Plaintiff and eight other Verizon employees received an e-mail from Daniel Irving directing them to reduce the number of e-mails sent to him so that he could discern those that were "important" from those that were "not-so important." (Def. Stmt. ¶ 45.) Plaintiff elaborates that she was not permitted to send him e-mails at all, was not permitted to leave him voice mail messages, and was required to speak with him in person if she had any questions for him. Further, she alleges that Irving followed her to client meetings, and did not do this with the other Sales Engineers. (Pl. Aff. ¶ 41.)

In the fall of 2001, CAM Tim Mitten was placed on a Performance Improvement Plan, requiring him by year-end to achieve certain milestones, or, absent satisfactory achievement, face termination.  (Def. Stmt. ¶ 49.)

In December of 2001, Daniel Irving questioned Plaintiff regarding complaints he received from a Verizon business office representative describing Plaintiff as unresponsive. (Def. Stmt. ¶ 50.) Plaintiff acknowledged that there was an occasion where she did not respond to a business office representative, but states that the issue involved was not one

that she as a Sales Engineer would typically deal with. As a result of the complaint, Plaintiff was placed on a counseling plan. Plaintiff avers that the male employees at Verizon, despite committing more serious performance problems, received less or no discipline. Specifically, CAMs Michael Finnegan and Ray Brogan, and Sales Engineers David Winley and Kevin Dean. (Pl. Aff. ¶¶ 89-93; Pl. Ex. D (Gaglione Depo.) at 178-79; Pl. Ex. T (Van Hoesen Depo.) at 198-209.)

During 2002, Plaintiff, Anne Byrne, and Tom Spencer were the Sales Engineers in the Verizon ESG Buffalo office. Byrne and Spencer held the position of Sales Engineer II as of January, 2002. The three Sales Engineers all performed their work from cubicles, and not offices, during the year 2002. (Def. Stmt. ¶¶ 51-82.)

Also during 2002, Byrne, Spencer, and Plaintiff were assigned to act as a single point of contact for certain accounts. Plaintiff states that Winley and Dean, who were higher-level Sales Engineers, were not required to do so. (Def. Stmt. ¶ 53; Pl. Aff. ¶¶ 82-83.)

Plaintiff's performance-based incentive compensation for 2002 was based on a team goal relating to the entire Sales Engineering team in the Verizon ESG Buffalo Office. That team included Plaintiff, Anne Byrne, Tom Spencer, Sara DeLena, and CAMs Tim Mitten and Jim Keller. (Def. Stmt. ¶ 54.)

On March 12, 2002, Daniel Irving met with Plaintiff and presented his evaluation of her overall performance for the year 2001 as "meets expectations." (Def. Stmt. ¶ 56.) Specifically, Irving rated Plaintiff as "needing improvement" in two categories, "very effective" in one category, and "meets expectations" for another. According to Plaintiff, this was the first appraisal that she received from Irving in which he rated her as "needs

improvement" in any category. (Pl. Aff. ¶¶ 46, 49, 50; Pl. Ex. F.) A "meets expectations" rating means that an employee meets the minimum requirements of the job, and is considered a satisfactory rating in that employees with such ratings typically receive merit raises and are eligible for promotion provided they are qualified for the job to which they are seeking promotion. (Def. Stmt. ¶¶ 57-58.)

That day, Plaintiff began a counseling session with Irving concerning the complaints made by business office representatives that Plaintiff was unresponsive, despite her recent appraisal stating that she was "very customer focused as is very responsive to customer needs." (Def. Stmt. ¶ 59; Docket No. 109, Ex. F.)   Plaintiff acknowledged to Irving, however, that she "need[ed] to be more responsive to [business office representatives'] requests." (Def. Stmt. ¶ 61.)   Additionally, Plaintiff was placed on the counseling plan based on a deficient Request for Proposal ("RFP") she submitted to Rochester Schools in January, 2002, which was ultimately rejected. Plaintiff contends, however, that Rochester Schools rejected Verizon's bid on the basis of receiving a lower bid from a competitor, and not because of deficiencies in her RFP. (Def. Stmt. ¶¶ 59-60; Pl. Aff. ¶¶ 48, 50.) Plaintiff satisfactorily completed the counseling session two months later. (Def. Stmt. ¶ 64.)

Also in March, 2002, Plaintiff received a pay raise of 1.87 percent, to $54,400, a cumulative 14.2 percent increase from the year 2000. As of March 12, 2002, Plaintiff was the lowest paid Sales Engineer in the ESG Buffalo office. (Def. Stmt. ¶ 63; Pl. Aff. ¶ 30.)

On August 4, 2002, CAM Tim Mitten was placed on another Sales Performance Improvement Plan, which included defined objectives, call and proposal requirements, and mandatory weekly conferences. (Def. Stmt. ¶ 65.)

Prior to the merger with Bell Atlantic, GTE had a history of offering communications

6

technology products and services that Bell Atlantic did not offer, such as voice and data Customer Premise Equipment ("CPE").  Following the merger, the former Bell Atlantic sales team (which became part of Verizon ESG) had the opportunity to market and sell communication technology products that were not previously part of the Bell Atlantic product line. Because the majority of the former Bell Atlantic sales team, including Plaintiff, had little hands-on experience with voice and data CPE products, Verizon ESG management decided to recruit and hire individuals from outside the company with experience in CPE products. (Def. Stmt. ¶¶ 67-71.)

With respect to the Buffalo ESG office, Verizon created two new positions, titled Senior Specialist-Technology Solutions. One position was created to focus exclusively on voice CPE, and the other on data CPE. Both positions carried a competitive starting salary of $90,000.00. Plaintiff applied for neither position. (Def. Stmt. ¶¶ 72-73, 75.)

Daniel Irving was the hiring manager for the voice and data Senior Specialist-Technology Solutions positions in Buffalo, who ultimately offered one position to David Winley. According to Irving, Winely was selected because he had hands-on technical experience with voice CPE products, as he had worked for Nortel Networks (a manufacturer of CPE products) for eighteen months as a Systems Engineer  and GTE (a reseller of CPE products) for thirteen years. Winley accepted the position and agreed to a start date of April 1, 2002. Consistent with Verizon policy, Winley got credit for his former service time with GTE, which resulted in an allotment of twenty vacation days. (Def. Stmt. ¶¶ 74, 76-79.) Plaintff contends that Winley was unqualified for the position because he possessed a high school diploma and not the requisite Bachelor's degree as provided by

the job announcement.[3] (Pl. Aff. ¶ 11; Pl. Ex. U.)

The other Senior Specialist-Technology position, relating to data CPE, was filled by Kevin Dean. Dean had previously worked as a sales engineer for Nortel Networks with a focus on data products, and worked in sales for approximately six months at Frontrunner, a reseller of such products. Irving selected Dean on the basis that he possessed marketable hands-on technical experience with data CPE products. (Def. Stmt. ¶¶ 80-81; Ex. V (Dean Depo.) at 11-12.)

Winley and Dean worked out of offices, not cubicles, as the positions into which they were hired were higher-level than those of the Sales Engineers (Plaintiff, Anne Byrne, and Tom Spencer), who worked out of cubicles. (Def. Stmt. ¶ 82.) Winley and Dean's positions were later re-titled Sales Engineer IV. (Pl. Ex. C (Gaglione Depo.) at 183-184.)

In 2002, the work of the Sales Engineers was segmented by product: Plaintiff was responsible for core voice or local usage products, Anne Byrne was responsible for optical services products, Tom Spencer was responsible for fast packet (data services) and Winley and Dean were responsible for voice and data CPE, respectively. (Def. Stmt. ¶ 83.)

Plaintiff contends that Winley was permitted to relocate on company time and was assisted in moving by Daniel Irving and other employees, who were also on company time. (Am. Compl. ¶ 37.) Verizon states that Daniel Irving, Kevin Dean, and Ray Brogan assisted Winley in moving, but it was not during working hours, and Irving explained that employees were required to use vacation time if he desired to move during a workday. (Def. Stmt. ¶ 89.) In contrast, Plaintiff avers that Winley was hired on April 1, 2002, but not required to

---

[3] Plaintiff attaches a job posting for Senior Specialist-Technology Solutions for Verizon's Menands, New York location. (Pl. Ex. U).

report to work until May 1, 2002, allowing him time to relocate to Buffalo. (Pl. Aff. ¶ 56.) According to Winley's Employee Absence/Tardiness Record, he did not use any benefit time in April, 2002. (Pl. Ex. W.) Plaintiff claims that in October, 2001, Irving required her to take vacation days to move into a new residence. (Pl. Aff. ¶ 58.)

On June 27, 2002, Daniel Irving permitted Plaintiff to work from home, but explained that going forward, employees would no longer be permitted to work from home due to another employee's attendance problems. (Def. Stmt. ¶ 92.)

Plaintiff claims that sometime in 2001, Daniel Irving intended to manipulate a Buffalo Board of Education sale in order to have Kevin Dean receive credit as a means to help Dean meet his objective. While the sale was not manipulated and Dean did not receive credit for the sale, Plaintiff maintains that Irving made it clear that he would manipulate sales dates to assist male employees with their personal objectives, suggesting that male employees could miss personal objectives without consequence, whereas Plaintiff was placed on a counseling plan for failing to respond to a business representative. (Def. Stmt. ¶¶ 94-95; Pl. Aff. ¶¶ 64-65.)

In 2002, an $8.5 million sale was posted. According to Plaintiff, the sale was actually completed in December, 2001, and that the timing of the posting of the sale negatively impacted her incentive-based compensation for 2001 and 2002. However, Plaintiff's incentive compensation was based on a team goal, and therefore any impact also affected the incentive compensation for Sales Engineers Tom Spencer and Anne Byrne, Sales Engineer Manager Daniel Irving, CAM Jim Keller, and Regional Sales Manager Michael McGowan. (Def. Stmt. ¶¶ 94-95.)

In August 2002, Plaintiff's physician had advised her to take a disability leave of absence related to her thyroid.  Daniel Irving asked Plaintiff if she would work from home, and Plaintiff refused. She took disability leave for three to four weeks. (Def. Stmt. ¶ 98; Pl. Aff. ¶ 62.)

In October, 2002, Plaintiff alleges that Irving followed her and another female colleague to a client meeting at Niagara Falls Memorial Medical Center. The client cancelled the meeting, however, and Irving met the two women at a restaurant, had lunch with them, and paid for their lunch. Plaintiff believes Irving did so to require personal contact with Plaintiff and in retaliation for her refusal to acquiesce to his sexual advances. (Def. Stmt. ¶ 99; Pl. Aff. ¶ 33.)

The week after Christmas, 2002, Plaintiff, Anne Byrne, David Winley, and Kevin Dean all took vacation. During that time, Plaintiff and Byrne were required to check their voicemail and be reachable my cell phone. Plaintiff, however, has no knowledge of whether the same expectations were applied to Winley and Dean. Verizon states that Irving required all Sales Engineers he supervised to check messages and be reachable during non-work hours, and Spencer was required to participate in a conference call shortly after returning home from the hospital where he had undergone surgery. (Def. Stmt. ¶¶ 102-104.)

Plaintiff contends that beginning in or about April, 2001, and continuing until October, 2002, she was told that Sales Engineer promotions were frozen, but she believes that other Sales Engineers, including Mark Connor, were promoted during that period. The basis for her belief is that she heard during an October, 2002 branch meeting that two men--Mark Connor and Sean Brown--had been promoted, although she does not know

when they were promoted or the reasons why. She asked Daniel Irving if the freeze had been lifted, and he responded that he did not know. (Def. Stmt. ¶¶ 105-106.) Plaintiff further contends that Sales Engineering Manager Chris Gaglione told her in March, 2001, that she was ready to be assessed for the position of Sales Engineer II, but Irving refused to permit Plaintiff to assess for the position. (Pl. Ex. F, Bates. #056-058; Pl. Aff. ¶ 37.) Gaglione, then based in Syracuse, New York, testified that between 2001 and 2003, he attempted to secure a promotion for a Syracuse-based Sales Engineer named David Locke, but was told there was a freeze on promotions. (Def. Stmt. ¶ 107.)  Eventually, Plaintiff and Anne Byrne received promotions before Locke in 2003. (Gaglione Depo. at 74-75). When Gaglione became Sales Engineering Manager for the Verizon ESG Buffalo office in January 2003, he subsequently promoted Plaintiff because he "thought she was a good candidate for assessment, and also because her assessment . . . had been unjustifiably delayed for more than two years." (Def. Stmt. ¶ 110; Pl. Ex. S (Gaglione Decl.) ¶ 8.)

It was commonplace for Verizon employees to request promotions, and employees would have to wait to receive a desired promotion. (Def. Stmt. ¶ 108.) For example, Mark Connor was promoted in October, 2002, to Sales Engineer III, twenty-three months after his request for promotion. In the interim, he was advised that there were no positions available, or that there was a freeze in place. (Def. Stmt. ¶ 109.) Plaintiff nonetheless takes issue with the fact that Mark Connor and Sean Brown were assessed and promoted in October, 2002, when the promotion freeze was purportedly in place, and that Plaintiff herself was not promoted until ten months after Connor's promotion. (Pl. Aff. ¶¶ 69, 77.)

In early 2003, Verizon changed the Senior Specialist job title to Sales Engineer IV.

11

As a result of that change, David Winley and Kevin Dean had their job titles changed accordingly. As in previous years, Plaintiff's performance-based incentive compensation for 2003 was based on a team goal relating to the entire sales engineering team in the Verizon ESG Buffalo office, which now included Winley and Dean. (Def. Stmt. ¶¶ 111-112; Pl. Ex. D (Gaglione Depo.) at 152.)

Daniel Irving continued to be responsible for Plaintiff's performance evaluations for the year 2002. On March 11, 2003, Irving rated Plaintiff as having met the expectations of her Sales Engineer I position, noting that Plaintiff responded to the previous year's counseling session by "demonstrat[ing] more initiative in developing and pursuing sales opportunities. She worked with CAM's [sic] by establishing review sessions to uncover opportunities and to assist in closing already identified opportunities." With respect to the category "Customer Focus," Irving rated Plaintiff as "very effective" for the year 2002. (Def. Stmt. ¶ 114.)

Around the same time that Plaintiff received her 2002 performance appraisal, she received a salary increase of 4.04 percent, to $56,600.00 effective March 30, 2003. Spencer also received a salary increase to $72,800.00, a change of 4.9 percent. (Def. Stmt. ¶ 115; Pl. Ex. N.)

CAM Tim Mitten's 2002 performance appraisal was rated "Does Not Meet Position Requirements," and he was advised that he would be removed from Verizon's payroll if he did not find another position elsewhere within Verizon by January 17, 2003. (Def. Stmt. ¶ 116.) According to Plaintiff, Mitten was permitted to work in the ESG group for an additional twenty-four months after he was first disciplined for poor performance in the fall of 2001. (Pl. Ex. P (Mitten Depo.) at 158-159.)

In July, 2003, Plaintiff assessed for a promotion before a panel in Valhalla, New York, and was promoted to the position Sales Engineer II effective August 17, 2003. Plaintiff's co-worker Anne Byrne was also assessed, and was promoted from Sales Engineer II to Sales Engineer III at the same time. (Def. Stmt. ¶ 120.) Plaintiff states that this promotion was delayed for more than two years. (Pl. Aff. ¶ 31, 33.) Although Christopher Gaglione also wanted to have Syracuse-based Sales Engineer David Locke assess for a promotion as well, he was only allowed to have two candidates, and Gaglione selected Plaintiff and Anne Byrne.[4] (Def. Stmt. ¶ 121.)

One month later, in August, 2003, Plaintiff received another raise of 4.95 percent, to $59,00.00. Since the year 2000, Plaintiff's base salary increased 24.7 percent, up from $47,600.00. (Def. Stmt. ¶ 122.) Despite her raise, Plaintiff still earned $13,400.00 less than Tom Spencer, who was also a Sales Engineer II, who earned more in his first year as a Systems Analyst in 1997 than Plaintiff's base salary in 2003. (Pl. Ex. N.)

That same month, Verizon announced that salaried, non-union employees were eligible to participate in a buyout program through which they voluntarily would resign their employment in exchange for a severance stipend and certain other benefits when they left the payroll. (Def. Stmt. ¶ 123.) Plaintiff contends that Branch Manager Mark Van Hoesen obtained information regarding the Reduction In Force packages, whereas Plaintiff was unable to obtain details regarding the Reduction In Force package offered to her before deciding whether to accept it or not. (Pl. Ex. T (Van Hoesen Depo.) at 14-20; Pl. Aff. ¶ 101.)

---

[4] By this time Christopher Gaglione had become the Sales Engineering Manager for the Verizon ESG Buffalo office.

On September 19, 2003, Plaintiff filed her Equal Employment Opportunity Commission ("EEOC") charge of discrimination. (Def. Stmt. ¶ 124.)

In August or September, 2003, Daniel Irving purchased season tickets to professional hockey games for personal use. Because he could not attend all forty games, he made the tickets available to others. Irving offered the tickets to a group of male employees, which, Plaintiff contends, did not give the female employees a "greater opportunity to succeed" in that the tickets could have potentially been used for entertaining clients, even though they were purchased at Irving's own expense. (Def. Stmt. ¶¶127-128; Pl. Aff. ¶ 20, 39.) At that time, Verizon permitted employees to personally purchase sports tickets and expense them if they were used for client purposes. (Def. Stmt. ¶ 129.) Verizon and Plaintiff disagree as to whether Irving made the tickets available to everyone in the office, or only the male employees. (Def. Stmt. ¶ 130; Pl. Aff. ¶ 20.)

On October 31, 2003, Christopher Gaglione informed Plaintiff that he would permit her to work from home on days when she was "unable to be physically present in the office" due to personal obligations, provided that she "used [her] discretion and limit[ed] work from home" to days when it was necessary. (Def. Stmt. ¶ 125.) Plaintiff contends that every other Sales Engineer was provided with the opportunity to work from home except for her. (Pl. Aff. ¶¶ 62-63.)

In November, 2003, David Winley resigned from his position as Sales Engineer VI as part of Verizon's Reduction In Force. (Def. Stmt. ¶ 126.)

Plaintiff's performance-based incentive compensation for 2004 was again based on a team goal relating to the entire Sales Engineering team in the Verizon ESG Buffalo office, as well as CAMs Sara DeLena, Tim Mitten, and Jim Keller. (Def. Stmt. ¶ 132; Pl. Aff.

14

¶ 13.)

In early 2004, Tom Spencer resigned from his Sales Engineer position in Buffalo and took a job in Verizon's "E-911" Department. (Def. Stmt. ¶ 133.) When Spencer left the ESG work group, his salary was $76,200.00, an increase of 24.3 percent from when he entered the workgroup in 1997. In early 2004, Plaintiff's salary was $59,400.00, an increase of 25.3 percent from when she entered the work group in the same year as Spencer, 1997. (Def Stmt. ¶ 134.)

In February, 2004, Verizon hired Michael Chase as a Sales Engineer II in Buffalo, transitioning from a position as branch manager for Verizon Selected Services. As a Sales Engineer, Chase worked out of a cubicle, in the same location that Tom Spencer had used prior to his departure. (Def. Stmt. ¶137.)

In March, 2004, Christopher Gaglione met with Plaintiff and told her he had evaluated her as having "met expectations" of her Sales Engineer II job during the year 2003, commenting that she "has met the very high expectations for her position." Plaintiff disagreed with her rating. (Def Stmt. ¶¶ 138-139.) The previous year, Plaintiff received the same rating ("met expectations") and was promoted five months after her March, 2003 performance evaluation. Plaintiff argues that this promotion was unjustifiably delayed for two years. (Def. Stmt. ¶ 140; Pl. Ex. S (Gaglione Decl.) ¶ 8.)

Effective March 28, 2004, Verizon increased Plaintiff's salary by 3.54 percent, from $59,400.00 to $61,500.00 (Def. Stmt. ¶ 141.) Plaintiff believed she deserved a more generous raise, however, she  was unaware of how her 2004 raise measured against the raises received by the other Sales Engineers in her office. She maintains that at all times her pay was significantly lower than Tom Spencer's, the previous male Sales Engineer in

her office.

In May, 2004, Kevin Dean accepted a position with Nortel Networks and voluntarily resigned his employment with Verizon. Verizon did not fill Dean's position. (Def. Stmt. ¶ 143.)

As of May, 2004, the Sales Engineers in the Verizon ESG Buffalo office were Plaintiff, Anne Byrne, and Michael Chase. (Def. Stmt. ¶ 144.)

In May, 2004, Christopher Gaglione permitted Plaintiff to work from home when her office became too hot and humid due to a lack of air conditioning.  (Def. Stmt. ¶ 145.) According to Verizon, Plaintiff made frequent requests to work from home, which Plaintiff disputes. Rather, Plaintiff only made such requests when her children were ill, and that she did not work from home as frequently as male employees, such as Michael Finnegan. (Def. Stmt. ¶ 146; Pl. Aff. ¶¶ 56, 60.)

Plaintiff claims that in June, 2004, she and other female employees were excluded from participating in a charity golf tournament. Michael Chase, the male Sales Engineer in Plaintiff's department, was also not invited to attend the golf outing. (Def. Stmt. ¶¶ 148-149.) Plaintiff did not request to participate in the tournament.(Def. Stmt. ¶ 150.) Plaintiff did not play golf in the year 2004, but states that she would typically play golf at corporate and charity events, and was discriminatorily denied the opportunity to participate in this particular event. (Def. Stmt. ¶ 151; Pl. Aff. ¶ 40.)

Plaintiff claims that in July, 2004, she requested permission to work from Verizon's Amherst office. Christopher Gaglione denied her request, while Michael Chase and CAM Ray Brogan (who was not supervised by Gaglione) were permitted to work out of the Amherst location, as well as from home. Chase worked in the Amherst office for

approximately six weeks while he transitioned from his former position with Verizon Selected Services, located in Amherst. (Def. Stmt. ¶¶ 152-154.) Plaintiff contends that Chase worked in the Amherst office "on and off" for most of 2004. (Pl. Aff. ¶¶ 87-88.) While Plaintiff acknowledges that Brogan was a CAM and was not supervised by Gaglione, she adds that both Brogan and Chase did not request alternative work locations from Gaglione, they simply worked when and where they wanted to. Further, Plaintiff alleges that in May, 2004, Brogan was working with Plaintiff on  an account (University at Buffalo) and that he offered the client concessions that she believed to be unethical and/or against New York State policy. After reporting Brogan's actions to her supervisor, Christopher Gaglione, and other superiors, she was removed from the University at Buffalo account on August 25, 2004. (Pl. Aff. ¶¶ 89-93, Pl. Ex. CC & DD.)

In the spring and summer of 2004, Plaintiff worked from home at times due to the lack of air conditioning in Verizon's Buffalo office. (Def. Stmt. ¶ 155.)

In September, 2004, Christopher Gaglione made Plaintiff aware of a potential job opportunity with Verizon's National-Commercial Tier One group, to which Plaintiff responded that she was not interested. (Def. Stmt. ¶ 156.) Plaintiff believes she was "set up to fail" by Gaglione by suggesting she work for a CAM that had "notorious performance problems." (Pl. Aff. ¶ 97.)

In October, 2004, CAMs in Buffalo and Rochester requested a meeting with Bob Dixon, to whom the Branch Sales Engineering Managers, including Christopher Gaglione, reported. During an October 27, 2004 meeting, the CAMs complained that the Sales Engineers were difficult to reach and were not being responsive to requests for assistance. (Def. Stmt. ¶ 157.) Likewise, Dixon heard complaints from the Regional Sales Manager

and CAMs in Rhode Island that there was not adequate management oversight of the five Sales Engineers there. At that time, neither the three Sales Engineers in Buffalo nor the five Sales Engineers in Rhode Island had an on-site supervisor. Rather, the Buffalo-based Sales Engineers reported to Gaglione, whose office was in Syracuse. Likewise, the Rhode Island-based Sales Engineers reported to a Sales Engineering Manager in Vahalla, New York.

In response to those complaints, Dixon proposed to his superior, Mark Van Hoesen, a restructuring that included hiring and placing an on-site Sales Engineering Manager in Rhode Island, and moving the Sales Engineers and one project management position to Gaglione's office in Syracuse. (Def. Stmt. ¶¶ 157-160.) Plaintiff contends that the primary motivation in relocating the positions to Syracuse was to force out the two employees who had complained about discrimination and retaliation in the Buffalo office, herself and Anne Byrne. (Pl. Ex. S (Gaglione Decl.) ¶ 14.) Although Dixon and Van Hoesen considered placing a Sales Engineering Manager in Buffalo, the company did not have enough critical mass in the territory to justify a manager in both Buffalo and Syracuse. (Def. Stmt. ¶ 162.)

On November 2, 2004, after Dixon's restructuring had been proposed to Van Hoesen, Verizon was served with a copy of Plaintiff's lawsuit at its Corporate Security department, then located in New York City. (Def. Stmt. ¶ 163.) Prior to that, Verizon was notified of the EEOC of Plaintiff's discrimination complaint in September, 2003 and in July, 2004, when she filed an amended charge. (Pl. Ex. FF & GG.)

The restructuring plan impacted four employees–female Sales Engineers Anne Byrne and Plaintiff, male Sales Engineer Michael Chase, and male Project Manager Michael Finnegan. Plaintiff had no involvement in the decision that changed the job

18

locations for these four employees. (Def. Stmt. ¶¶ 164-165.) Plaintiff avers that Finnegan and Chase had advance notice of the restructuring days or weeks before a December 3, 2004, meeting wherein the affected employees were informed of the decision, because Finnegan announced that he had already accepted a new position within Verizon shortly after the December 3 meeting. (Def. Stmt.¶¶ 165-166; Pl. Ex. S (Gaglione Decl.) ¶¶ 20-21.)

All four employees were told they had three options: (1) relocate to Syracuse and work out of the ESG office in that city; (2) transfer to another Verizon position in Buffalo; or (3) take a severance package. (Def. Stmt.¶ 167.) Plaintiff also discussed the possibility of a "Flexible Work Arrangement" with Patrick Koseski, a Human Resources Manager at Verizon. Specifically, the Flexible Work Arrangement provided for an employee with no performance issues to permanently work from home. Plaintiff completed a formal application for a Flexible Work Arrangement, setting forth the reasons she sought to work from home. (Pl. Aff. ¶ 109; Ex. JJ.)

Plaintiff also requested a copy of the severance package for which she might be eligible. Koseski told Plaintiff that he was not permitted to produce an advance copy, however, the packages were standard, and the details were available to all employees on the company's intranet. (Def. Stmt.¶ 167.) Plaintiff contends, however, that Koseski did not tell her about the the availablility of information on the company's intranet, and, further, that Koseski failed to provide her with information regarding the amount of severance or the language contained in the release. (Pl. Aff. ¶ 101-104; Pl.  Ex. H (Koseski  Depo.) at 156.) At the time the restructuring was announced, Plaintiff had filed her federal lawsuit two months prior, and Byrne had an existing, similar lawsuit pending against Verizon.

19

Plaintiff and Michael Chase both elected to remain in their positions with the ESG group and work from the Syracuse office beginning in 2005. Anne Byrne had also originally agreed to work from Syracuse, but soon transferred to another job within Verizon in Buffalo. Michael Finnegan transferred to a job in Verizon's E-911 department. (Def. Stmt. ¶¶ 169-172.)

One month prior to her job location being moved to Syracuse, Plaintiff submitted a written request that she be permitted to work full time from her Lancaster, New York home. Verizon's position is that the proposed Flexible Work Arrangement was contrary to the reasons the Sales Engineer groups had been consolidated into one office in Syracuse. (Def. Stmt. ¶¶ 173-174.) Plaintiff contends, however, that the primary reason to move the Sales Engineering jobs was to retaliate against Plaintiff for the complaints of discrimination raised by her and Byrne. (Pl. Ex. S (Gaglione Decl.) ¶ 14.) Christopher Gaglione, who had never granted a full-time work at home request, feared that granting Plaintiff's request would spawn similar requests from other Sales Engineers, and also upset Anne Byrne. He advised Plaintiff that the job had been moved to Syracuse, and that was where she was required to report for work. (Def. Stmt. ¶¶ 175-176.)

Gaglione typically allowed his employees to work from home on a case-by-case basis. Although he did not allow Michael Chase and Plaintiff to work full-time from home, he states that he took a flexible approach with both employees, regularly "ben[ding] the rules" for them. (Def. Stmt. ¶¶ 177-178.) Plaintiff was advised that she needed to be present in the Syracuse office more frequently and was instructed to manage her schedule appropriately. (Def. Stmt. ¶¶ 179.) Plaintiff states that a Sales Engineer who worked in Syracuse but lived in Rochester, New York, was permitted to work from home at his

20

convenience, and she was subject to greater scheduling restrictions than the other Sales Engineers. (Pl. Ex. D (Gaglione Depo.) at 271-272, Pl. Ex. S (Gaglione Decl.) at 30; Pl. Aff. ¶¶ 112-113; Pl. Ex. KK at Bates #0882, Ex. LL.)

In March, 2005, Christopher Gaglione met with Plaintiff and evaluated her as having "met expectations" of her Sales Engineering II position during the year 2004. This rating was the same as she had received in previous years. Plaintiff disagreed with the rating "meets expectations." (Def. Stmt. ¶¶ 180-181.) Also in March, Gaglione placed Michael Chase on a Performance Improvement Plan because Chase was responsible for a delay in a project installation. (Def. Stmt. ¶ 182.) Unlike Plaintiff's participation in the counseling plan three years earlier, a record of Chase's Performance Improvement Plan was not contained in his personnel file at Verizon. (Pl. Ex. MM, NN.)

In July and August, 2005, Christopher Gaglione ranked his employees, and, in the process, ranked Plaintiff as "least desirable" within the group. In ranking the Sales Engineers, the management team first collectively identified nine attributes of a strong Sales Engineer (e.g., communication, follow-up, work ethic, teamwork) in order to improve upon the group's weaknesses. Two other Sales Engineers, both of whom were male, were also identified as needing improvement in certain areas.  According to Plaintiff, the attributes were subjective guidelines used to identify employees for potential layoff or termination, in order to reduce the workforce in Syracuse. She was not, however, laid off in 2005. (Def. Stmt. ¶¶ 183-188; Pl. Ex. D (Gaglione Depo.) at 327-330, 352-353.) Plaintiff further contends that the ranking of her abilities was inconsistent and contrary to the appraisal that Gaglione had previously given her in March 2005, for the year 2004. (Pl. Ex. OO.)

On July 5, 2005, Bob Dixon wrote to Plaintiff and Michael Chase, reminding them to report to work in the Syracuse office, asking them to confirm that they were adhering to that policy, and instructing that they were not permitted to work at home without Christopher Gaglione's authorization. Thereafter, Plaintiff was required to be present in her office in Syracuse a minimum of 24 hours per week. (Def. Stmt. ¶ 189; Pl. Aff. ¶ 113.) According to Plaintiff, this was a "new regulation." She ignored and did not respond to Dixon's email. (Def. Stmt. ¶ 190.) Michael Chase replied to the email, stating that he was working from Syracuse. Dixon suspected Chase was in fact working from home, however, because Dixon did not see him in the Syracuse office and was told by Gaglione that Chase was not regularly in the Syracuse office. Chase resigned a short time later. (Def. Stmt. ¶ 191.)

Plaintiff did not list Mark Van Hoesen or Bob Dixon as references when pursuing other jobs within Verizon. According to Plaintiff, she did not list them as references due to their previous descriminatory and retaliatory behavior. (Def. Stmt. ¶ 195; Pl. Ex. H (Pl. Depo.) at 322-324.) However, on July 25, 2005, Plaintiff wrote an e-mail asking to use Van Hoesen or Dixon as references, and both responded positively. (Def. Stmt. ¶ 196.) Although Dixon directly called the hiring manager for the position to which Plaintiff applied, she was not offered the job. (Pl. Ex. H (Pl. Depo.) at 325-326.)

On August 12, 2005, Verizon's Vice President sent an e-mail to all domestic telecom management employees addressing the telecommuting provision of the Flexible Work Arrangements policy, and reminded all employees to report to their assigned work location five days per week. (Def. Stmt. ¶ 197.) Plaintiff believes this policy was only enforced as it related to her, and not other Verizon employees. (Pl. Aff. ¶¶ 112-113; Pl. Ex. S (Gaglione

22

Decl.) ¶ 30.)

Shortly thereafter, Plaintiff commenced disability leave due to the stress and anxiety resulting from Verizon's disparate, discriminatory, and retaliatory treatment. She reported her symptoms to psychiatric care provider Dr. Maria Nickolova, who represented to Verizon that Plaintiff  was unable to function, was fatigued, had difficulty concentrating, and had a high level of anxiety. Plaintiff's disability leave lasted from August, 2005, to March, 2006. During that time, Plaintiff completed 21 credits at Medaille College toward a bachelor's degree in business, earning high marks, took and passed a DANTES test, and also volunteered at her daughter's school and at a nursing home. According to Plaintiff, these activities helped her to alleviate the stress and anxiety caused by the hostile work environment at Verizon. (Def. Stmt. ¶¶ 198-211; Pl. Ex. RR, SS (Nicokolva Depo.) at 24, 38-43, Ex. TT.)

Meanwhile, in early February, 2006,  Plaintiff spoke with Christopher Gaglione, who advised her that as part of a restructuring related to Verizon's merger with MCI, her work location would be moving to either Buffalo or Amherst, New York. Plaintiff was also informed that she would no longer be reporting to Bob Dixon or Mark Van Hoesen, and she had her choice between the downtown Buffalo or the Amherst offices. That month, Plaintiff told Dr. Nickolova that she began to feel better, and advised her psychiatrist that she was ready to return to work.  Dr. Nickolova was satisfied that Plaintiff would be able to return to work, and Plaintiff returned to Verizon from disability leave in March, 2006.  (Def. Stmt. ¶¶ 211-212, 214; Pl. Aff. ¶ 121;Pl. Ex. SS (Nickolova Depo.) at 53-54.)

During Plaintiff's disability leave, Verizon paid Plaintiff 100 percent of her salary, plus incentive pay based on the assumption that she would have achieved 100 percent

attainment of her team sales goal had she been working. (Def. Stmt. ¶¶ 219-220.)

Upon her return to work, Plaintiff's supervisor was Sales Engineer Manager Mark Witte, and she no longer reported to Christopher Gaglione. Plaintiff elected to work out of the downtown Buffalo office, as she had learned that Bob Dixon and Daniel Irving were working from Verizon's Amherst location. (Def. Stmt. ¶ 221; Pl. Aff. ¶¶ 124-126.) Witte had previously worked for MCI, and had not met Plaintiff prior to becoming her supervisor. Witte was advised by Plaintiff upon her return to work that she did not want to interact with Dixon or Irving. (Def. Stmt. ¶¶ 222-223.) Witte then discussed Plaintiff's concerns with Dixon, who responded that he would try to limit his interaction with Plaintiff so as to not make her or others in the office uncomfortable. (Def. Stmt. ¶ 224.)

Initially, Plaintiff was permitted to work out of the office in downtown Buffalo. After five months, Mark Witte directed Plaintiff to report to the Amherst office for work, largely because he wanted her in the same location as the sales team that she supported. (Def. Stmt. ¶¶ 225-226.) However, Plaintiff contends that she was initially given a choice of work locations, and that she selected the downtown Buffalo office. (Pl. Aff. ¶ 124.) Plaintiff also believes that Witte's request for her to report to the Amherst location was to separate her from the employees at the downtown office, and that Witte purposefully placed Plaintiff in close physical proximity to Bob Dixon and Daniel Irving, knowing of Plaintiff's retaliation and discrimination allegations against them. (Pl. Aff. ¶¶ 125-126.)

In order to avoid interaction with the two men, Plaintiff states that she requested permission from Mark Witte to sit in his office in Amherst when he was not there. Witte denied Plaintiff's request after consulting with the human resources department. Further, no other employees were permitted by Witte to use his office, except in isolated

24

circumstances. (Def. Stmt. ¶¶ 227.) Plaintiff contends that she requested to use Witte's office due to a recurrence of symptoms of emotional distress, brought on by her coming in contact with Dixon and Irving. (Pl. Aff. ¶¶ 125-126; Pl. Ex. TT.)

Plaintiff contends that Bob Dixon assigned products within her product speciality to another Sales Engineer, Greg Shelton. Verizon states that Dixon left his job as Branch Sales Engineering Manager and became a Regional Sales Manager prior to Plaintiff's return from disability leave, and thus no longer had control or decision-making over Plaintiff. (Def. Stmt. ¶ 229.) Plaintiff avers, however, that Dixon handled special accounts, such as the National Fuel Gas account, and that she was required to work with Dixon on such accounts. Dixon then assigned Greg Shelton, a Syracuse-based Sales Engineer, to work on the National Fuel account, to assist Dixon with services that were part of Plaintiff's product specialty. By removing Plaintiff from the National Fuel account, Dixon made it more difficult for her to achieve her personal objective. (Pl. Aff. ¶ 127.) Plaintiff further contends that Shelton had accounts in Buffalo, but was permitted to report to the Syracuse office, and was not required to work at the Buffalo office. Shelton worked on accounts in Syracuse as well, and Mark Witte wanted his reporting location to be primarily in Syracuse. (Def. Stmt. ¶ 230.)

While supervising Plaintiff, Mark Witte at one point set a goal for Plaintiff to add ten new customer relationships by the end of the year. A male Sales Engineer was given the same requirement, the purpose of which was to expand each employee's exposure to customers. (Def. Stmt. ¶ 231.) Plaintiff states that Sales Engineers have never been required to solicit new customers, nor was it part of their job duties. CAMs on the other hand, were responsible for soliciting new business on the part of Verizon. Further, having

been a Sales Engineer for the nine previous years, she never lacked exposure to Verizon's customers, and no other Sales Engineer (with one exception) was required to add 10 new accounts by the end of the year. Christopher Gaglione, in Syracuse, was also not instructed to require his Sales Engineers to add new accounts to their modules. (Pl. Aff. ¶ 128; Pl. Ex. S (Gaglione Decl.) ¶ 36.)

In October, 2006, Mark Witte approved Plaintiff's participation in training in Atlanta, Georgia, for CISCO Boot Camp. The cost of the training, including travel expenses, was $1,830.64, but Plaintiff failed to complete the necessary requirements for CISCO certification. (Def. Stmt. ¶ 232.) Plaintiff contends that she was required to participate in the training, that she did not request the assignment and the CISCO certification, nor was it ever a requirement for Sales Engineer to have. Further, Greg Shelton attended a similar training and also failed to obtain his CISCO certification. (Pl. Aff. ¶ 129.)

In early 2007, Mark Witte was notified that Verizon Business was engaging in a Reduction in Force that would impact the Sales Engineer ranks. He was told the number of Sales Engineers in his work group would be reduced by one. (Def. Stmt. ¶ 233.)  In determining which employees' positions would be eliminated, Verizon considered its business needs and skill set, capabilities, job performance, and results of individual employees. (Def. Stmt.¶ 234.)  Plaintiff states that Verizon did not maintain any type of employee ranking or rating for the purpose of identifying which employees would be terminated in the 2007 Reduction in Force, and that Verizon had already begun to set up Plaintiff for termination by creating unattainable goals and re-assigning her accounts to other Sales Engineers. (Pl. Aff. ¶¶ 127-128, 133.)

Within Mark Witte's group, Plaintiff was selected because her skill set was

unsophisticated, largely focused on traditional telephone services, and her capabilities, job performance, and results trailed those of the other Sales Engineers in her group. (Def. Stmt. ¶ 235.) Plaintiff contends that male Sales Engineer Shelton possessed the same unsophisticated skill set and also failed to obtain CISCO certification, like Plaintiff. Furthermore, in 2006 and 2007, Plaintiff had received positive feedback regarding her performance with regard to an account with M&T Bank, by individuals within and without Verizon. (Pl. Aff. ¶¶ 132-133.)

On February 9, 2007, Witte met with Plaintiff and informed her that Verizon was conducting a Reduction in Force, and her position was among approximately 155 that would be eliminated as of March 9, 2007. HR Manager Linda Shinomoto participated in the meeting by telephone. (Def. Stmt. ¶ 236.) Thereafter, on March 9, 2007, 155 positions were eliminated from Verizon, impacting twice as many men as women. (Def. Stmt. ¶ 237.) Plaintiff maintains that her termination was discriminatory and retaliatory. (Pl. Ex. S (Gaglione Decl.) ¶¶ 38-39.)

Witte never discussed the Reduction in Force with Bob Dixon, Christopher Gaglione, or Mark Van Hoesen–none of whom were involved in the decision to eliminate Plaintiff's position. (Def. Stmt. ¶ 238.) Witte did speak with Gaglione after Plaintiff's termination, indicating that he was "proud" to be able to terminate her. (Pl. Ex. S (Gaglione Decl.) ¶¶ 38-39.) Plaintiff refutes Verizon's assertion that it did not consider Plaintiff's gender or pending lawsuit or related complaints, claims, or charges in deciding to eliminate her position in the Reduction in Force. (Def. Stmt. ¶ 239.)

On April 27, 2007, two months after Plaintiff was notified that she had been selected for termination as part of the Reduction in Force, Verizon's counsel deposed Plaintiff's

psychiatrist, Dr. Nickolova, who confirmed that Plaintiff represented to her that Plaintiff was incapacitated during the time she attended college full-time in an accelerated program at Medaille College. Accordingly, had Plaintiff not been among the 155 employees selected for the Reduction in Force, she would have been subsequently terminated for cause on the basis of disability fraud. (Def. Stmt. ¶¶ 240-241.) Plaintiff states that she did not represent that she was incapacitated, nor did she attend college full-time during her disability leave. Rather, she claims that she told Dr. Nickolova and her counselor that her position with Verizon was a stressor in her life, and that she suffered an inability to function, fatigue, difficulty in concentration, lack of motivation, a decrease in activities of daily living, anxiety, decreased appetite and energy, poor sleep, tremors, sweats, and tachycardia. As a result of these symptoms, Plaintiff was diagnosed with generalized anxiety disorder and depressive disorder, and she was removed from work as a result of those diagnoses. Moreover, Plaintiff enrolled in a college program at Medaille College designed for full-time employed individuals, which was comprised of one full course per month with classroom sessions once per week, and that she commenced this program before she was removed from work due to her disability. Both Dr. Nickolova and Plaintiff's counselor knew of Plaintiff's coursework and encouraged her to participate in the program. (Pl. Aff. ¶ 118.)

## B.    Procedural History

Plaintiff filed her Amended Complaint on April 17, 2008 (Docket No. 57) alleging that Verizon underpaid her because she is female, delayed her 2003 promotion, unlawfully terminated her as part of a Reduction in Force, and generally subjected her to unfair and unequal treatment because she is female and/or because of her EEOC activity.

Earlier in this litigation, Verizon moved to dismiss Plaintiff's original complaint, which

this Court granted in part on September 29, 2005. (Docket No. 13.) That Decision and Order limited Plaintiff's Title VII disparate treatment and retaliation claims to discrete events that occurred on or after November 23, 2002, and limited her NYSHRL disparate treatment and retaliation claims to events that occurred on or after October 5, 2001. This Court also determined that the controlling statute of limitations restricted her EPA claims, at a minimum, to pay periods on or after October 5, 2001.

Thus, the remaining claims before this Court are Plaintiff's Title VII claims of disparate treatment and retaliation relating to events occurring on or after November 23, 2002; state law claims of disparate treatment and retaliation relating to events occurring on or after October 5, 2001; and her EPA claim limited to events on or after October 5, 2001. Verizon has filed a Motion for Summary Judgment seeking dismissal of the remaining claims in the Complaint. (Docket No. 101.)

## III. DISCUSSION

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.*  "An alleged factual dispute regarding immaterial or minor facts between the parties will

not defeat an otherwise properly supported motion for summary judgment." Powell v. National Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (citation omitted). In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party. Weinstock v. Columbia Univ., 224 F.3d 33, 40 (2d Cir. 2000).

The Second Circuit has noted that trial courts should be particularly cautious in deciding whether to grant summary judgment in employment discrimination cases, because the employer's intent is often at issue. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). However, the Supreme Court more recently has "reiterated that trial courts should not 'treat discrimination differently from other ultimate questions of fact.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993)). In other words, summary judgment can be appropriate even in the fact-intensive context of discrimination cases. This is consistent with a principle purpose of the summary judgment rule; "to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

## B.    Disparate Treatment and Retaliation

Plaintiff contends that she was discriminated against in her employment in Verizon's Enterprise Solutions Group because of her gender and that after she made various complaints, she was subjected to treatment that constituted further acts of discrimination and retaliation. Verizon seeks summary judgment as to each alleged incident of discrimination and/or retaliation.

Under Title VII and NYSHRL, it is unlawful for an employer to discriminate against an individual in compensation or in terms, conditions or privileges of employment because

of that individual's sex. In evaluating claims of sex discrimination, this Court applies the burden shifting analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-804 (1973) and <u>Texas Dep't of Comt'y Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).[5]  To make out a <u>prima facie</u> case of discrimination, Plaintiff must show that (1) she is a member of a protected class, (2) she is qualified for her position, (3) she suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination.  <u>Weinstock</u>, 224 F.3d at 42 (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).  The burden Plaintiff carries at the <u>prima facie</u> stage of summary judgment is minimal. <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000). In fact, no evidence of discrimination is required.  <u>James v. New York Racing Ass'n</u>, 233 F.3d 149, 153 (2d Cir. 2000).

If Plaintiff meets her initial burden to establish a <u>prima facie</u> case, a rebuttable presumption of discrimination arises and the burden then shifts to Verizon to articulate a legitimate, non-discriminatory reason for the challenged employment action. <u>Burdine</u>, 450 U.S. at 254.  If Verizon succeeds in making its showing, "the presumption of discrimination arising with the establishment of the <u>prima facie</u> case drops from the picture." <u>Weinstock</u>, 224 F.3d at 42 (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 510-11 (1993)).

The burden then shifts back to Plaintiff to produce "evidence that [Verizon's] proffered, non-discriminatory reason is a mere pretext for actual discrimination." <u>Weinstock</u>, 224 F.3d at 42. "In short, the question becomes whether the evidence, taken

---

[5] When considering claims brought under NYSHRL, this Court employs the same analysis it uses for Title VII claims.  <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 565 n.1 (2d Cir. 2000).

as a whole, supports a sufficient rational inference of discrimination." Id. However, "evidence contradicting the employer's given reason—without more—does not necessarily give logical support to an inference of discrimination." James, 233 F.3d at 154. Put simply, "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." Id. at 156 (quoting St. Mary's, 509 U.S. at 519).

It is also unlawful, under both Title VII and the NYSHRL, to discriminate against an employee because that individual has opposed any practice forbidden under those statutes or filed an administrative complaint thereunder. 42 U.S.C. § 2000e-3(a); N.Y. EXEC. LAW § 296(1)(e). The allocation of burdens of proof in retaliation claims parallels that of discrimination claims. Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (citations omitted). However, the elements of a prima facie case differ somewhat. To prevail on her retaliation claims, Plaintiff must show that (1) she was engaged in a protected activity, (2) Verizon was aware of her participation in this activity, (3) Verizon took an action against her that was so materially adverse a reasonable employee would have been dissuaded from engaging in protected activity, and (4) there is a causal relationship between the protected activity and the adverse action—that is, a retaliatory motive played a part in the action. Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53 (2006); Treglia v. Town of Malius, 313 F.3d 713, 719 (2d Cir. 2002). Where there is no direct evidence of a causal relationship, a plaintiff may show a causal relationship by showing temporal proximity–that the retaliatory activity took place soon after the plaintiff engaged in protected activity. See Cifra v. GE, 252 F.3d 205, 217 (2d Cir. 2001).

1.    **Delayed Promotion**

Plaintiff contends that she was entitled to a promotion as early as Spring, 2001, from

the position of Sales Engineer I to Sales Engineer II, but was not promoted until August,

2003. (Am. Compl. ¶¶ 27-29; Def. Stmt. ¶ 122.) Specifically, she argues that she asked her

supervisor, Daniel Irving, in summer of 2001 to put her through the promotion assessment

process. At that time, Irving informed Plaintiff that there was a freeze in place. However,

it was announced during an October 2002 branch meeting that two male Sales Engineers,

Mark Connor and Sean Brown, who worked in the Albany office, had been promoted,

although she did not know when or why they were promoted. (Def. Stmt. ¶ 106.) Plaintiff

asked Irving if the freeze had been lifted, and he responded that he did not know. (Id.)

To demonstrate a prima facie case of failure to promote, a plaintiff must show that

(1) she is a member of a protected class, (2) she applied and was qualified for a job for

which the employer was seeking applicants, (3) she was rejected for the position, and (4)

the position remained open and the employer continued to seek applicants having the

plaintiff's qualifications.  Petrosino v. Bell Atl., 385 F.3d 210, 226 (2d Cir. 2004) (quoting

Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir. 1998) (quoting McDonnell

Douglas, 411 U.S. at 802)).

Verizon argues that Plaintiff does not establish a prima facie case of failure to

promote because Mark Connor and Sean Brown were both subject to lengthy delays in

promotion as well, and they reported to a different manager in a different Verizon office,

therefore the circumstances do not give rise to an inference of discrimination. (Def. Mem.

at 14-16.)

Here, Plaintiff repeatedly indicated her interest in a promotion to Sales Engineer II

between April, 2001 and October, 2002, and was told that Sales Engineer promotions were frozen. Plaintiff has submitted evidence that she was qualified for advancement to the next level within her job title. Further, Verizon does not dispute that Connor and Brown were promoted in the Albany office during that time period. See Velez v. Project Renewal, No. 02 Civ. 3084, 2003 WL 402500, at * 3 (S.D.N.Y. Feb. 20, 2003) ("courts have found an inference of discriminatory intent where employees not in plaintiff's protected group are treated more favorably"). The record is unclear as to when the freeze on promotions ended and whether Daniel Irving had knowledge that it had or had not ended. While Connor and Brown waited two years for their promotions, they were nonetheless promoted during the time frame in which assessments were allegedly frozen. Additionally, Plaintiff and another female co-worker received their promotions only after they began to report to a new supervisor, nearly a year after the two male Sales Engineers were advanced. Also supporting the inference of discrimination is Gaglione's declaration, which indicates that Plaintiff's promotion was unjustifiably delayed. Although Verizon is correct in arguing that Plaintiff has not set forth a retaliation claim because she has failed to causally link the delayed promotion to her protected activity, see Byrne v. Telesector Resrouces Grp., No. 04-CV-076, 2007 WL 962929, at *11 (W.D.N.Y. March 27, 2007), aff'd, 339 Fed. Appx. 13 (2d Cir. 2009), it is this Court's view that Plaintiff has established a prima facie case of promotion discrimination.

Further, Verizon doesn't specifically offer a legitimate nondiscriminatory reason for its decision not to promote Plaintiff. Verizon does not explain why the Sales Engineers in Albany were promoted, nor is there any evidence in the record that there was a need to promote individuals in that office in 2002 despite the purported freeze**.** The record simply

indicates that Plaintiff was advised that there was a freeze on promotions in place, and that the only individuals advanced during that time were men.

Because Verizon has not provided a legitimate, non-discriminatory reason for promoting the two male Sales Engineers, its motion for summary judgment on Plaintiff's delayed promotion claim is denied.

### 2.    Job Transfer to Syracuse

Plaintiff contends that Verizon's decision to relocate her position, along with the positions of three other individuals, to the Syracuse office in December 2004 was discriminatory and retaliatory. (Am. Compl. ¶¶ 65-71.)

Verizon argues that there is no inference of gender bias present because the transfer impacted two males, and because she cannot causally connect the business decision to any protected activity. (Def. Mem. at 16-19.)

Plaintiff was told on December 3, 2004, that her job and three others would be transferred from the Buffalo office to the Syracuse office under a restructuring plan, approximately one month after Plaintiff commenced legal action against Verizon for acts of discrimination and retaliation. In July, 2004, Verizon had received a copy of Plaintiff's "right to sue" letter from the EEOC, stemming from a charge of discrimination filed against Verizon.

Plaintiff has met the first two elements in establishing a <u>prima facie</u> case of retaliation. With respect to the third element, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N.</u>, 548 U.S. at 67-68 (internal quotations omitted). In

speaking of "material adversity" Supreme Court in <u>Burlington N.</u> emphasized separating "significant from trivial harms." <u>Id.</u> at 68. Engaging in statutorily protected activity does not mean the employee is "immunize[d] ... from those petty slights or minor annoyances that often take place at work and that all employees experience." <u>Rochan v. Gonzales</u>, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (internal quotation marks omitted). Thus, "context matters ... [and] 'an act that would be immaterial in some situations is material in others.'" <u>Burlington N.</u>, 548 U.S. at 69 (quoting <u>Washington v. Ill. Dep't of Rev.</u>, 420 F.3d 658, 661 (7th Cir. 2005)).

Here, Plaintiff was subject to a lateral transfer, retaining her job title and performing the same duties as she did in the Buffalo office. Further, Plaintiff was given a choice of three options, and elected to relocate to Syracuse in lieu of accepting a severance package or transferring to a different job within the company and remaining in Buffalo. Despite being advised that Christopher Gaglione had discontinued work from home for all employees, Plaintiff requested a full-time Flexible Work Arrangement in February, 2005, indicating that commuting to Syracuse would present a hardship for her.  Although that request was denied, Gaglione nonetheless permitted both Plaintiff and Michael Chase, a male Sales Engineer, to telecommute on a frequent basis from March to August, 2005. After being told by her supervisors that she was required to work at her desk in Syracuse regularly, Plaintiff commenced a leave of absence on August 30, 2005 through March, 2006, when she was re-assigned to a Buffalo work location. Because Plaintiff regularly worked from home during the first six months of her assignment in Syracuse and was on disability leave for another seven months and did not report to Syracuse during that time, she was not negatively impacted by the transfer.  Further, Plaintiff was presented with several options

36

and chose to relocate knowing that the reporting location would be distant from her home in Buffalo. Plaintiff only made it known that the relocation would be a hardship after she had agreed to take the position in Syracuse. The transfer, under these circumstances, cannot be said to be the type of activity that might well dissuade a reasonable employee from engaging in protected conduct, but rather an undesirable consequence resulting from Plaintiff's choice to remain in her current position. See generally, Burlington N., 548 U.S. at 68 (law protects individual "from retaliation that produces an injury or harm.")[6]

Further, Plaintiff has not shown that the restructuring plan was linked to her discrimination complaints. Assuming Verizon was aware of Plaintiff's amended discrimination charge, service of that charge occurred at least six months prior to the restructuring plan. Verizon was served with her federal lawsuit two months prior. It is true that the Second Circuit has not established a bright line rule to define the outer limits of a temporal relationship. However, "many courts in this circuit have held that periods of two months or more defeat an inference of causation." Ragin v. East Ramapo Cent. School Dist., No. 05 Civ. 6496,  2010 WL 1326779, at *24 (S.D.N.Y. March 31, 2010) (collecting cases). Even if this Court were to find the period of two to six months temporally proximate, which it does not, see, e.g., Garrett v. Garden City Hotel, Inc., No. 05 Civ. 0962, 2007 WL 1174891, at *21 (E.D.N.Y.  Apr. 19, 2007) ("[D]istrict courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the

---

[6] It is for this reason that Plaintiff cannot show that she was subject to an adverse *employment* action so as to establish a prima facie case of discrimination. See Galabya v. New York City Bd. of Education, 202 F.3d 636, 640 (2d Cir.2000) (Examples of adverse actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.").

adverse employment action does not allow for an inference of causation."), Plaintiff received favorable treatment by Verizon during the intervening time period. Her satisfactory performance evaluation, a 3.54 percent salary increase, permission to work from home during the summer of 2004, and being notified of a potential career advancement opportunity relating to a major account serve to break chain of causation. Under these circumstances, this Court finds that Plaintiff has not established a prima facie case of retaliation on the basis of her job transfer.

Assuming, arguendo, Plaintiff met her evidentiary burden under McDonnell, Verizon has articulated a non-discriminatory reason for its decision to relocate the Sales Engineer positions to Syracuse.

Verizon states that in the Fall of 2004, CAMs in Buffalo and Rochester complained to Branch Sales Engineering Manager, Robert Dixon, that the Buffalo Sales Engineers were difficult to reach and not responsive to requests.  (Def. Appx., Tab 46 ("Dixon Decl.") ¶ 4, Tab 50 (Dixon Depo.) at 395-396.)  Dixon also had received complaints about five Sales Engineers working in Verizon's Providence, Rhode Island office. (Def. Appx., Tab 46, (Dixon Decl.) ¶ 5.)  At that time, neither the Buffalo nor the Rhode Island Sales Engineers had an on-site Sales Engineering Manager. Christopher Gaglione, who was based in Syracuse, supervised both the Buffalo and Syracuse-based Sales Engineers, while the Rhode Island workers reported to a manager based in Valhalla, New York.  (Id. ¶ 6.)

To address the concerns raised, Dixon proposed to his supervisor that an on-site manager be hired to supervise the Providence Sales Engineers, and that the three Buffalo Sales Engineers be moved to Syracuse, where Gaglione was located.  (Id. ¶ 7.) Dixon and

his supervisor, Mark Van Hoesen, considered the hiring of an additional manager for Buffalo, but rejected that option in light of the small number of Sales Engineers working there.  (Id. ¶ 8.)  This Court finds that Verizon has sufficiently articulated a non-retaliatory business reason for its restructuring decision.

At her deposition, Plaintiff stated that she and her colleagues were advised the Sales Engineer functions were being moved to Syracuse for business reasons, and that Sales Engineers would not be able to work from home full time. Plaintiff stated that she was not involved in the decision to relocate the Sales Engineers to Syracuse. (Def. Appx., Tab 1 (Pl. Depo.) at 249-250.)   Additionally, the restructuring impacted four total employees, and Plaintiff was not singled out for transfer. Citing to Gaglione's Declaration, Plaintiff suggests that the primary factor for her Syracuse transfer and Verizon's refusal to allow Plaintiff to work from home was an effort to retaliate against her for her EEOC activity. (Pl. Mem. at 15; Pl. Ex. S (Gaglione Decl.) ¶ 14.) This Court must disregard Gaglione's statement, however, because it contradicts his prior deposition testimony. See Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ( "factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony"). For example, when asked whether Bob Dixon decided to relocate Plaintiff and Byrne to Syracuse because he knew it would be a hardship for them, Gaglione responded, "that's not true." (Def. Appx., Tab 66 (Gaglione Depo.) at 282-283). Likewise, with regard to the decision to centralize the Sales Engineers in one office, Gaglione previously testified:

We were having some issues [in Buffalo], some complaints

39

> from [CAMs] . . . . [I]t was brought to my attention that in Providence, Rhode Island we were having similar issues with regard to getting the [Sales Engineers] engaged and getting the best economy of sales with the breadth and depth of our pdocut line. And a suggestion was made . . . that a possibility would be to centralize the SE resources for a particular . . . territory and thereby creating an environment that would foster the idea of being a rising tide would raise all boats . . . . [L]ike nine or ten people under one roof would be more accessible and more powerful than the separateness that was created by having like four or three SE's in Buffalo and six or eight in Syracuse . . . . So Bob [Dixon] suggested doing that across our footprint and I think that it's a good idea and I think it's working very well.

(Id.)

In light of the evidence submitted by Verizon, Plaintiff cannot create a material issue of fact by simply contradicting Verizon's legitimate, non-discriminatory explanation to show pretext. See James, 233 F.3d at 154.

For all of these reasons, summary judgment is warranted with respect to Plaintiff's allegation of a retaliatory job transfer.

### 3.    Removal from University at Buffalo Account

Plaintiff contends that she suffered actionable job retaliation when she was removed in August, 2004, from the University at Buffalo account after complaining to her managers about CAM Brogan's conduct, specifically, her belief that Brogan impermissibly back-dated a sales contract and waived certain charges. (Am. Compl. ¶ 63.) Verizon argues that she does not show that she was engaged in a protected activity, but rather alleges that she was adversely impacted when she complained about Brogan's sales ethics. (Def. Reply Mem. at 3-4; Pl. Aff. ¶¶ 89-93.)This Court agrees that Plaintiff has not set forth a prima facie case of retaliation, because Title VII does not protect employees from retaliation for opposing misbehavior by co-workers that is unrelated to discrimination against a protected class

40

member. See Santucci v. Veneman, No. 01–CV–6644, 2002 WL 31255115, at *4 (S.D.N.Y. Oct.8, 2002) (granting motion to dismiss where plaintiff "objected to the assignment/rotation system because of its relationship to an allegedly corrupt system of payoffs—not because defendant discriminated on the basis of race, color, religion, sex or national origin" (internal citation and quotation marks omitted)); Manatu v. Bowery Residents Comm., No. 99–CV–722, 2000 WL 1159330, at *2 (E.D.N.Y. Aug. 11, 2000) (finding that the plaintiff failed to show that she engaged in protected activity when she "allege[d] that she was retaliated against [for][ ] report[ing] mismanagement ... to state auditors" because "Title VII does not protect whistleblowers who complain about mismanagement"); Harper v. Hunter Coll., No. 95–CV–10388, 1999 WL 147698, at *l, *3 (S.D.N.Y. Mar. 15, 1999) (dismissing retaliation claim based on the plaintiff's reporting unsafe conditions).

Because Plaintiff has not stated a prima facie case of retaliation, summary judgment is appropriate in Verizon's favor with regard to this claim.

### 4. Placement on Counseling Plan

Plaintiff argues that in March, 2002, Daniel Irving's placement of her on a counseling plan was an act of discrimination or in retaliation for rebuking Irving's sexual advances. (Am. Compl. ¶¶ 32, 34.)[7]

Plaintiff was placed in a counseling session on March 12, 2002, following a complaint that Plaintiff had been unresponsive to a Verizon business office representative who had a question on behalf of a client regarding a post-sale inquiry. Additionally, her

---

[7] The counseling plan pre-dates Plaintiff's EEOC charge of discrimination by over one year and therefore her claim of retaliation does not warrant discussion here.

manager perceived that a January 2002 RFP submitted to Rochester City School District was below her capabilities.

On the outset, Verizon argues that Plaintiff's placement on a counseling plan does not constitute an adverse employment action for purposes of a Title VII discrimination claim. It is true that district courts in this Circuit have held that the issuance of a performance improvement plan and the recommendation that a plaintiff attend counseling sessions do not constitute adverse employment actions. See Waters v. General Bd. of Global Ministries, 769 F.Supp.2d 545 (S.D.N.Y. 2011); Robins v. New York City Bd. of Educ., No. 07 Civ. 3599, 2010 WL 2507047, at *7 (S.D.N.Y. June 21, 2010); Altieri v. Albany Pub. Library, No. 05-CV-126, 2005 WL 1388905, *3 (N.D.N.Y. June 8, 2005). "To be adverse, an employment action must involve the deprivation of some tangible job benefits such as compensation, terms, conditions or privileges of employment." Murphy v. Bd. of Educ. of the Rochester City Sch. Dist., 273 F.Supp.2d 292, 304 (W.D.N.Y. 2003) (citations and quotations omitted). Although Plaintiff contends that the counseling plan remained in her personnel file and was "able to be used by [Verizon] to supplement any discipline that it wished to impose on her," (Pl. Mem. at 18), Plaintiff has not established that she suffered any cognizable harm from being placed on the counseling plan. See Cramer v. Fedco Automotive Components Co., Inc., No. 01-CV-757, 2005 WL 839671, at *10 (W.D.N.Y. Apr. 12, 2005.) (plaintiff's claim of negative performance evaluation did not rise to the level of adverse employment action because there was no attendant negative result, such as a demotion, suspension or loss of wages). To the contrary, after two months, Plaintiff showed improvement and was removed from the counseling plan. She then received a satisfactory performance evaluation on March 31, 2002 and also received

a salary increase at that time, followed by subsequent positive evaluations and salary increases. From 2002 to 2003, Plaintiff's base salary increased 24.7 percent. Thus, the action Plaintiff complains of cannot be said to be materially adverse for purposes of a Title VII discrimination claim.

Finally, the circumstances of the counseling plan do not give rise to an inference of discrimination. Although she urges the Court to find that two of her male co-workers were treated more favorably than her in that they were not placed on counseling plans for the same conduct, i.e., submitting deficient RFPs, Plaintiff produces little evidence in support of this contention. Indeed, at Plaintiff's deposition, she indicated that David Winley reported to a different supervisor at that time (Christopher Gaglione), and that she was not aware whether Winley was disciplined or not. (Def. Appx., Tab 64.) Likewise, she proffers no evidence that Kevin Dean failed to complete an RFP, or that he was or was not reprimanded for doing so.

Accordingly, Plaintiff fails to satisfy the third and fourth elements for establishing a prima facie case of discrimination under the McDonnell Douglas framework, and therefore fails to satisfy her evidentiary burden with regard to this claim. Accordingly, Verizon is entitled to summary judgment on the claim that she was discriminatorily placed on a counseling plan.

### 5. Termination

Plaintiff alleges that Verizon retaliated against her when it terminated her in February, 2007, as part of a Reduction in Force. (Am. Compl. ¶¶ 98-99, Pl. Mem. at 22.)

Plaintiff fails to establish a prima facie case of retaliation.[8] She does not provide any direct evidence of a causal relationship, and her termination took place three years after the commencement of her lawsuit and four years after her initial charge of discrimination with the EEOC, which is too long of a period of time to show temporal proximity.

Assuming Plaintiff met her de minimus burden, Verizon has provided a legitimate, non-discriminatory reason for her termination. Further, according to Verizon, Plaintiff was selected for termination because he perceived her skill set to be the least sophisticated of those in her work group, and her capabilities and job performance trailed behind her peers. See Chuang v. T.W. Wang Inc., 647 F.Supp.2d 221 (E.D.N.Y. 2009) (finding plaintiff's layoff as part of a reduction in force legitimate, non-discriminatory, and non-pretextual, where plaintiff had conflict with supervisor and possessed a less diverse skill set than the employee that remained on staff).

Plaintiff contends that Verizon's proffered reason is pretextual for unlawful retaliation, yet she has not put forward any admissible evidence other than her own affidavit that her performance was adequate. However, her own subjective opinions or beliefs are insufficient to survive summary judgment. See Valentine v. Standard & Poor's, 50 F.Supp.2d 262, 283 (S.D.N.Y. 1999) ("[a] plaintiff cannot sustain an action based on . . . conclusory allegations of discrimination.") Although Plaintiff may disagree with Verizon's assessment of her performance and the decision to select her as the sole Sales Engineer for termination in her group, this does not show pretext. It is well-settled that a court "does

---

[8] Plaintiff did not argue in her brief that she was terminated on the basis of gender discrimination, and appears to have abandoned this claim. (Pl. Mem. at 22-23.)

not sit as a super-personnel department" to review employers' decisions. Martin v. MTA

Bridges & Tunnels, 610 F.Supp.2d 238, 251 (S.D.N.Y. 2009).  As such, Verizon is entitled

to summary judgment on Plaintiff's claim that her termination was retaliatory.

**6.    Remaining Claims**

The following claims, which involve Verizon's routine management decisions,

warrant minimal discussion as she has failed to establish a prima facie case of

discrimination and/or retaliation in each instance.

**a.    Sales Manipulation**

Plaintiff complains that she suffered discrimination in connection with two instances

in which she believes that sales were improperly credited to a male co-worker. (Am. Compl.

¶¶ 43-44.) In particular, Plaintiff claims that her manager, Daniel Irving, said in 2002 that

he was going to manipulate a Buffalo Board of Education Sale in order to have Kevin Dean

receive credit for it as a means for helping Dean reach his sales objectives. (Id.) However,

Plaintiff later admitted at her deposition that the sale was not manipulated and Dean was

not given credit for the sale. (Def. Stmt. ¶ 95; Def. Appx., Tab 1 at 187-190.)

Plaintiff also states in her Amended Complaint that she was denied credit for an

$8.5 million sale improperly attributed to David Winley. The sale, posted in 2002,  was

completed in December, 2001 by her co-worker Anne Byrne. Plaintiff later acknowledged

in her deposition, however, that she did receive credit for that sale, because her incentive

compensation was based on a team goal. She maintains, however, that the timing of the

sale credit negatively affected her incentive compensation for 2001, as well as the

incentive compensation for Sales Engineers Tom Spencer, Anne Byrne, CAM Jim Keller,

her manager Daniel Irving, and Regional Sales Manger Michael McGowan. (Pl. Aff. ¶ 66.)

45

By her own admission, the alleged late-posting of the sale adversely impacted the incentive compensation for her male colleagues as well. There can therefore be no inference of discrimination where employees within a protected class are treated the same as other employees. See Bernard v. JP Morgan Chase Bank NA, 408 Fed.Appx. 465, 468-69 (2d Cir. 2011) (unpublished opinion).

   **b. Change in Job Duties**

  Next, Plaintiff alleges that, prior to November, 2003, the requirement for her to act as the single point of contact for certain customers was discriminatory in nature because Kevin Dean and David Winley were not subject to the same requirement. (Am Compl. ¶ 55.) She admits, however, that during 2002, male Sales Engineer Tom Spencer was assigned to be a single point of contact on certain accounts, only Winley and Dean were not, who held higher-level designations than Plaintiff and Spencer within the group of Sales Engineers. (Pl. Aff. ¶¶ 82-83.) Thus, Plaintiff cannot demonstrate that her similarly situated male co-workers were treated more favorably than her, and thus there can be no inference of discrimination here.

  Plaintiff also complains that in 2006, Plaintiff's supervisor, Mark Witte, required her to add ten new contacts to her module, where Sales Engineers had never before been required to solicit new accounts. (Am. Compl. ¶ 92; Pl. Mem. 20.) Witte, however, imposed the same requirement on Plaintiff's male colleague, Gregg Maragliano, (Def. Stmt. ¶ 231), and for that reason she fails to show an inference of discrimination. See, e.g., DeMars v. O'Flynn, 287 F.Supp.2d 230 (W.D.N.Y. 2003) (plaintiff failed to show that an employment action took place under circumstances giving rise to an inference of discrimination where male and female officers were treated the same with regard to their supervision and

assignments).

In any event, as Verizon points out, Plaintiff cannot establish that the requirements to serve as a point of contact or to add new contacts to her module were assignments "more disruptive than a mere inconvenience or an alteration of job responsibilities," and therefore do not rise to the level of actionable adverse employment actions. Galabya, 202 F.3d at 640; accord, e.g., Klein v. New York University, 786 F.Supp.2d 830 (S.D.N.Y. 2011) (university professor's dissatisfaction with course assignments is not adverse employment action where she did not allege any resulting loss in wages or material benefits.)

### c.    Job Re-assignments and Exclusion

Plaintiff contends that in 2006, Verizon assigned products within her area of specialty to other Sales Engineers and excluded her from account assignments and from sales appointments. Specifically, that in September, 2006, Bob Dixon assigned products within Plaintiff's product specialty to male sales Engineer, Greg Shelton, that Dixon excluded Plaintiff from being assigned to new accounts, and that in October through December of 2006, Dixon and unnamed CAMs excluded Plaintiff from sales appointments. (Am. Compl. ¶¶ 88, 92, 94.)

There is not much in the record to support or refute Plaintiff's allegation. Verizon contends that Dixon became a Regional Sales Manager supervising CAMs in October, 2005, and at that time no longer had control or decision-making authority over Plaintiff. (Def. Stmt. ¶ 229.) Plaintiff, however, avers that Dixon continued to handle special accounts, such as National Fuel and that she was required to work on those accounts with Dixon. According to Plaintiff, Dixon asked male Sales Engineer Greg Shelton to assist him with certain services on the National Fuel account–services that were part of Plaintiff's

47

product specialty. In removing Plaintiff from the National Fuel account, Dixon made it difficult for her to achieve her sales objectives.[9] (Pl. Aff. ¶ 127.) Yet she also admits that in March, 2006, she explained to Mark Witte that she did not wish to interact with Dixon, who responded that he would try to limit his interaction with her. (Id.) Even accepting Plaintiff's allegations as true, she cannot show that her exclusion from certain accounts and meetings happened under circumstances giving rise to an inference of discrimination, because Plaintiff herself requested that Bob Dixon limit his contact with her.

To the extent that Plaintiff seeks to argue that Dixon's actions were retaliatory, no such inference can be made in that the decisions to re-assign certain projects or exclude Plaintiff from meetings occurred two years after Plaintiff filed her federal lawsuit and three years after her initial EEOC charge of discrimination. See Young v. Daughters of Jacob Nursing Home, No. 09-CV-7475, 2011 WL 2714208, at *8 (S.D.N.Y. July 12, 2011) (period of time of three years between plaintiff's lawsuit and termination "far too long to support an inference of discrimination").

### d. Perquisites

Plaintiff argues that Verizon retaliated and or discriminated against her when she was not offered tickets to hockey games and not invited to participate in a charity golf outing. (Am. Compl. ¶¶ 54, 59.) Plaintiff appears to contend that these actions are materially adverse because she was not provided with the same opportunity to entertain Verizon's clients as the men in her office. She nonetheless fails to state a prima facie case, because she has acknowledged that the hockey tickets in question were season tickets

---

[9] Plaintiff also does not state that at any time she failed to meet her sales objectives.

purchased by Daniel Irving at his own expense, who sought out friends or co-workers to purchase tickets to the games he could not attend. Although there is no evidence, aside from Irving's own testimony, that he made the tickets available to everyone in the office, there is likewise no evidence that Plaintiff expressed an interest in purchasing the tickets at that time, that she was negatively impacted by not being offered the tickets, or that such an action would reasonably dissuade a reasonable employee from filing a charge of discrimination. (Def. Stmt. ¶¶ 127-131.)

With respect to the charity golf outing, Plaintiff does not argue that her exclusion from the event negatively impacted her.  She further admits that she did not ask to participate in the tournament, and that she does not know who participated on behalf of Verizon. (Def. Stmt. ¶¶ 148-151.) A male Sales Engineer in Buffalo, Michael Chase, was also not invited to the golf outing. (Id., ¶ 149.) There is therefore no inference of discrimination arising out of her alleged exclusion from the golf tournament, and Plaintiff's claim fails on this basis.

### e.   Work Location

On several occasions, Verizon denied Plaintiff's various requests for alternative work locations, including requests to telecommute, but permitted her male co-workers to work from their desired locations.  (Am. Compl. ¶¶ 16, 32, 38, 60, 72, 73, 81.)

It is well-settled that an adverse employment action is a "materially adverse change in the terms and conditions of employment," and it is "more disruptive than a mere inconvenience." Galabya, 202 F.3d at 640. While the Second Circuit has not ruled on whether the denial of work-from-home or telecommuting status constitutes an adverse employment action, district courts in this Circuit and several other federal courts have

49

found that it is not. <u>Martinez-Santiago v. Zurich North America Ins. Co.</u>, 2010 WL 184450, at *7 (S.D.N.Y. Jan.  20, 2010) (collecting cases). Based on the facts of this case, this Court does not find that Verizon's refusal to grant Plaintiff's requests constituted adverse employment actions, because she has not shown that Verizon's conduct materially "affected the terms, privileges, duration, or conditions" of her employment. <u>Cooper v. New York State Dep't of Human Rights</u>, 986 F.Supp. 825, 828 (S.D.N.Y. 1997).

Here, Plaintiff had taken a position in Syracuse, yet repeatedly requested to work from home in Buffalo, where she resided. While relocating to Syracuse presented an inconvenience to Plaintiff in that she continued to live in the Buffalo area, "[t]he realities of the workplace dictate that employees do not always have the option to work in the location they desire." <u>Little v. State of N.Y.,</u> No. 96 CV 5132, 1998 WL 306545, at *5 (E.D.N.Y. June 8,1998) (noting that "employees must often go where the employer determines they are needed most.") Further, this Court notes that despite the fact that Plaintiff's supervisor directed that no Sales Engineer would be permitted to exclusively work from home, she was in fact granted permission to telecommute on several occasions. (Def. Stmt. ¶¶ 92, 93, 98, 125, 145, 147, 155, 177.) She also presents no admissible evidence that her male co-workers were permitted to work from home when she was not.

Insofar as Plaintiff might suggest that the denial of her work-from-home requests were retaliatory, she cannot show that a causal connection exists between the protected activity and the alleged adverse action. Both Plaintiff and her male co-worker Michael Chase, also a Sales Engineer, were required to report to the Syracuse office when not meeting with clients. Although she claims that Ray Longhenry, a Sales Engineer from Rochester who also worked in the Syracuse office, was permitted to work from home, she

presents no evidence to this end. (Pl. Mem. at 21.)

Plaintiff also states that in 2002 she was prohibited from telecommuting while her male colleague, Michael Finnegan, worked remotely from home. Even assuming Plaintiff's allegation is true, Verizon's refusal to permit her to work at home in 2002 pre-dates her EEOC activity and the instant lawsuit, and therefore she cannot causally connect the retaliatory action with her protected activity.

### f.   Vacation Time

Plaintiff takes issue with Verizon's allegedly disparate treatment with regard to vacation time.

First, she objects to David Winley's receipt of 20 vacation days when he was newly-hired into the ESG. Plaintiff, on the other hand, only received 15 vacation days. (Am. Compl. ¶ 36.) However, Plaintiff does not controvert the fact that Winley's allocation of extra days was consistent with a Verizon policy of crediting former service time with GTE. (Def. Stmt. ¶ 79.)

Second, she contends that in 2002, David Winley was permitted to relocate three times on Verizon's time, and that two of the three moves were assisted by Kevin Dean, Ray Brogran, and Daniel Irving, who were also on company time, whereas Plaintiff was required to use vacation days in order to facilitate her move in October, 2001.[10]

There is a disputed issue of fact as to whether Winley was permitted to move on company time. (Def. Stmt. ¶ 89; Pl. Aff. ¶ 56; Pl. Ex. W.)  The dispute is immaterial, however, for several reasons. The record indicates that Plaintiff's move was for personal

---

[10] As this claim relates to conduct occurring in October, 2001, it is only actionable under New York state law. (Dec. & Order 9/29/2005 (Docket No. 13) at 23.)

reasons, and not for her employment with Verizon, while Winely relocated to Buffalo for the purpose of beginning work for Verizon in April and May of 2002. (Pl. Aff. ¶¶ 55-56, 58). Even assuming Plaintiff's allegations are true, she does not and cannot establish that she suffered an adverse employment action when she was required to use her allotted vacation days to move to a new residence during the work week because she does not point to a loss of a material benefit of her employment, rather, Plaintiff chose to use her benefits in order to facilitate a move during the work week, as opposed to moving outside of work hours or on the weekend. See, e.g., O'Neill v. City of Bridgeport Police Dept., 719 F.Supp.2d 219 (D.Conn. 2010) (no adverse employment action in religious discrimination suit where plaintiff was forced to use vacation days to take Saturdays off, in order to comply with his religious beliefs).  Moreover, Plaintiff does not set forth a prima facie case of retaliation arising out of Verizon's refusal to provide Plaintiff with paid relocation time because she cannot establish that any adverse action was linked to her protected activity, which occurred nearly two years later when she filed her EEOC complaint in September, 2003.

Finally, Plaintiff objects to a requirement that she check her voicemail and be reachable via cell phone during vacation days in December, 2002, but male co-workers Kevin Dean and David Winley were not. (Am Compl. ¶ 47.) Again, Plaintiff fails to show that Verizon's requirement that she check her voicemail during vacation days is an adverse employment action, and, further, she admits to having no knowledge of whether the same expectations were applied to male employees. (Def. Stmt. ¶ 101.)

### g.   Ranking

Plaintiff also does not state a prima facie case of either discrimination or retaliation

on the basis that in July or August 2005, she was ranked "least desirable" out of the Sales Engineers in her group and the ranking was "without basis." (Am. Compl. ¶ 79.) Although she alleges that her superiors (Christopher Gaglione, Bob Dixon, and Mark Van Hoesen) intended to use this information to reduce the workforce in Syracuse by two Sales Engineers, no Reduction In Force occurred in 2005 and therefore the ranking cannot constitute an adverse action for purposes of a Title VII discrimination or retaliation claim. As this Court has previously noted, It is not a court's role to second-guess an employer's personnel decisions, so long as they are non-discriminatory. See Seils v. Rochester City Sch. Dist., 192 F.Supp.2d 100, 111 (W.D.N.Y. 2002) (citing, inter alia, Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir.1985)), aff'd, 99 Fed. Appx. 350 (2d Cir. June 9, 2004) (summary order).

### h.  Personal Contact

Plaintiff complains that Daniel Irving required Plaintiff to personally meet with him to discuss work-related issues between June, 2001 and the end of 2002. Specifically, she alleges that she was not permitted to email him or telephone him with any questions, and that Irving followed her to a client meeting on one occasion without justification. (Am. Compl. ¶¶ 32, 42.)

With regard to Irving's requirement that Plaintiff meet with him in person, it is undisputed that he requested that all Sales Engineers he supervised limit their e-mail communications to him. (Def. Stmt. ¶ 45; Def. Appx., Tab. 18.)

Although Verizon does not delve into the circumstances surrounding the cancelled client meeting, during which time Daniel Irving followed Plaintiff to the appointment and subsequently bought her and her co-worker lunch, it is of little consequence because

standing alone, it does not establish an adverse employment action. See, e.g., Hill v. Rayboy-Brauestein, 467 F.Supp.2d 336, 345-55 (micro-management and excessive scrutiny not adverse actions).

In sum, all of the foregoing actions stated by Plaintiff are simply too trivial to constitute materially adverse actions for purposes of a Title VII discrimination or retaliation claim. See Burlington N., 548 U.S. at 68 (affirming judgment as a matter of law dismissing plaintiff's retaliation claim where alleged retaliatory acts included threats of termination, exclusion from meetings, disciplinary counseling, and comments and stares from co-workers). Although she appears to suggest that these acts may somehow be aggregated to evidence a "way of life" at Verizon (Pl. Mem. at 23), there is no authority for the proposition that this Court should consider the cumulative effect of individually alleged adverse employment actions when evaluating Plaintiff's discrimination claim. See Hill, 467 F.Supp.2d at 356 n.22 (S.D.N.Y. 2006) (noting that the court is not aware of any authority "that supports the proposition that the Court can consider the cumulative effect of non-adverse employment actions when evaluating an intentional discrimination claim"). Thus, Plaintiff has failed to establish a prima facie case of discrimination and/or retaliation on her claims relating to routine managerial decisions, and Verizon is entitled to summary judgment on these claims.

## C.    Unequal Pay for Equal Work

Finally, Plaintiff contends that she was discriminated against with respect to her pay and compares her salary to that of David Winley, Tom Spencer, and Kevin Dean. (Am. Compl. ¶ 143.) She asserts her claim under the EPA, which prohibits employers from discriminating against employees on the basis of sex by paying higher wages to employees

of the opposite sex for equal work.  29 U.S.C. § 206(d)(1).

To establish a prima facie case of discrimination in violation of the EPA, a plaintiff must show that: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort and responsibility; and iii) the jobs are performed under similar working conditions."  Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (2d Cir. 1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).

A plaintiff need not prove that her job is identical to that of a higher paid male employee, but must show that the kinds of work being performed are "substantially equal." Mazzella v. RCA Global Comm., Inc., 642 F. Supp. 1531, 1551 (S.D.N.Y. 1986) (EPA) (citations omitted). The comparison cannot be based solely on job titles or job descriptions; what matters is the actual content of the jobs performed.  Mazzella, 642 F. Supp. at 1551.

Once a plaintiff has made a prima facie showing, the burden of persuasion shifts to the defendant to show that the disparity results from seniority, merit, production quotas, or a factor not related to gender.  Kaplan v. Multimedia Entm't, Inc., 02-CV-0447, 2005 WL 2837561, at *5 (W.D.N.Y. Oct. 27, 2005) (citation omitted).  Where the employer comes forward with proof of an affirmative defense, the plaintiff may counter that showing by producing evidence that the reason the defendant seeks to advance is actually a pretext for sex discrimination. Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 526 (2d Cir. 1992). "'The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has use[d] the factor reasonably in light of the employer's stated purpose as well as its other practices.'" Id. (quoting Maxwell v. City of Tucson, 803 F.2d 444, 446 (9th Cir.1986) other quotation omitted).

Verizon asserts that Plaintiff's pay inequity claim fails as a matter of law because she cannot demonstrate that she performed substantially equivalent work to her male colleagues, specifically, David Winley, Tom Spencer, and Kevin Dean.[11] (Def. Mem. at 21.)

Plaintiff, David Winley, and Tom Spencer were all Sales Engineers (with different numerical designations) in Verizon's Buffalo office. Each Sales Engineer specialized in a distinct area of telecommunications: Plaintiff was responsible for core voice/local telephone usage products, Winley was responsible for voice CPE, and Spencer was responsible for fast packet/data services. Plaintiff argues that the product specialization is the main distinction among the positions, and that all Sales Engineers performed essentially the same work, which involved assisting CAMs in designing telecommunication systems for customers and prospective customers, and designing and implementing such systems and presenting their design proposals. According to the declaration of Christopher Gaglione, there was no distinction between the level of skill, effort, and responsibility between Winley, Spencer, and Plaintiff. (Pl. Ex. S, ¶ 13.)

However, Verizon states that along with the work of the Sales Engineers being segmented by product, each Sales Engineer had unique work requirements. Verizon cites to David Winley's pre-sale visits and post-sale implementation duties that was not asked of Plaintiff. (Def Stmt. ¶ 86.) Plaintiff contends, on the other hand, that Winley's post-sale installation duties resulted from his own error in ordering the wrong equipment for installation, and that Winley's tasks were not beyond Plaintiff's technical scope and expertise. Indeed, when Michael Chase was hired to succeed Winley (performing the same

---

[11] Although Plaintiff mentions Kevin Dean, she provides no information relative to her claim that she was consistently paid less than him. (Pl. Mem. at 24.)

56

job duties), his title was Sales Engineer II, the same job title as Plaintiff. (Pl. Aff. ¶ 57; Dean Depo. at 210-211.)

Assuming Plaintiff presented admissible evidence that would permit a conclusion that she, Winley, and Spencer all performed the same job requiring substantially equal skill, effort, and responsibility, in similar working conditions in the same sales group, and even though it is  it is undisputed that Plaintiff was paid less than each of the comparators, her EPA claim still fails as a matter of law. Verizon has come forward with legitimate business reasons for the pay disparity with regard to both individuals.

First, David Winley was paid a higher base salary so that Verizon could recruit him into the position. Verizon ESG aggressively set the salary for the Senior Specialist-Technology Solutions positions because "it was necessary to do so in order to hire or retain an employee with particular desired skills," which is a legitimate reason other than sex under the EPA. Sobol v. Kidder, Peabody & Co., Inc., 49 F.Supp.2d 208, 200 (S.D.N.Y.1999).  It is undisputed that Winley was employed for 18 months as a Systems Engineer by Nortel Networks and, prior that, spent 13 years working for GTE, and had "hands-on" experience with the voice CPE products[12] that would be the focus of the new Senior Specialist-Technology Solutions position. Accordingly, Verizon has proffered a legitimate explanation for the pay disparity with regard to David Winley. See Manzella, 642 F.Supp. at 1551-52 (company's belief that candidate had certain skills and experience that would be useful in position was legitimate factor.)

Likewise, Tom Spencer came to the Enterprise Solutions Group with ten years of

---

[12] Plaintiff does not dispute that she did not possess this skill set. (Def. Stmt. ¶ 70.)

management experience at Verizon and had already been earning $58,800.00, and he would not agree to a transfer unless he received a raise, negotiating a starting salary of $61,300.  In contrast, Plaintiff joined the sales team the same year at a starting salary of $47,400.00, after seven years in a union-represented clerical job. Courts have recognized both greater management experience and the need to increase pay to induce a transfer to be legitimate business reasons for disparities in starting salaries. Fahmy v. Duane Reade, Inc., No. 04 Civ. 1798, 2006 WL 1582084 (S.D.N.Y. June 9, 2006.); Manzella, 642 F.Supp. at 1551-52. Finally, between 1997 and 2003, Spencer's salary increased by 24.3 percent, and Plaintiff's salary increased by 25.3 percent. It is therefore undisputed  that between 1997 and 2003, there was no disparity by which their respective based salaries increased, undercutting any inference of pay discrimination.

Accordingly, this Court concludes that Verizon has established legitimate reasons for its decisions which Plaintiff has not overcome with any showing of pretext. Accordingly, summary judgment is warranted on Plaintiff's claims of unequal pay.

## IV. CONCLUSION

For the foregoing reasons, Verizon's motion for summary judgment (Docket No. 101) is granted in part and denied in part. Plaintiff's Amended Complaint (Docket No. 57) is dismissed except with respect to Plaintiff's allegation that her promotion in 2003 was discriminatorily delayed because of her gender in violation of the NYSHRL.

## V. ORDERS

IT HEREBY IS ORDERED, that Verizon's Motion for Summary Judgment (Docket

No. 101) is GRANTED in part, and DENIED in part.


SO ORDERED.

Dated:       May 30, 2012
             Buffalo, New York


                                        /s/William M. Skretny
                                       WILLIAM M. SKRETNY
                                           Chief Judge
                                    United States District Court