**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

CINDY MOLL,

                Plaintiff,

     v.

TELESECTOR RESOURCES GROUP, INC.,
d/b/a VERIZON SERVICES GROUP, a/k/a
VERIZON NEW YORK INC.,

                Defendant.

Case No.  04-CV-0805S

JUDGE SKRETNY

---

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

James S. Urban, Esq.
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
jsurban@jonesday.com
*Admitted Pro Hac Vice*

Attorneys for Defendant
Telesector Resources Group, Inc., d/b/a
Verizon Services Group, a/k/a Verizon
New York Inc.

This Court should grant summary judgment in full for the Defendant, Verizon Business[1] (hereinafter "Defendant" or "Verizon"), because Plaintiff Cindy Moll ("Plaintiff" or "Moll"), even after an additional opportunity to develop the evidentiary record following remand to this Court by the Court of Appeals, still cannot demonstrate that she was subjected to a gender-based hostile work environment, gender-based discrimination or retaliation.  Here is why:

- **First,** with respect to Moll's contention that she was subjected to a gender-based hostile work environment ("HWE"), she cannot demonstrate that the conduct of which she complains, assuming everything happened as she described, was severe or pervasive.  A Second Circuit panel declared precisely that when it affirmed summary judgment in the lawsuit brought by Moll's co-worker (Anne Byrne), stating then that Moll's specific allegations "are insufficient to amount to a hostile work environment" because they consist of "isolated incidents that do not rise to a sufficiently serious level to manifest a work environment 'permeated with discriminatory intimidation.'" Byrne v. Telesector Resources Group, Inc., No. 08–0101–cv, 2009 WL 2019951,*5 (2nd Cir. July 14, 2009).

- **Second,** with respect to her claims of gender-based disparate treatment, Moll cannot establish the required *prima facie* case and, even if she could, Verizon can articulate legitimate nondiscriminatory reasons relating to the *many* events of which she complains.  There is no evidence those reasons are a pretext for discrimination.

- **Third,** with respect to her claims of retaliation, she also cannot establish the required *prima facie* case.  Further, in most instances, intervening favorable treatment breaks any causal connection between protected activity and events that Moll describes as being retaliatory.  In all events, Verizon can articulate legitimate nonretaliatory reasons relating to the events that she characterizes as being retaliatory.

- **Last,** her pay inequity claim (whether asserted under the Equal Pay Act or otherwise) fails because she cannot demonstrate that she performed "equal work on jobs requiring equal skill, effort, and responsibility" in comparison to males and, in all events, Verizon can point to gender-neutral reasons for any purported pay disparity.

## I.      BACKGROUND

During October 2004, Moll filed her original Complaint, docketed at ECF-1.  Verizon filed a motion to dismiss Moll's lawsuit, and the Court on September 29, 2005 granted the motion in part, dismissing as time-barred all of Plaintiff's HWE claims and any allegations of

---

[1] Verizon Business is formerly known as Telesector Resources Group, Inc., d/b/a Verizon Services Group, a/k/a Verizon New York Inc.

discrimination, retaliation, and pay disparity that related to events occurring before the applicable statutes of limitations.  See ECF-13.  Three and a half years later (on April 17, 2008), Moll filed her Amended Complaint (docketed at ECF-57), wherein she contended (as she did in her original Complaint) that Verizon underpaid her because she is a female, delayed her 2003 promotion, and generally along the way subjected her to adverse action either because she is a female or in retaliation for her complaints of discrimination.  She also alleged that she was laid off in 2007 as part of a reduction in force in retaliation for her (at that point in time) three-year-old lawsuit.  On May 30, 2012, this Court granted Verizon's motion for summary judgment with respect to all of Plaintiff's claims that had survived Verizon's motion to dismiss, except for her allegation that a 10-month delay of her 2003 promotion amounted to disparate treatment.  See ECF-72.  The parties settled that discrete promotion-delay claim and entered into a Stipulation of Dismissal, in which Plaintiff agreed to dismiss that claim with prejudice, and Verizon agreed to dismiss its then-pending counterclaim without prejudice (subject to re-filing if the Second Circuit remanded the case).  See ECF-129.

Moll subsequently appealed elements of this Court's order on Verizon's motion to dismiss (challenging dismissal of her HWE claim as being untimely), and elements of its summary judgment order (challenging (i) dismissal of her disparate treatment and retaliation claims related to her 2005 Syracuse transfer and 2007 layoff (with respect to which she also challenged denial of a motion to compel); and (ii) dismissal of her pay disparity claim).  Specifically, Moll's statement of issues on appeal (see Tab 66 of Verizon's Appendix of Record Evidence, which is Moll's appellate brief) were:

1. **Whether the Court below erred in granting summary judgment dismissing Moll's claims of retaliation when direct evidence of retaliation was submitted in opposition to the Motion for Summary Judgment.**  However, her so-called direct evidence related to only two events: her 2005 transfer to Syracuse and her 2007 layoff.  See Appx. Tab 66, Moll's appellate brief at p. 26 (ECF page 34) ("Moll's former supervisor … provided a sworn statement that her transfer from Buffalo to Syracuse was motivated by discriminatory animus"); and pp. 31-32 (ECF pages 39-40) ("Gaglione … stated that Witte told him 'that he was proud to be able to terminate Ms. Moll.' … As such, Witte's admission constitutes direct evidence of Verizon's retaliatory animus towards Moll.").

2. **Whether the Court below erred in dismissing Moll's claims of discrimination and retaliation under Title VII and the HRL when questions of fact existed as to whether Moll was terminated for discriminatory and retaliatory reasons.**  This, again, was limited to Moll's 2005 transfer and 2007 layoff.  See Appx. Tab 66, Moll's appellate brief at p. 31 (ECF page 39) ("Moll raised significant questions of fact that the District Court overlooked" when dismissing the Syracuse transfer claim"; and "Questions of fact exist [as to] whether Moll's termination was retaliatory.").

3. **Whether the Court below erred in dismissing Moll's cause of action under the EPA finding that Verizon had a "factor other than sex" for the pay disparity between Moll and her male counterparts and further, that Moll failed to demonstrate any evidence of pretext with respect to the pay disparity.**  This related to Moll's EPA claim.

4. **Whether the Court below erred in denying Moll's objections to that portion of the Magistrate Judge's Order which denied her Motion to Compel documents regarding her termination as part of a reduction in force, especially in light of the Court's ruling that Plaintiff failed to demonstrate evidence of pretext of unlawful retaliation.**  This was limited to Moll's 2007 layoff.

5. **Whether the Court below erred in dismissing Moll's claims of hostile work environment on Defendant's Motion to Dismiss by ruling that her Complaint failed to adequately allege facts which related back to acts which occurred within the applicable statute of limitations.**  This was limited to Moll's HWE claim.

On July 24, 2014, the Court of Appeals reversed and remanded the case, vacating the

Court's orders (even though many elements of those vacated orders were not addressed) and

remanding for further proceedings.  Once the case was back before this Court, and because the

then-dismissed HWE claims had been deleted from Moll's first Amended Complaint filed in

2008, she filed a second Amended Complaint post-remand on April 2, 2015 that renewed her

3

HWE claims.  See ECF-148.  Facts related to the HWE allegations were substantively (in many respects, word for word) identical to those that appeared in the original Complaint.  Compare ECF-1, ¶¶1-62 to ECF-148, ¶¶1-62.  In persisting with her claims (except for the settled promotion-delay claim),[2] Moll turns a blind eye to the numerous examples of favorable treatment that she received through the years (e.g., promotions, pay raises, satisfactory performance evaluations, expensive training) all of which are itemized in Verizon's contemporaneously filed Statement of Material Facts (hereinafter "SMF").

Verizon expects Moll to ignore those facts when she responds, as well as facts related to two particular circumstances that wholly undermine her credibility.  Namely, while working part-time in 2000 and 2001 (roughly two days per week) following the birth of her child, Moll stayed silent during a seven-month period in which Verizon mistakenly paid her full-time wages, resulting in an overpayment to her exceeding $10,000.00.  While a senior Verizon manager wanted to fire Moll at the time for her obvious dishonesty, her immediate supervisor convinced the manager to let Moll remain employed and repay the money over time (yet another example of favorable treatment).  SMF ¶¶55-65.  Later, from August 2005 until March 2006, Moll perpetrated disability fraud upon Verizon, pretending to be fatigued and unable to function or concentrate while at the same time attending college full-time in an accelerated degree program at Medaille College.  SMF ¶¶219-238.  She did this so she could maintain income from Verizon (paid as short-term disability benefits) while attending college full time and finishing her degree.

---

[2] Moll's counsel of record confirmed this at Gaglione's post-remand deposition, stating "frankly, the whole 'delayed promotion claim' is resolved at this point."  See SMF ¶43, n. 1.

## II.     LEGAL ARGUMENT

### A.     Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Curry v. Federal Express Corp., No. 03-CV-619S, 2006 WL 839426, *3-4 (W.D.N.Y. March 28, 2006) (Skretny, J.). A fact is "material" if it "might affect the outcome of the suit under governing law." Anderson, 477 U.S. at 248; Curry, 2006 WL 839426 at *3-4. In a case where the non-moving party bears the ultimate burden of proof at trial, the movant may satisfy its burden by pointing to the absence of evidence supporting an essential element of the non-moving party's claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Curry, 2006 WL 839426 at *3-4. Indeed, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985); Curry, 2006 WL 839426 at *3-4.

### B.     The Court Should Dismiss Moll's Hostile Work Environment Claims

This Court should dismiss Moll's HWE claims because the conduct of which Moll complains, viewed in its totality and assuming it occurred as she described, was not sufficiently severe or pervasive to constitute an actionable hostile work environment under the controlling law. The merit of Moll's HWE claim was not addressed by the Second Circuit panel (Judges Walker, Cabranes, and Parker) that remanded the case; it made clear that it "expressed no views

on the merits of Moll's hostile work environment claims."  Moll v. Telesector Resources Group, Inc., 760 F.3d 198, 204 (2014).

For her part, Moll contends in her HWE claims that she was subjected to "sexually offensive acts [… that] created a hostile working environment in which [she] was intimidated, harassed, and undermined in her attempts to succeed."  See ECF-148 (Second Amended Complaint), ¶123; see also ¶134 (contending she was subjected to "to unwelcome comments, insults and other sexually offensive conduct thus creating a hostile work environment").  In Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1986), the Supreme Court enunciated the standard governing determinations of gender-based HWE claims.  There, the Court declared that the complained-of acts "must be sufficiently severe or pervasive 'to alter the conditions of [the would-be victim's] employment and create an abusive working environment.'"  This doctrine was further explained in Harris v. Forklift Systems, 510 U.S. 17 (1993), where the Supreme Court held that a plaintiff must establish that (i) the "workplace is permeated with 'discriminatory intimidation, ridicule and insult'" that is so "severe or pervasive" as to create an "objectively hostile or abusive work environment," and (ii) the plaintiff in fact "subjectively perceive[d] the environment to be abusive."  Id. at 21-22 (quoting Meritor, 477 U.S. at 65, 67).

To aid the determination of whether particular workplace misconduct is sufficiently "severe or pervasive," the Court in Harris identified several non-exclusive considerations: whether (in the light of all the circumstances) the complained-of behavior: (i) was sufficiently frequent, or (ii) severe; (iii) was physically threatening or humiliating or merely an offensive comment; (iv) unreasonably interfered with the victim's work; and (v) caused psychological harm.  See id. at 23.  "'[O]ffhand comments, and isolated incidents (unless extremely serious)" will not suffice.  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

Applying the Supreme Court's guidance, the Second Circuit in Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998), examined whether two incidents independently or collectively created an actionable HWE.  First, a co-worker told the plaintiff that she "had been voted the 'sleekest ass' in the office."  In the second incident, the co-worker "deliberately touch[ed the plaintiff's] breasts with some papers that he was holding in his hand."  Id. at 767-68.  The Second Circuit, in affirming dismissal of the plaintiff's HWE claim, wrote:

> [T]he two incidents in question -- the co-worker's comment, apparently regarding [the plaintiff's] posterior, and his use of papers held in his hand to touch her breasts—are obviously offensive and inappropriate, [but] they are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded [the plaintiff's] work environment.  Nor are these incidents, together or separately, of sufficient severity to alter the conditions of [the plaintiff's] employment without regard to frequency or regularity.

Id. at 768; see also Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) ("incidents … must be sufficiently continuous and concerted in order to be deemed pervasive"); Holtz v. Rockefeller & Co., 258 F.3d 62, 75 (2d Cir. 2001) ("offhand comments, and isolated incidents … will not amount to discriminatory changes in the terms and conditions of employment"); Brennan v. Metropolitan Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999) (when alleged acts of harassment are merely offensive, so that they do not unreasonably interfere with the employee's job performance, and is not "'sufficiently continuous and concerted' to be considered pervasive, it is beyond the purview of the discrimination laws").  Following the above-described controlling Second Circuit law, federal district courts below have dismissed HWE claims when the complained-of conduct, even if inappropriate, was not severe or pervasive.  See Husser v. N.Y. City Dep't of Educ., 137 F.Supp. 3d 253, 275 (E.D.N.Y. 2015) (12 incidents over a three-year period, "however inappropriate and boorish—are insufficiently severe" and were "episodic at best"); Urban v. Capital Fitness, 2010 WL 4878987, *8 (E.D.N.Y. Nov. 23, 2010) ("obnoxious and purile" behavior not severe or pervasive).  This Court applied these same standards when

dismissing the hostile work environment claims brought by Moll's co-worker (Anne Byrne),

determining (among other things) that the complained-of conduct was "clearly boorish and in

poor taste [… but] 'conduct that is merely offensive' does not 'rise to the level of a hostile work

environment'" if it is not "not of sufficient severity or frequency." Byrne v. Telesector

Resources Group, Inc., 04-cv-76, 2007 WL 962929, *19 (W.D.N.Y. March 29, 2007).  When

Byrne appealed, Moll's HWE allegations also were front and center before that Second Circuit

panel (Judges Raggi, Livingston and Korman, sitting by designation), SMF¶273, which did

express views on the merits of Moll's hostile work environment claims, stating unequivocally

that the "allegations of sexual harassment experienced by Moll or other female co-workers … are

insufficient to amount to a hostile work environment." Byrne, 2007 WL 962929 at *19.

Here, after remand, Moll detailed the allegations underlying her HWE claims in her

response to Verizon interrogatory No. 15 (Third Set) (attached at Appx. Tab 59), which she

verified as being true and correct on October 23, 2015 and again at her deposition.  While she

listed a handful of actions that she contends were directed at her, many others involved Moll

simply complaining that a male co-worker received some purported benefit that she did not

receive (e.g., disparate treatment).  She also listed events for which she was never present.  First,

with respect to actions directed at her or involving perceived disparate treatment, Moll contends:

- **During 1998, nothing actually happened:**  Moll contended in her interrogatory response that her one-time co-worker and later supervisor, Dan Irving, sexually harassed her beginning in or about 1998.  That was an overstatement because, at her deposition, Moll couldn't recall anything that happened in 1998.  SMF¶20.

- **During 1999, Moll received repeated phone calls on one evening only, heard three isolated comments at other times during 1999, and received a single note:**
  - Moll says that while she and Irving were attending out-of-town training over a four-day period, Irving repeatedly called her room after dinner on one evening and asked her to come to his room, which she refused to do before taking the phone off the hook.  SMF¶21.  Moll did not complain to anyone at the time.  SMF¶22.

8

- o Moll says Irving made three isolated comments during the year and left her a single note, all with the same message: "You look and smell nice."  SMF¶24. Moll never responded, never told Irving to stop, and did not complain.  SMF¶25.

- o Other than one note that stated, "I hate when we get interrupted," nothing else happened in 1999, and Moll admits that there was no contact between her and the alleged harasser, Irving for an 18-month period until March 2001. SMF¶¶26-29.

- **In 2000, Verizon sales manager Mike McGowan—once—would not let Moll use Verizon's Buffalo Sabres tickets, and a co-worker referred to her as "hottie":**

  - o Moll suggested in her interrogatory response that she was denied access to Verizon's tickets to Bills football and Sabres hockey games multiple times, but that was another overstatement.  She conceded in deposition testimony that she never was denied Bills tickets, and was only denied Sabres tickets once. SMF¶¶33-34.

  - o Moll contends that co-worker Mike Finnegan referred to her as "hottie," but she never told him to stop or complained to anyone at the time.  SMF¶45.

- **In 2001, Moll contends that she received a single note, had to study for a CISCO certification test on her own time, was told (along with her co-workers) to limit email traffic, and could not (like male co-workers) assess for potential promotion:**

  - o According to Moll, she found on her desk a note in Irving's handwriting, which stated that he thought about her while he was in the shower, and she looked and smelled great.  SMF¶30.  Again, she did not bring the note to the attention of, nor complain to, anyone.  SMF¶31.

  - o Moll also complains that she was not permitted to stay home from work and study for a CISCO certification test, in contrast to a males sales engineer (William Gronwoldt).  She admits, however, that Gronwoldt worked downstate (in Westchester County) and reported to a different manager.  SMF¶¶67-69.

  - o Moll also complains that then-supervisor Irving required her to speak to him in person, but Irving actually told his entire group to "please cool the e-mails to me [because] I get about 50-70 e-mails a day and am having a tough time discerning the important ones from the not-so important ones … ."  SMF¶66.

  - o Moll also complains that, beginning in 2001 and continuing into 2002, she requested to be promoted, but then-supervisor Irving either ignored her emails or told her that promotions were frozen.  However, Irving had no power to promote, and only power to nominate someone to be assessed by a panel of managers for potential promotion.  SMF¶40.  Further, Moll admits that "[t]here were periods that they weren't promoting people," and concedes that Irving never flat out refused to nominate her for assessment.  SMF¶41.  Also, a male sales engineer (Marc Connor), was told (like Moll) that promotion assessments were frozen in 2001 and 2002, when he also wanted to be assessed.  SMF¶¶38-39.

- **In 2002, Moll was counseled for performance issues, was given a raise, had to move into a new home on her own time, and was subjected to the same vacation,**

**work-from-home and workspace-assignment practices/policies as were male employees:**

- o Moll complains that Irving put her on a counseling session, which referenced complaints concerning Moll's unresponsiveness, as well as a January 2002 Request for Proposal submitted to Rochester Schools. Verizon lost the January 2002 Rochester Schools RFP after Moll neglected to include responses that Irving specifically directed her to include, and Moll admits that she had been unresponsive to the business office. In all events, the purpose of the counseling session was to help Moll improve. SMF¶¶82-85.

- o Moll also complains that a newly hired employee (David Winley) received more vacation days than her; however, Winley got more vacation due to credit he received, pursuant to Verizon policy, for his former service time with GTE. SMF¶102.

- o Moll also complains that she was not permitted to move into a new home on Company time; another overstatement, as she admits she never asked to be permitted to move into that home during work time. SMF¶¶114-115.

- o Moll also complains that she was not permitted to work from home, which is another overstatement; on June 27, 2002, Irving permitted Moll to work from home but explained that, going forward, no one would be permitted to work from home, largely because one employee in the group had attendance problems. SMF¶¶117-118.

- o Moll complains that she was assigned a cubicle, while Sales Engineer IVs Winley and Kevin Dean had offices. She admits, however, that male Sales Engineers at her level (first Tom Spencer and later Mike Chase) worked from a cubicle. SMF¶¶75, 10 and 167.

- o Moll also complains that Irving once followed her to a customer meeting. She admits, however, that both she and account manager Sara Delena were to attend the meeting, which got cancelled, so Irving ultimately treated them to lunch. SMF¶125.

- o Moll also complains that around Christmas 2002, she was required to check voice mail and be reachable by cell phone during her vacation. Moll admits, however, that she did not know whether the same expectations applied to males and, in fact, they were subject to the same expectations. SMF¶¶126-128.

- **In 2003, male co-workers who collectively purchased a Sabres season ticket package with their own money didn't invite Moll to participate:** Moll complains that her male co-workers divided up what she incorrectly perceived to be Company-owned Sabres tickets among themselves; in fact, Irving personally purchased a full-season package (two tickets) and, because he could not himself attend 40 home Sabres games, made the tickets available to his co-worker friends. SMF¶¶156-159.

- **In 2004, Moll and the other sales engineer (a male) were not invited to play in a charity golf outing, and Moll was required to work from her assigned workspace:**

  o Moll complains that then-manager Chris Gaglione refused to let her work from Amherst, even though she perceived that a male corporate account manager did, as did Sales Engineer Mike Chase.  However, the corporate account manager had a different job title and reported to a different supervisor, and Chase only worked there for six weeks when he was transitioning from his old job.  Moll, meanwhile, worked from home.  SMF¶¶175-177 and 184-186.

  o Moll complains that she was not invited to a charity golf outing; however, the only male Sales Engineer (Chase) also was not invited.  SMF¶¶180-183.

- **In 2005, Verizon moved the reporting location for two male employees and two female employees (including Moll) from Buffalo to Syracuse:**  Moll complains that her reporting location was moved to Syracuse. However, two males (Chase and Mike Finnegan) were treated identically (dooming any suggestion of gender-based hostility with respect to this event) and, in all events, Moll never reported to Syracuse because Gaglione allowed her to work from Buffalo until she ultimately availed herself of disability leave.  SMF¶¶190, 193, 199-202; see also ECF-117 at p. 36 ("Because Plaintiff regularly worked from home during the first six months of her assignment in Syracuse and was on disability leave for another seven months and did not report to Syracuse during that time, she was not negatively impacted by the transfer.").

- **In 2006, Moll's manager permitted her to work from downtown Buffalo for five months, before eventually directing her to report to the Amherst location (where the rest of her sales team reported):**  Moll complains that she was forced to report to Amherst.  Her then-manager, Mark Witte, actually permitted Moll to work out of the office at 65 Franklin Street in Buffalo for five months, until ultimately directing her to report to Amherst because he wanted her in the same location as the sales team that she supported, and which (like her at this point) was required to report there.  SMF¶¶245-246.

- **In 2007, Moll's manager won't let her use his office as her workspace when he is not there, gives her the same networking goal as a male co-worker, and selects her for layoff:**

  o Moll complains that, once in Amherst for good, Witte would not let her use his office as her workspace during periods when he wasn't there using it himself.  However, he didn't let any male subordinate employees use his office.  SMF¶247.

  o Moll also complains that Witte at one point set a goal for her to add 10 new customer relationships by the end of the year.  A male sales engineer was given the exact same requirement, the purpose of which was to expand each employee's exposure to customers.  SMF¶250.

  o Finally, Moll complains about being selected for a reduction in force, which impacted males and females alike, and which Moll herself has described as being retaliatory but not based on her gender.  In all events, Witte selected a male for layoff during the same time period.  SMF¶¶253-263, 271.

11

The other events that Moll characterizes as being examples of gender-based hostility did not involve her, and/or she wasn't present for most of them.  For instance, Moll complains that during 2000, she heard a male co-worker tell a female account manager to sit on his lap, but Moll concedes she was never subject to such a comment, nor did she complain about what she heard said to her co-worker.  SMF¶46.  She also contends that a male co-worker stated during a 2001 office luncheon that he was going to save the whipped cream for a female co-worker so that she could have a hot time that night, but Moll admits she wasn't present, that the comment was not directed at her, and she only heard about it later, at which time she did not complain to anyone.  SMF¶73.  Moll also contends that Irving looked at a female co-workers breasts and said the word "hooters" during 2002, but she did not hear the comment (she only heard it repeated), and didn't complain about it when it happened.  SMF¶116.  Moll also contends she heard that a co-worker once gave out his home-office fax number as being "25-PENIS" in 2003, but she doesn't recall him ever saying it to her (or anyone else), nor did she ever complain about it.  SMF¶161.  Finally, Moll once heard a male co-worker call a female co-worker an "old bag," which she considered to be disrespectful but not sexually offensive; ironically, this was the one instance when Moll *actually complained*, telling her then-manager "[t]hat it wasn't very nice, what he said … ."  SMF¶47.

Here, at end, the conduct that Moll itemizes was not sufficiently "severe or pervasive" as to create an "objectively hostile or abusive work environment," and her own actions indicate that she did not subjectively perceive the environment to be abusive."  Harris, 510 U.S. at 21-22; see also Byrne, 2007 WL 962929 at *19.  First, the events she itemizes are spread over nine years, during which there were many extended periods of no challenged acts or, at most, isolated challenged acts.  The challenged acts were episodic at best, as opposed to being pervasive, and

none were of sufficient severity. <u>Quinn</u>, 159 F.3d at 768. Second, many events she itemizes involve her merely complaining that a male received some perceived benefit that she did not. Other acts among those she itemized did not involve her, and she was not even present. Moll never "subjectively perceive[d] the environment to be abusive," which is confirmed by the fact that the only act about which Moll *ever* contemporaneously complained was when a male co-worker called a female co-worker an "old bag." In that instance, Moll told a manager that the comment "wasn't very nice." SMF¶47. Finally, during this same nine-year period, Moll received favorable treatment in the form of satisfactory performance evaluations, pay raises, a promotion, and having her job saved after she pretended that she did not realize she had been overpaid by in excess of $10,000.00 (all of which collectively explains why Moll never complained about anything except the "old bag" comment). At end, because Moll cannot demonstrate that the conduct of which she complains was sufficiently frequent or severe, was physically threatening or humiliating, or that it interfered with her work, her HWE claims fail as a matter of law and must be dismissed with prejudice. <u>Harris</u>, 510 U.S. at 21-22; <u>Byrne</u>, 2007 WL 962929 at *19; <u>Husser</u>, 137 F.Supp. 3d at 275; <u>Urban</u>, 2010 WL 4878987 at *8.

**C.      The Court Should Again Dismiss Moll's Disparate
         Treatment And Retaliation Claims**

There also is no factual or legal support for Moll's contentions that Verizon discriminated and/or retaliated against her. Many discrete events with respect to which this Court granted summary judgment on the merits in 2012 were not even the subject of Moll's appeal. As for the discrete events that she did actually challenge on appeal (the 2005 transfer of her work location to Syracuse and her 2007 layoff), those claims should be dismissed again.

As this Court noted in its decision dismissing the majority of Moll's claims the first time around, under <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), a Title VII plaintiff

such as Moll must show that (i) she was a member of a protected class; (ii) she was qualified for her job; (iii) she suffered an adverse employment action; and (iv) she suffered the adverse employment action in circumstances giving rise to an inference of discrimination.  See Mauro v. Southern New England Telecommunications, Inc., 208 F.3d 384, 386 (2d Cir. 2000) (affirming summary judgment for employer).  The court's "determination with respect to the circumstances that give rise to an inference of discrimination must be a determination of whether the proffered *admissible* evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive."  McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997).  If the plaintiff has established a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  McDonnell Douglas, 411 U.S. at 802.  If the employer meets this burden, the plaintiff then must prove that the articulated justification is in fact a pretext for discrimination.  Id. at 804; see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993).

The analysis is pretty similar in the retaliation context.  See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (McDonnell Douglas burden-shifting analysis used in claims of discrimination also applies to retaliation claims).  In order to ultimately prevail on her retaliation claims, Moll must first present a *prima facie* case of retaliation, specifically that (i) she was engaged in a protected activity, (ii) Verizon was aware of her participation in this activity, (iii) Verizon took a materially adverse action against her, and (iv) a causal connection exists between the protected activity and the adverse action.  Fitzgerald v. Henderson, 251 F.3d 345, 358 (2d Cir. 2001), cert. denied sub nom., Potter v. Fitzgerald, 536 U.S. 922 (2002).  Absent direct evidence, no causal connection can be inferred when the complaining party is afforded favorable treatment during the time period when she contends retaliation occurred.  See Byrne,

2007 WL 962929 at *12; Ebanks v. Neiman Marcus Group, Inc., 414 F. Supp. 2d 320, 332 (S.D.N.Y. 2006) (plaintiff failed to establish a *prima facie* case of retaliation where she was consistently given positive reviews, received regular pay raises of approximately five percent and was not denied any other benefits).  Only if Moll meets her initial burden does the burden of production shift to Verizon to introduce evidence of a legitimate, non-retaliatory reason.  Nieves v. Angelo, Gordon & Co., 341 Fed. App'x 676, 678 (2d Cir. 2009).  Moll then has the opportunity to prove that the alleged justification is merely a pretext for retaliation.  Id.

At the pretext point under either theory, "plaintiffs must show that there is a material issue of fact as to whether (i) the employer's asserted reason for [the challenged action] is false or unworthy of belief and (ii) more likely than not the employee's [protected trait or protected activity] was the real reason."  Criley v. Delta Air Lines, Inc., 119 F.3d 102, 104 (2d Cir. 1997) (internal citations omitted) (affirming grant of summary judgment for employer as plaintiff could not establish that the employee's protected characteristic was the real reason for its actions). "[A] Title VII plaintiff may not prevail by establishing only pretext, but must prove, in addition, that a motivating reason was discrimination [or retaliation]."  Fields v. New York State Office of Mental Retardation and Developmental Disabilities, 115 F.3d 116, 120 (2d Cir. 1997).  Moll cannot meet her *prima facie* burden, nor can she demonstrate pretext.[3]

---

[3] When conducting its analysis, the Court should consider Moll's "state law claims in tandem with her Title VII claims because New York courts rely on federal law when determining claims under the New York Human Rights Law."  Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1180 (2d Cir.), cert. denied, 506 U.S. 826 (1992) ("New York courts have consistently looked to federal case law in expounding the [New York] Human Rights Law").  When this Court ruled on Verizon's Motion to Dismiss, it stated that "substantive analysis of [the state law claims] is based on federal law."  (See Moll Op., at p. 22.)

1.      **Moll's Claims Related To Routine Managerial Decisions Fail**

As an initial matter, it appears that Moll continues to ask the Court to delve into various managerial actions with which she takes issue, ostensibly asking the Court to act as what the Second Circuit has termed a "super personnel department" to second-guess in some cases seemingly routine actions by her managers.  The Second Circuit has made clear that courts should not delve into day-to-day minutia, and substitute their judgment for that of the employer.  See Delaney v. Bank of America, 766 F.3d 163, 169 (2d Cir. 2014) ("[w]hile we must ensure that employers do not act in a discriminatory fashion, we do not sit as a super-personnel department that reexamines an entity's business decisions") (internal quotations omitted).  Further, when this Court initially dismissed the majority of these claims brought by Moll, it held then that such complaints "involve Verizon's routine management decisions, [and] warrant minimal discussion as she has failed to establish a prima facie case of discrimination and/or retaliation in each instance."  ECF-117 at p.45.  Moll's gripes were "simply too trivial to constitute materially adverse actions for purposes of a Title VII discrimination or retaliation claim.  Id. at p. 54.  As these were not among the issues Moll raised on appeal, and were not analyzed by the Second Circuit panel, further discussion is unnecessary.  Nonetheless, out of an abundance of caution, Verizon addresses them:

*First*, Moll did not challenge on appeal and, in all events, still cannot establish a discrimination and/or retaliation claim related to two discrete instances in which she complains about sales being improperly credited to specific males.  Moll claims that Irving said in 2002 that he was going to manipulate a Buffalo Board of Education sale in order to have Sales Engineer IV Kevin Dean receive credit as a means of helping Dean meet his sales objective.  However, Moll admitted at her deposition that the sale was not manipulated and that Dean was never given credit for the sale.  It never happened.  SMF¶¶120-121.  Moll also complains that Sales Engineer

16

IV David Winley received credit in 2002 for an $8.5 million sale that she believes was completed in December 2001.  Moll admits, however, that she also received credit for the sale. SMF¶¶122-123.  Also, the record evidence demonstrates that because her incentive compensation was based on a team goal, the posting of this sale in 2002 (to the extent that the timing hurt anyone) hurt the incentive compensation for her male co-workers and male managers alike.  Id.  Thus, male and female employees were treated equally, and "[t]here can therefore be no inference of discrimination."  ECF-117 at p. 46.  There also can be no inference of retaliation because Moll during 2001 and 2002 had not even filed an EEOC charge and was, in all events, sent by her manager to valuable CISCO training, was spared discipline after she failed to disclose that she was overpaid in excess of $10,000.00, received satisfactory performance evaluations and was given salary increases (her salary was up 14.2 percent from what Moll was earning in 2000).  SMF¶¶52, 56, 63-65, 67, 70, 79, 81, 86, 89 and 118.

*Second*, Moll did not raise on appeal and, in all events, still cannot demonstrate that she suffered adversely when she was directed prior to November 2003 to act as the single point of contact for certain customers.  Because there is no dispute that male Sales Engineer Tom Spencer was (like Moll) assigned to be the single point of contact for accounts, SMF¶76, Moll "cannot demonstrate that her similarly situated male co-workers were treated more favorably than her, and thus there can be no inference of discrimination.  ECF-117 at p. 46.  There also can be no inference of retaliation because the period about which she complains is "prior to November 2003," during which her managers sent her to training, promoted her once, increased her salary by 23.8 percent dating back to 2000, and gave her satisfactory performance evaluations. SMF¶¶52, 56, 63-65, 67, 70, 79, 81, 86, 89 and 118.

17

**Third**, Moll did not challenge on appeal and, once again, still cannot demonstrate that her management team discriminated or retaliated in July 2005, when it ranked her as "least desirable" among Sales Engineers in her work group.  The record shows that this stack ranking was a management exercise to identify and improve upon the group's weaknesses while capitalizing on its strengths; it was *not* used for the purpose of identifying employees for potential layoff or termination, and Moll was not laid off in 2005.  SMF¶¶206-211.  As a result, as this Court already found, the ranking cannot constitute an adverse action for purposes of discrimination or retaliation claims.  ECF-117 at p.53.

**Fourth**, Moll did not challenge on appeal and still cannot demonstrate discrimination or retaliation arising out of her then-Manager Mark Witte's requirement in or about 2006 that she broaden her professional network by adding 10 new account contacts.  Witte imposed the same requirement on a male Sales Engineer, Gregg Maragliano (the purpose of which was to induce the sales engineers to broaden their exposure to Verizon customers), SMF¶250, "and for that reason she fails to show an inference of discrimination."  ECF-117 at p. 46.  There also can be no inference of retaliation because Moll received favorable treatment, as Witte during 2006 assigned Moll to "one of the highest revenue and prestigious accounts in the office," permitted her for a period of five months to work at the 65 Franklin Street office, and sent her to costly training in Atlanta.  SMF¶¶245, 248, 251.

**Fifth**, Moll did not challenge on appeal and still cannot establish actionable discrimination or retaliation with respect to Verizon's alleged failure to allow her to share in hockey tickets and/or participate in a charity golf outing.  With respect to the hockey tickets, Moll was denied access to Verizon's tickets once, during January 2000, SMF¶33, which was long before she filed her EEOC charge in September 2003.  Given the timing, it is not actionable

as an independent act of disparate treatment (because it is untimely), and there is no protected activity to which it could be tied for purposes of retaliation.  Three years later, during 2003, Irving personally bought two Buffalo Sabres season tickets, then simply sought out co-worker friends who wanted to take some games and offset his personal expense.  SMF ¶¶156-158.  This element of her claim is not actionable because there is no evidence the Moll expressed an interest in purchasing tickets from Irving, that she was negatively impacted by not having access to any tickets, or that Irving excluding her in 2003 would reasonably dissuade a reasonable employee from filing a charge of discrimination.  ECF-117 at p.49.

With respect to the golf outing, Moll admits that she did not ask to participate in the tournament, does not know who participated on behalf of Verizon, and cannot show how missing the event impacted her.  SMF¶¶180-183.  The only other male Sales Engineer in Buffalo at the time (Mike Chase) also was not invited to the golf outing, and "there is therefore no inference of discrimination arising out of her alleged exclusion from the golf tournament."  ECF-117 at p. 49.

**Sixth,** Moll did not appeal and, in all events, still cannot demonstrate that her managers' refusals of her requests for various alternative work locations, such as working in an office rather than a cubicle and working out of her manager's office when he was not in the office are actionable adverse employment actions.  She also cannot show that she was denied the ability to work remotely because the record is clear that she did so at various times, including when she was assigned to a Syracuse reporting location in 2005, as she never reported there because her then-manager, Gaglione, let her manage her schedule in order to work from Buffalo.  SMF¶¶118, 175-177, 190, 193, 199-202, 245.

For example, while Moll was, indeed, assigned to a cubicle rather than an office, all Sales Engineers (including males Tom Spencer and Mike Chase) below level IV were assigned to

19

cubicles.  SMF¶¶75, 10 and 167.  Further, while Moll takes issue with her managers' refusal to allow her to work from home, she repeatedly worked from home.  SMF¶¶118, 175-177, 190, 193, 199-202.  Since male and female Sales Engineers were treated the same with respect to work locations,[4] Moll cannot create any inference of discrimination.  Moreover, she also cannot causally connect a particular work location issue to protected activity because she received satisfactory performance evaluations, salary increases, a promotion and other favorable treatment during the same time period, and in all events she was permitted to work from Buffalo when her reporting location was Syracuse.  SMF¶¶118, 175-177, 190, 193, 199-202, 245.

*Seventh*, Moll also cannot establish a discrimination and/or retaliation claim related to various issues surrounding vacation time.  First, Moll challenges David Winley's receipt of 20 vacation days when he was newly hired, while Moll only received 15 days.  This does not demonstrate disparate treatment or retaliation because Winley received extra days consistent with a Verizon policy of crediting former service time with GTE.  SMF ¶102.  Moll also believes that Mr. Winley was permitted to relocate on Company time, while she was forced to take vacation days to move.  However, contrary to Moll's "belief," Winley was not permitted to move on Company time.  Winley's new coworkers helped Mr. Winley move, but it was not during working hours.  SMF¶113  In fact, Irving explained that an employee would be required to use vacation time if he desired to move during a work day.  Moll also objects to a requirement that she check her voice messages and be reachable via cell phone during vacation days in December 2002.  Moll admits, however, that she has no knowledge of whether the same expectations were applied to male employees.  In fact, Irving required all Sales Engineers he supervised to check

---

[4] With respect to the denial of Plaintiff's request to work out of the office of her Manager, Mark Witte, Mr. Witte did not allow *any* employers to work out of his office in his absence. SMF¶247.

messages and be reachable during non-work hours, eliminating any possible inference of discrimination.  SMF ¶¶127-128.  In one instance, Mr. Spencer participated in a conference call from home, hours after having surgery.  SMF¶130.  There also can be no inference of retaliation because, during this same time, Moll received satisfactory performance raises, salary increases and other favorable treatment.

**Eighth,** Moll complains that in 2006 that Verizon, namely Bob Dixon, assigned products within her area of specialty to other sales engineers, rather than to her, which made it difficult for her to achieve sales objectives.  To the extent that what she complains of may have happened, the record does not support any inference of discrimination or retaliation.  Namely, Mr. Dixon had moved to another job (Regional Sales Manager) in October 2005 and had nothing to do with decisions affecting Moll as an SE II when she returned in March 2006 from her fraudulent disability leave.  SMF¶249.  Further, upon her return from the bogus disability leave, Moll objected to working anywhere near Mr. Dixon and, as such, was permitted by her supervisor initially to work in another office, and Mr. Dixon told Moll's manager that he would steer clear of Moll so as to not make her uncomfortable.  SMF¶244.  In all events, Moll's contentions are undermined by her own allegations and testimony, as she states in her Second Amended Complaint that, upon her return from disability leave in 2006, "Plaintiff's Sales Engineer Manager was Mark Witte[… who] assigned Plaintiff to the M&T Bank project, which was one of the highest revenue and prestigious accounts in the office."  ECF-148 at ¶85.  Thus, assuming what Moll contends occurred actually happened, she cannot show that it happened in circumstances giving rise to an inference of discrimination or retaliation.  Rather, it happened because she specifically requested that Verizon limit her contact with Mr. Dixon (and with Irving, too).

**Ninth**, Moll has no retaliation claim arising out of her removal from the University of Buffalo account "because Title VII does not protect employees from retaliation for opposing misbehavior by co-workers that is unrelated to discrimination against a protected class member." ECF-117 at pp. 40-41.  That is indeed the case with respect to this allegation.  SMF¶¶178-179.

### 2.    Plaintiff's Claim Related To Being Placed On A Counseling Session Fails As A Matter Of Law

Moll did not raise on appeal, and still cannot show, that Irving's counseling of her regarding her performance in March 2002 was actionable discrimination or retaliation.  For there to be an adverse employment action, there must be some negative impact on employment.  See Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 443-44 (2d Cir. 1999) (plaintiff's "conclusory allegation that she deserved an excellent, rather than an average, performance rating" was insufficient to constitute an adverse employment action).  Further, even "negative evaluations and decreased raises" do not rise to the level of an adverse employment action.  Cramer v. Fedco Automotive Components Co., Inc., No. 01-CV-0757E(SR), 2005 WL 839671, *10 (W.D.N.Y. Apr. 12, 2005).

Here, Moll was placed on a counseling session on March 12, 2002 following complaints from clients concerning Moll's unresponsiveness, and after her manager perceived that the quality of her work on a January 2002 Request for Proposal was below Moll's capabilities.  SMF ¶¶82-85.  For her part, Moll admits that she was unresponsive to clients, and that she did not include in Verizon's response to the Request for Proposal in question information that Irving specifically directed her to include.  SMF¶¶83-84.  The purpose of the counseling session "was to induce her to improve her performance."  SMF¶85.  Irving removed Moll from the counseling session less than two months later on May 6, 2002 after he determined that she had shown improvement.  SMF¶87.

There is no dispute that, despite Moll being on the counseling session from March through May 2002, Irving on March 31, 2002 rated her 2001 performance as having been satisfactory, and Moll contemporaneously received a salary increase.  A year later (in March 2003), when Moll's 2002 performance formally was evaluated, Irving rated Moll as having *met* the expectations of her job during 2002, and she received yet another salary increase.  SMF¶¶79, 81-86, 141-142.  Lastly, there is no dispute that Verizon promoted Moll to Sales Engineer II effective August 17, 2003 and increased her salary an additional 4.95 percent or by $2,800 to $59,400.  SMF¶¶149-151.  Indeed, from 2000 through August 2003, Moll saw her base salary increase 24.7 percent.  SMF¶151.  In light of these facts, including the intervening or contemporaneous favorable treatment, Moll cannot show that the counseling session aimed at causing her to improve her performance was a materially adverse event, which dooms any theory of discrimination or retaliation.  See ECF-117 at p.42 ("[Moll] has not established that she suffered any cognizable harm from being placed on the counseling plan.").

Further, in all events, any discrimination theory fails because in 2002 a male member of Moll's work group, CAM Tim Mitten, was placed on a more formal Performance Improvement Plan and eventually was fired from his CAM job.  SMF¶143.  Because this male was treated less favorably than her, there can be no inference of discrimination.  Similarly, any inference of retaliation is dispelled by the favorable treatment that Moll received (including satisfactory evaluations, salary increases) discussed above.

### 3.    Plaintiff's Claim of Retaliatory Job Transfer Fails

When this Court granted summary judgment with respect to Moll's retaliatory job-transfer claim, it articulated at least two alterative bases for that ruling, with one reason being that Moll never actually reported to Syracuse (a fact definitively confirmed by the post-remand discovery), leaving Moll unable to demonstrate that she suffered any materially adverse

employment action.  See ECF-117 at pp. 36-37 ("Because [Moll] regularly worked from home during the first six months of her assignment in Syracuse and was on disability leave for another seven months and did not report to Syracuse during that time, she was not negatively impacted by the transfer.  Further, [Moll] was presented with several options and chose to relocate knowing that the reporting location would be distant from her home in Buffalo.  [Moll] only made it known that the relocation would be a hardship after she had agreed to take the position in Syracuse.  The transfer, under these circumstances, cannot be said to be the type of activity that might well dissuade a reasonable employee from engaging in protected conduct, but rather an undesirable consequence resulting from Plaintiff's choice to remain in her current position."  ECF-117 at pp. 36-37.

The Second Circuit panel, when remanding, stated that it vacated summary judgment ([b]ecause we reverse[d] the district court's order denying Moll's motion to compel."  Moll, 760 F.3d at 204.  Then, in the very next sentence of its decision, the Second Circuit panel made clear that "[i]f, following discovery, Moll is unable to establish a genuine issue of material fact suggesting Verizon discriminated or retaliated against her, the district court is free to re-consider summary judgment for Verizon."  Id.

As for the motion to compel, that related to Moll's document request Nos. 5 (seeking co-worker personnel records) and 21 (seeking documents related to any positions eliminated as part of a reduction in force the Verizon's Buffalo, Rochester, Syracuse, or Albany offices).  Id. at 202-03.  Notably, the Second Circuit never addressed nor analyzed Moll's contention on appeal that this Court erred by finding that the transfer of Moll's reporting location to Syracuse was not "an action against her that was so materially adverse a reasonable employee would have been dissuaded from engaging in protected activity."  See id., generally.  As a result, that

determination by this Court was undisturbed by the Second Circuit panel and still stands (now with even more factual support than the first time this Court entered summary judgment for Verizon as to this claim).

Specifically, during post-remand discovery, Gaglione confirmed his pre-remand testimony that Moll was never required to report to Syracuse.  First, the Court will recall, when Gaglione was deposed by Moll's counsel on December 13, 2006 (at which time he was employed by Verizon), he stated unequivocally that "[t]he truth is [Moll] never really showed up in Syracuse very often at all.  It never was really a hardship for her at all because she never really did it.  And the truth is I covered for her a lot not doing it."  Then, when Gaglione was deposed by Verizon's counsel on May 10, 2017, he confirmed that his pre-remand deposition testimony on that point "was true."  In fact, when Gaglione was asked point-blank during his post-remand deposition whether he ever required Moll to report to Syracuse, he said "I really didn't pay attention to it, and I made it clear I wasn't."  SMF¶199.  At end, according to Gaglione, he applied the same standard to both Moll and the male sales engineer (Mike Chase) whose reporting location had been moved to Syracuse:  "You know," Gaglione confirmed at this post-remand deposition, "[Chase] never came [to Syracuse] either."  SMF¶202.  As for Moll, knowing these facts would doom her challenge to the Syracuse transfer, she tried her best to dance around them during her own post-remand deposition.  Ultimately, however, she confirmed that she wasn't in Syracuse if she had appointments scheduled in or around Buffalo, so she simply made sure that she scheduled appointments in and around Buffalo.  SMF¶¶200-201.

Thus, five years after this Court originally dismissed Moll's job-transfer claim, Moll lands in the same place:  The claim fails as a discrimination claim because the decision impacted two males and two females, leaving her unable to demonstrate any inference of gender

discrimination.  As for the retaliation claim, Moll must demonstrate that (i) she was engaged in a protected activity, (ii) Verizon was aware of her participation in this activity, (iii) Verizon took an action against her that was so materially adverse a reasonable employee would have been dissuaded from engaging in protected activity, and (iv) there is a causal relationship between the protected activity and the adverse action—that is, a retaliatory motive played a part in the action. Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53 (2006); Treglia v. Town of Malius, 313 F.3d 713, 719 (2d Cir. 2002); see also ECF-117 at p.32.  This Court already determined that Moll satisfied the first two elements, but could not demonstrate that she suffered a materially adverse action, nor could she demonstrate any causal connection between protected activity and the job transfer.  Id. at pp. 35-40.  Assuming Gaglione's changed testimony regarding the intent behind the transfer (which he offered after losing his job at Verizon) is true, that only helps Moll with respect to the causation element.  As to whether she suffered a materially adverse action (with respect to which Gaglione's testimony (corroborated by Moll) remains unchanged), Moll still cannot satisfy that element, and her retaliation claim relating to the Syracuse transfer must again be dismissed as a result.

### 4.    Plaintiff's Claim Relating To Her Layoff Fails, Again

When this Court granted summary judgment with respect to Moll's claim relating to her 2007 layoff, it determined that she had abandoned the gender-discrimination aspect of her layoff claim, see ECF-117 at p. 44, n. 8, a ruling that Moll did not challenge on appeal (likely because the facts clearly demonstrated that gender played no role in her layoff).  For instance, the overall reduction-in-force impacted 155 employees, among whom the ratio of laid-off males to laid-off females was two to one.  SMF¶263.  Also, six months after selecting Moll, Witte selected a male (Steve Medve) for layoff during the same year, and Medve went off payroll within two weeks of

when Moll left the payroll.  SMF¶271.  Thus, no inference of gender discrimination could be drawn.

As for Moll's retaliation claim, this Court was skeptical of it in 2012 and granted summary judgment because Moll did "not provide any direct evidence of a causal relationship, and her termination took place three years after the commencement of her lawsuit and four years after her initial charge of discrimination with the EEOC, which is too long of a period of time to show temporal proximity."  ECF-117 at 44.  This Court then went on to make clear that had Moll been able to clear those hurdles, she in all events still could not demonstrate that Verizon's explanation for selecting her for layoff (e.g., "because [Witte] perceived her skill set to be the least sophisticated of those in her work group, and her capabilities and job performance trailed behind her peers") was pretextual.

When the Second Circuit panel remanded, it made no mention of Moll's layoff other than to say that "failure to keep records of the reduction in force that resulted in Moll's layoff may itself constitute evidence that the reduction in force was pretextual."  Moll, 760 F.3d at 204.  However, that doesn't help Moll, who possesses no evidence of any failure by Verizon to maintain records related to the particular selection of her for layoff in the reduction in force in question.  First, the manager (Witte) who selected Moll didn't recall any documents, except the "next step" documents that are delivered to employees being notified of layoff.  SMF¶255.  Second, Witte had to make another layoff selection six months later—literally, on a moment's notice—when he selected Medve, which occurred also without documentation.  SMF¶271.  Third, Verizon in all events did produce documentation relating to the reduction in force that resulted in Moll's layoff, including the spreadsheet that listed all employees whose positions were eliminated, the email forwarding the list, brief instructions for layoff notifications (for

instance carryover vacation is not paid out), and email traffic surrounding Moll's short-term disability leave that commenced in February 2007 and ultimately delayed her off-payroll date until October 2007.

As for Gaglione, his testimony doesn't help Moll either, as he confirmed when deposed post-remand that Witte did not consult him when selecting Moll for layoff, and he doesn't recall what he and Witte may have discussed after the fact.  SMF¶259.  When questioned, all that Gaglione could recall was that he perceived that Witte was happy, which falls well short of establishing that Witte acted with retaliatory intent when he selected Moll for layoff.  What is clear is that Witte was told that his team of sales engineers would be reduced in size by one, as was the case in many other work groups throughout the Company.  Moll's position was eliminated on Witte's team because her skill set was unsophisticated, largely focused on traditional telephone services, and his team was moving in the direction of next-generation MCI products and services.  SMF¶256.

It is well established that "[a] *bona fide* reduction in workforce is a legitimate nondiscriminatory reason for terminating an employee."  Chaung v. T.W. Wang, Inc., 647 F. Supp. 2d 221, 234 (E.D.N.Y. 2009); James v. New York Racing Assoc., 76 F. Supp. 2d 250, 256 (E.D.N.Y.1999).  Further, it "is both lawful and consistent with common sense for an employer to choose [during a RIF] employees … whose performance and qualifications are lacking relative to other employees."  Chaung, 647 F. Supp. 2d at 234.  No inference of discriminatory motive can arise where the reduction in force equally affects members of both genders.  See, e.g., Turner v. NYU Hosp. Ctr., 784 F. Supp. 2d 266, 283 (S.D.N.Y. Mar. 4, 2011) (in reverse race discrimination case, "evidence regarding the June 2004 reduction in force and other employees'

interactions with [a manager] do not support an inference of a discriminatory motive [because] two-thirds of the twenty-eight employees that [the employer] chose to layoff were non-white.")

Here, Moll cannot demonstrate that her layoff was in retaliation for some protected activity. First, Witte never discussed the reduction-in-force with individuals at whom Moll historically has directed her allegations of discrimination and retaliation. SMF¶260. Second, just prior to being told to reduce his work group by one sales engineer as part of the reduction-in-force, Mr. Witte had treated Moll favorably, assigning her to "one of the highest revenue and prestigious accounts in the office[,]" allowing her to work for a period of months at the 65 Franklin Street office, and selecting her to attend CISCO boot camp training in Atlanta, Georgia (during which, notably, she failed to complete the requirements necessary to attain CISCO certification). SMF¶¶245, 248 and 251. Third, the only record evidence that Moll has developed is that managers in the post-merger Company, such as Witte, heavily favored legacy MCI employees over Verizon employees (which was consistent with Witte's stated priority related to "movement towards … next generation, MCI portfolio services." SMF¶¶256-258.

In all events, had Moll not been selected in early 2007 to be included in the reduction-in-force, the Company subsequently would have terminated her once it compiled and reviewed, in the context of Verizon's policies, the facts discovered in this litigation relating to Moll's 2005-06 disability leave. While on disability, during which Moll represented to Verizon and to her treating psychiatrist that she was incapacitated, Moll attended college full-time in an accelerated degree program. Moll would have been terminated for her dishonesty. SMF¶¶269-270.

**D.    The Court Should Dismiss Moll's Pay Inequity Claim**

Lastly, Moll's pay inequity claim fails because she still cannot demonstrate that she performed substantially equivalent work to males (Tom Spencer, Kevin Dean and David Winley) who were paid more than her and, in all events, Verizon can show reasons that are unrelated to

gender for any pay disparity about which she complains.  When this Court entered summary judgment for Verizon with respect to Moll's pay disparity claim, it assumed that Moll could prove that she performed substantially equivalent work, but dismissed the claim because Verizon came "forward with legitimate business reasons for the pay disparity."  ECF-117 at p. 57.  When the Second Circuit panel remanded the pay disparity claim with the others, its stated reason for doing so was tied to its ruling on the motion to compel.  See <u>Moll</u>, 760 F.3d at 204 ("The district court's refusal to compel Verizon to produce the requested documents deprived Moll of the opportunity to find evidence that might support her argument that … she was paid unequally.").  The Second Circuit panel did not comment upon this Court's basis for dismissing the pay disparity claim the first time around, and nothing has changed since.

The Equal Pay Act and the civil rights laws in general "prohibit employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for 'equal work.'" <u>See</u> <u>Byrne</u> 2007 WL 962929 at *19; <u>Belfi v. Prendergast</u>, 191 F.3d 129, 135 (2d Cir. 1999) (quoting 29 U.S.C. § 206(d)(1)).  To establish a *prima facie* case of gender-based pay disparity, a plaintiff must demonstrate that (i) the employer pays different wages to employees of the opposite sex; (ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (iii) the jobs are performed under similar working conditions. <u>See</u> <u>Byrne</u> <u>id</u>.; 29 U.S.C. § 206(d)(1); <u>Ryduchowski v. Port Auth. of New York and New Jersey</u>, 203 F.3d 135, 142 (2d Cir. 2000); <u>Belfi</u>, 191 F.3d at 135.  Jobs that are "merely comparable" are insufficient to satisfy a plaintiff's *prima facie* burden.  <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1310 (2d Cir. 1995), *abrogated on other grounds by* <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998); <u>Ruduchowski</u>, 203 F.3d at 142.  Here, Moll must show that the kind of work she performed was "substantially equal" to that performed by Messrs. Winley,

Dean and Spencer.  See Lanvin-McEleney v. Marist College, 239 F.3d 476, 480 (2d Cir. 2001).

The standard for what constitutes "equal work" remains high.  See Heap v. County of

Schenectady, 214 F. Supp. 2d 263, 271 (N.D.N.Y. 2002); Dinolfo v. Rochester Telephone Corp.,

972 F.Supp. 718, 723 (W.D.N.Y. 1997).  Jobs that are "merely comparable" do not meet this

standard.  Lambert v. Genesee Hosp., 10 F.3d 46, 56 (2d Cir. 1993), cert. denied, 511 U.S. 1052

(1994); Pfeiffer v. Lewis County, 308 F. Supp. 2d 88, 99 (N.D.N.Y. 2004) (quoting Lambert);

Virgona v. Tufenkian Import-Expert Ventures, Inc., No. 05 CV 10856(GEL), 2008 WL

4356219, at *8 (S.D.N.Y. Sept. 23, 2008) (quoting Lambert); see also Byrne Op. at p. 38.

        If a plaintiff meets her *prima facie* burden, the employer can nevertheless defeat the

claim by showing that the pay differential was based on a factor other than sex, which is one of

the four affirmative defenses listed in 29 U.S.C. § 206(d)(1).  An employer asserting that

affirmative defense must prove that the gender-neutral factor was adopted for a legitimate

business reason.  Tomka, 66 F.3d at 1310.  As this Court recognized in its Byrne decision

dismissing Ms. Byrne's EPA claims, (Byrne 2007 WL 962929 at *21), a "factor other than sex"

can include the circumstance where the employer pays a higher salary to someone because that is

the amount that it would take to attract and hire the desired candidate.  Horner v. Mary Institute,

613 F.2d 706, 714 (8th Cir. 1980); see also Sobol v. Kidder, Peabody & Co., Inc., 49 F. Supp. 2d

208, 220 (S.D.N.Y. 1999) (holding that an employer may pay higher wages to a male than a

female when it is necessary to do so in order to hire or retain an employee with particular desired

skills); Mazzella v. RCA Global Communications, Inc., 642 F.Supp. 1531, 1552 (S.D.N.Y.

1986) (male employee's higher salary justified in part because he could not be induced into

transferring without a salary match); Shieldkret v. Park Place Entm't Corp., No. 01 Civ. 5471,

2002 U.S. Dist. LEXIS 1032, 2002 WL 91621, at *3 (S.D.N.Y. Jan. 23, 2002) ("Salary matching

— payment of a higher salary to equal or exceed that of a prior job, or a competing offer — is a reasonable business tactic to lure or retain employees and justify a wage differential.")

Here, Moll's EPA claim fails because, as this Court determined in 2012, Verizon can articulate a legitimate reason other than sex for paying Spencer, Winley and Dean more than Moll. The record is clear that Messrs. Dean and Winley were paid high base salaries so that Verizon could recruit each of them into the job. SMF¶¶15-16, 98. Verizon paid these employees at the level that it did because it was "necessary to do so in order to hire or retain an employee with particular desired skills," which is a legitimate reason other than sex under the EPA. See Sobol, 49 F. Supp. 2d at 220; ECF-117 at pp. 57-58.

The same holds true with respect to Spencer. Moll joined the sales team in 1997 after seven years in a Union-represented clerical job and accepted a starting salary of $47,400.00 (which still was a 35.8 percent increase over the wages in her clerical job). In stark contrast, Spencer had been a Verizon manager for 10 years and already was making $58,800.00 when he was offered a position on the sales team, also in 1997. He told the hiring manager he would only take the job if it was a promotion and included a salary increase. SMF¶¶15-16. In order to convince Spencer to join the department, the hiring manager agreed to those demands. Notably, thereafter and until the time when Spencer left the sales team in early 2004, Moll's salary increased by 25.3 percent, compared to only 24.3 for Mr. Spencer, suggesting that there was no pay discrimination occurring. SMF¶164. In any event, this Court in Byrne and others have recognized both greater management experience and the need to increase pay to induce acceptance of an offer to both be legitimate, gender-neutral reasons for pay disparity. Byrne, 2007 WL 962929 at *21; Fahmy v. Duane Reade, Inc., 04 Civ. 1798, 2006 U.S. Dist. LEXIS 37703, at *27-29 (S.D.N.Y. June 9, 2006) (employer who paid employees with greater

managerial experience higher starting salaries had legitimate reason for doing so that was not overcome by plaintiff's assertions that one employee made exaggerated statements on his application and plaintiff had better educational qualifications); <u>Mazzella</u>, 642 F. Supp. at 1551-52 (higher salary justified in part because male employee could not be induced to transfer to new department without salary match).

Verizon also reasserts, consistent with its position when it first moved for summary judgment in 2011, that Moll cannot even demonstrate in the first instance that she performed equal work to that performed by Messrs. Winley, Dean and Spencer.  First, she admits that the work of the sales engineers was segmented by product.  She was responsible for the "specialty bucket" consisting of core voice (or local telephone usage) products, while Mr. Spencer was responsible for fast packet (data services), Mr. Winley was responsible for voice CPE, and Mr. Dean was responsible for data CPE.  SMF¶106.

Second, Moll admits that soon after Mr. Dean was hired in 2002 and continuing into 2003, Mr. Dean's manager assigned him to spend at least one day per week on site at the University of Buffalo assisting in a product (voiceover IP) installation.  Moll knows that Mr. Dean was working with technicians, but does not know in what capacity Mr. Dean assisted them. In fact, he acted as a technical resource to installers and performed some of the installation work himself.  Moll admits that she never performed such work.  SMF¶107.  As for Mr. Winley, Irving required him to go on pre-sale visits (either with salespeople or by himself) and ensure that Verizon's customer base was aware of the Company's new product (CPE) portfolio and to demonstrate that Verizon had credible expertise (*e.g.*, he and Mr. Dean) that had worked with this equipment it was, in fact, attempting to sell.  Irving also had Mr. Winley involved in post-sale implementation issues associated with the Buffalo Board of Education sale, a high-profile

33

implementation.  SMF¶109.  Moll was not asked to perform such work, nor could she.
SMF¶¶109-110.

Finally, Gaglione, in his post-remand deposition, retreated from his November 2011
declaration and confirmed that "in retrospect … the SEs that were on my team at that time put
forth a lot of effort in their particular subject matter area.  They had high levels of skill and that,
you know, their responsibilities were commensurate with what was called for *in their area of
expertise*."  SMF¶11 (emphasis supplied).  At end, there is no evidence that Moll and Spencer,
Winley and Dean "performed equal work on a job requiring equal skill, effort, and
responsibility" and, as a result, she cannot establish a *prima facie* case of pay inequity.  For the
reasons described above, the Court should dismiss Moll's pay disparity claims.

## III.    CONCLUSION

For the reasons set forth above, the Court should enter summary judgment for Defendant,
Verizon Business (formerly known as Telesector Resources Group, Inc., d/b/a Verizon Services
Group, a/k/a Verizon New York Inc.) and dismiss Moll's Second Amended Complaint in full
with prejudice.

Dated:  August 25, 2017          By:   s/ James S. Urban
       Buffalo, New York                James S. Urban, Esq.
                                           JONES DAY
                                           500 Grant Street, Suite 4500
                                           Pittsburgh, PA 15219
                                           (412) 391-3939
                                           *Admitted Pro Hac Vice*

                                         Attorneys for Defendant, Verizon
                                         Business, formerly known as Telesector
                                         Resources Group, Inc., d/b/a Verizon
                           Services Group, a/k/a Verizon New York Inc.

34