UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CINDY L. MOLL,

                              Plaintiff,

        v.                                          Civ. No.   04-CV-0805S(Sr)

TELESECTOR RESOURCES GROUP, INC.,
d/b/a VERIZON SERVICES GROUP,
a/k/a VERIZON NEW YORK INC.

                              Defendant.

---

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
### TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


GRECO TRAPP, PLLC
*Attorneys for Plaintiff, Cindy L. Moll*
1700 Rand Building
14 Lafayette Square
Buffalo, New York   14203
(716) 856-5800
E-mail address:  *jgreco@grecolawyers.com*


Josephine A. Greco, Esq.
Duane D. Schoonmaker, Esq.
        Of counsel

**STATEMENT OF FACTS**

Cindy L. Moll (hereinafter "Moll") was hired as a Sales Engineer/Systems Analyst (SE) by Verizon (hereinafter "Vz") in 1997.   (Plaintiff's Statement of Contested Facts, hereinafter referred to as PCF, ¶ 17).   She was hired at a base salary of $47,400.   Thomas Spencer (hereinafter "Spencer"), that same year, was hired as a Sales Engineer/Senior Systems Analyst, earning $61,300. (PCF ¶ 13, 16).   As Sales Engineers/Systems Analysts, they would support corporate Vz salespeople (known as Corporate Account Managers, or CAMs) in designing telecommunications systems for customers and prospective customers.   They would design and implement such systems, prepare price quotations for their designs, and would present their design proposals.   (Moll Aff., ¶ 8; Gaglione Dec. ¶ 11).   When Moll was first hired, the other Sales Engineers/Systems Analysts were her, Spencer, Anne Byrne (hereinafter "Byrne") and Daniel Irving (hereinafter "Irving").   (Moll Aff., ¶ 9)

Vz maintained company-wide policies prohibiting discrimination and harassment.   This policy stated that employees "will not engage in any behaviors that are harassing, including sexual harassment or offensive comments or jokes" (Ex. BBB, VER-CM 381).   It further states that employees "must not engage in any behavior that ridicules, belittles, intimidates, threatens or otherwise demeans co-workers …" Vz also "will not tolerate harassment … against any Verizon employee" and that "harassment can include making … sexist .. jokes or gestures or hazing." (Ex. BBB, VER-CM 385).   The policies also state that employees "must not engage in unwelcome sexual conduct or make unwelcome sexual overtures to co-workers …" This includes any behavior that "requires or implies that another person's submission to or rejection of sexual advances will affect that person's employment."   The policy also states that employees "will not request sexual favors, engage in visual, verbal or physical conduct of a sexual nature, display sexually suggestive objects or pictures, tell offensive jokes, use sexually suggestive language…" (Ex. BBB, VER-CM 386)

1

Beginning around Christmas, 1998, Moll began to suffer harassment, a hostile work environment, and discrimination.   The hostile work environment included numerous inappropriate remarks to Moll and other females.   During a 1998 phone conference in which numerous CAMs were participating, male co-worker Michael Finnegan stated to a female co-worker of Moll's, Sara DeLena, who was working from home that day: "Sara, are you at home, because I can hear the bedsprings creaking."   Finnegan, in 2000, told DeLena to "come sit on [his] lap."   Finnegan, began to call both Sara DeLena and a "hottie".   He continued to call Moll a "hottie" every month or two during the time they worked together, which was through 2003 or 2004.   Finnegan announced at an office Christmas party in 2000 that he had asked the restaurant to keep the whipped cream for DeLena to take home so she could have a "hot time with Tony," referring to her husband.   During the holiday season in 2000, Finnegan rented a van in which all of the members of the office in Buffalo were going to use to travel to the casino in Niagara Falls. When DeLena entered the van, Finnegan stated, "now we have two old bags in the van."   In 2000, Finnegan commented to Sales Manager Michael McGowan that the new President of the Sales Division, Veronica Polizzi was not "too bad looking."   McGowan responded by stating that she "had a lot of miles on her".   In January 2001, prior to leaving for an out-of-town sales kickoff meeting, Finnegan came into DeLena's office, asked her if she had a room alone, and upon learning that she did, told her that he was going to come knocking on her door in the middle of the night.   Finnegan also stated, "how are we going to get Sara in the hot tub? Hopefully without a suit."   McGowan regularly made comments about women's appearance. He also regularly made comments that referred to women as objects.   This included, but was not limited to, comments such as, "women should smell like vanilla because it would make them more appealing;" and "women should smell like bacon and eggs."   David Winley, a Technical Support Specialist hired in April, 2002 regularly made comments with regard to DeLena's appearance.   In particular, he repeatedly referred to DeLena as a "Bond woman."   In 2002,

2

DeLena's manager, Donald Donahue, told DeLena that he thought she should start exercising

and seeing a personal trainer, implying that she was overweight and needed to lose weight.

Also in 2002, at a meeting with a client and Sales Engineer, Kevin Dean, Dean told the client, in

front of DeLena, "I don't work for her, and she'll be working for me before I work for her."   In

early 2003, Finnegan told David Jager, whose wife had recently given birth, that any guy who

had to go 6 weeks without sex would be in "an upright and locked position".   During 2003, Moll

learned Finnegan was giving out his work and fax number as "25-PENIS."   Finnegan

intentionally asked for the fax number 25-PENIS in probably 1998.   Spencer remembered the

call from Finnegan in which Finnegan asked Spencer to fax him a document to his home at 25-

PENIS.   Spencer repeated the number to the people sitting near him.   Spencer did not report it

to anyone in higher management because

> [T]he general office atmosphere, it was like nothing.   I mean,
> everybody knew Mike, everybody knew what was going on.   I
> was probably the quietest one there.   So me saying that is just
> minor compared to other things that were always said every day…
> I should have reported it, but like I said, the office atmosphere, that
> one statement, and it keeps coming up, the one statement, was
> nothing compared to what went on.

(Ex. WW, , pp. 23-25); Ex. MMM.

In addition to all of this, Irving began making unwanted sexual advances and comments

to Moll.   Beginning in 1998 through 1999, Irving repeatedly made comments to Moll in the

workplace that she looked and smelled great.   McGowan was traveling to an award event when

he called Moll to ask her to go to his house and get his wife's identification, which she had

forgotten.   Irving stated that Moll had the keys to McGowan's house, suggesting that she must

be having an affair with McGowan.   Irving, at a later date, then questioned her directly whether

she was having an affair with McGowan or another male co-worker, Al Grant.   In or about

April, 1999, during a multiple day out-of-town training seminar, Irving called Moll in her hotel

room repeatedly asking her to come to his room.   Despite Moll's repeated refusals, his phone

3

calls stopped only after she took the phone off the hook.   Irving also left inappropriate notes on Moll's desk at work. The first note that she recalled said that he was unhappy when conversations between them would be interrupted by other people.   Thereafter, he left a note on her desk telling her that she looked good and smelled nice.   Specifically, the note said:   "I hate being interupted [sic] when we are talking – people are so rude – yes I know the 23rd was unplanned & I was <u>definitely</u> thinking about the possibilities!! You look & smell great today … Call me?"   (Exhibit YY).   Irving continued to make these comments through late 1999 until Moll was pregnant and started to show.   In January, 2000, Moll requested company tickets to take some customers from one of her accounts to a professional hockey game.   Her Sales Manager at the time, McGowan, told her that he gave the tickets to Irving because she was pregnant, and he thought she would be too tired.   PCF ¶ 28.   When Moll returned to full-time work following maternity leave in April 2001, Irving had been promoted to the position of SEM, which meant he was now her direct manager.   In late April or early May 2001, Irving left a note on Moll's desk stating that he thought about her when he was taking a shower, and that she looked good and smelled nice. PCF ¶ 30.   Moll found these comments and notes offensive, humiliating, and uncomfortable.   She rebuffed each of these advances by either walking away, to physically demonstrate that his advances were unwelcome, or ignoring his notes. PCF ¶ 31.

Thereafter, in approximately June 2001, Irving began to require Moll to see him personally with questions that she might have.   She was not permitted to send him e-mails nor was she permitted to leave him messages on his voice mail.   She had to physically see him for each such question.   She was the only Sales Engineer who had this requirement.   In fact, Irving required her to see him, rather than send him e-mails or leave him voice mails, until the time that he left as SEM in December 2002 or January 2003.   Every time that she had to go into Irving's office to see him, she was reminded that he left a note on her desk that he thought of her in the shower.   She found those encounters offensive, humiliating and degrading. PCF ¶ 31.   In

4

January 2002, Moll was working with Irving on a Request for Proposal (RFP) for the Rochester City School District.   She had completed all of the RFP that she could, and was simply waiting for Irving to provide her with information to complete the bid.   After standing at his door waiting for him for as long as she could, she left a message for him that he could leave the information for her and she would complete the RFP in the morning.   Irving called Moll at home and left a message for her to come back to the office that night.   Moll did not go back to the office that night because, given the prior notes and comments, she was afraid to be in the office alone with him at night. PCF¶ 82. In February or March, 2002, at an informal luncheon, Irving walked up to DeLena, looked at her breasts, and said "hooters." Scott Ruddy, a Manager from the Albany Office, laughed and stated "you said hooters, I can't believe you said that." PCF¶ 116.   In May 2002, in addition to having to physically go into Irving's office to talk with him, Irving stopped approving any requests that Moll had to work from home despite permitting Finnegan to work from home on an almost daily basis until at least August of 2003. PCF¶ 118. Moll felt this was yet another effort for Irving to control her location while at work.   In October 2002, Irving followed Moll to a client lunch that he had not been scheduled to attend.   He did not follow any other sales engineers around to client luncheons.   When Moll asked him why he was following her, he said that he wanted to "develop" her.   Moll found this behavior threatening and harassing. PCF¶ 125.

In the year 2000, Moll's SEM had been Chris Gaglione (hereinafter "Gaglione").   For her year-end appraisal, Gaglione believed that Moll was ready to be promoted from the position of SE I to SE II.   To be promoted, she would have to appear before an assessment board to demonstrate to them that she was capable of handling the requirements of the job into which she would be promoted. (PCF ¶ 42).31   Irving, now that he was her supervisor, and now that she had rejected his advances, refused to permit her to assess for the SE II position.   He would either

5

ignore her requests or would tell her that a promotional freeze was in place.   (PCF ¶ 131-132).
This continued throughout Irving's tenure as her SEM, at the end of 2002.

However, Byrne was assessed and promoted by March, 2001.   Two SEs in Albany,
Mark Connor (hereinafter "Connor") and Sean Brown (hereinafter "Brown"), were assessed and
promoted in October 2002.   (PCF ¶ 131).   Thus, even if a freeze had been in place, it was over
by, at the latest, October 2002.   Irving did nothing to promote her and, in fact, actively
prevented her from being promoted because she continually rejected his sexual advances.

In 2003, Gaglione became her SEM again.   Seeing that she had been unjustifiably
delayed in being promoted, he then added her to a slate of candidates for promotion, even over
other candidates.   (PCF ¶ 133).   Moll was promoted to SE II on August 17, 2003. PCF ¶ 149.

Irving disciplined Moll for a purported performance problem by placing her on a
counseling plan in March, 2002.   He claimed that she failed to respond to a Vz business office
representative who was calling with a question that should have been directed to another
employee and that she prepared an incomplete and shoddy proposal (known as an RFP) when
she once again rebuffed another sexual advance by refusing to go back to the office with him
alone at night.   (PCF ¶ 82-85).   This was also done even though other, male employees had far
more serious performance issues without being subjected to any discipline.   For instance, a
CAM, Mike Finnegan (hereinafter "Finnegan"), was found to not meet expectations.   Yet he was
not terminated.   He was found a new position within the company. PCF¶ 72. Throughout 2002
and 2003, David Winley (hereinafter "Winley"), an SE/TSS, had significant performance
problems, was deemed to need improvement, but was never disciplined.   For instance, Winley
could not operate necessary software programs to prepare price quotations, and relied upon
others to do that for him.   He went on vacation without completing a proposal that was due,
requiring Byrne to complete it, even though her mother was dying from a terminal illness.   (PCF
¶ 72, 127).   CAM Tim Mitten (hereinafter "Mitten") was permitted to fail to meet his sales

6

objectives for months on end, in violation of company policy.   Not until two years after he

proved that he could not meet his sales objectives, Vz terminated him.   (PCF ¶ 71, 78, 88).

Moll and Byrne were excluded from the opportunity to use Buffalo Sabres hockey tickets

to entertain clients.   For the 2003 season, Irving made available to the male employees a list of

games from which they could choose tickets to entertain Vz clients.   Neither Moll nor Byrne

were given this opportunity. PCF ¶ 156-160. In 2004, Moll was excluded from a charity golf

outing at which Vz was entertaining a large client on whose account Moll worked.   She was the

SE for BOCES at the time, and the logical choice to attend this event.   She was not invited.

Rather, Irving took a former Vz employee in her place. PCF ¶ 180.

Moll could not work from home, although other men worked from home consistently.

In June 2002, Irving sent an e-mail to Moll that she would no longer be permitted to work from

home.   She worked from home normally only when one of her children were ill or when the air

conditioning failed in the office.   However, Finnegan, who was now working as a project

manager, frequently worked from home.   Moll replied to Irving's e-mail, hoping that this rule

would apply to Finnegan.   Irving stated that he would decide who could or could not work from

home.   This was yet another attempt by Irving to keep Moll close to him. PCF¶ 117-119.

Finnegan came to the office no more frequently after the e-mail than he did before.   More

egregious was his use of his business fax line in his home, installed by Vz, while he was working

at home.   Finnegan would tell others that his fax number was "25PENIS".   He continued to use

this fax number during these legal proceedings. (PCF ¶ 144).

Vacation days were to be assigned based upon seniority; i.e. if a more senior person

wanted to take the same vacation day as a junior person, the senior person was entitled to that

vacation day.   However, on July 5, 2002, Moll, a 12-year employee, was denied the day while

Kevin Dean, (hereinafter "Dean") a 4-month employee, and Winley, a 3-month employee, were

given that day off.   Over Christmas 2002, Moll was required, for the only time in her career, to

check her voicemail or be available by cell phone.   To her knowledge, no male SE had this requirement. (PCF ¶ 118).

Vz also protected both Mitten and Finnegan when they proved incapable of performing their jobs.   In November of 2002, Irving declared at a sales meeting that he would manipulate a sale to help SE/TSS Dean receive credit because "the poor guy wasn't making his objective." (PCF ¶ 120).   In 2001, despite the fact that all SEs had a team goal, and should have the same appraisal rating for results based on the team goal, Irving rated Spencer as being "very effective" while he rated Moll as "improvement needed."   (PCF ¶ 79)

Initially, Moll was hired in the same year as Spencer, however earning $13,900 a year less than Spencer ($47,400 vs. $61,300). (PCF ¶ 51).   While Vz suggests that this was due to Moll's limited education, Winley was hired in 2002 with only a high school education at a salary rate of $90,000 per year.   (PCF ¶ 10).   While the SEs performed substantially similar work requiring similar levels of skill and effort, the pay disparity between Moll and her male colleagues actually increased.   (PCF ¶ 51).   As an example, as of April 1, 2002, Moll was earning a base salary of $54,400.   Spencer was earning a base salary $72,800.   Dean was earning a base salary of $88,000.   Winley was earning a base salary of $90,000.   On April 30, 2003, Moll was earning a base salary of $56,600; Spencer earned $76,200; Winley and Dean were still at their respective 2002 rates.   Spencer left this group in early 2004.   When he did so, Moll's salary was $16,800 per year lower than Spencer's. Amazingly, despite starting in the same year,   Moll's base salary in the year that Spencer left was still less than his base salary when he started with 7 years earlier. (PCF ¶ 51, 151).   Yet, they performed the same essential job duties. As their former supervisor, Gaglione, stated, "There was no distinction between a level of skills, effort and responsibility between Mr. Winley, Mr. Spencer, and Ms. Moll." (Ex. S. ¶ 11).

Moll, despite the overt harassment of Irving, was not the first female to complain to Vz about sexual discrimination.   CAM Sara DeLena complained first, followed by Byrne.   In November, 2002, Moll was contacted by Antoinette McDermott, of Vz's Equal Employment Opportunity office, and informed that another female co-worker, Byrne, had complained to the

8

EEO of sexual discrimination.   At that time, Moll complained to McDermott about Irving's conduct, his notes and comments, as well as the other discriminatory and harassing conduct to which Moll, Byrne, and DeLena had been subjected.   McDermott contacted Moll to investigate prior complaints of Byrne.   At that time, Moll told McDermott about the discrimination and retaliation to which she had been subjected. PCF¶ 73.

Shortly after Gaglione became her SEM again in 2003, Moll complained to him about Irving's discrimination.   Gaglione confirmed that Moll complained to him that Irving had made unwanted sexual advances to her by leaving a note on her desk that he thought about her while he was in the shower and she wasn't happy about it.   She may have mentioned at that time there were other notes and Gaglione thought she said she saved one (Ex. AAA, pp. 39-40).   Gaglione also believes that Irving said that he left the notes on Moll's desk but meant them in a complementary fashion.   Ex. AAA, pp. 110-111.

On April 10, 2003, McDermott conducted an informational meeting regarding training about discrimination, retaliation and harassment.   Irving, who was no longer Moll's manager but still worked in the same office, was one of the attendees of the meeting.   One of the reasons for this meeting was that females in the office had previously complained of discrimination within the office.   Gaglione recognized that there was a problem and unhealthy environment in the office and set up the training.   Irving, during the presentation, laughed and joked during the vignettes set forth by McDermott.   Byrne and Moll both complained to Gaglione and McDermott about this behavior.   In June, 2003, Moll sent an email to McDermott further itemizing her complaints of harassment and discrimination, including having Irving at the training session.   Vz failed to respond.   PCF¶ 73.

Moll made further complaints to McDermott on August 18, 2003 about harassment and discrimination.   McDermott kept handwritten notes of that conversation (Exhibit XX).   In particular, Moll told McDermott about further notes she had received from Irving and faxed her a copy of the note (Ex. YY).   Vz still took no action with respect to Moll's complaints. PCF¶ 31.

Moll was removed from a client account in August 2004 after complaining that, in May, 2004, Vz corporate account manager, Ray Brogan (hereinafter "Brogan"), had asked the client to back date an agreement by 3 months and promised to waive mileage charges for PRI service that Moll believed could not be waived.   While she was told that a representative of the client had asked to have her removed, she had never worked with that individual. (PCF ¶ 72).

As a result of the discrimination and retaliation endured by Moll, she filed a Charge of Discrimination with the EEOC on September 19, 2003.   (PCF ¶ 153).   Thereafter, on July 14, 2004, she filed an Amended Charge of Discrimination. On October 5, 2004, she filed her Complaint in the instant action. (Dkt. 1).   It was received by Vz on November 2, 2004. (PCF ¶ 189).

One month later, Vz transferred Moll's job, Byrne's job, and the jobs of two other individuals (Finnegan and Mike Chase) from its Buffalo to its Syracuse office.   It did so because "they believed this action would force [Moll and Byrne] to leave ESG." (Ex. S. ¶ 14). Gaglione conceded that this action was taken in retaliation for Moll's continuing complaints of discrimination and retaliation.   "The primary factor for this decision was an effort to retaliate against both Ms. Moll and Ms. Byrne for their continuing complaints of discrimination and retaliation.   Dixon and Van Hoesen wanted to make life as difficult as possible for Ms. Moll and Ms. Byrne and stated that they believed this action would force them to leave ESG."   PCF¶ 190

While Robert Dixon, (hereinafter "Dixon") Gaglione's supervisor, and the architect of this plan, stated that he wanted to transfer these jobs to Syracuse to be with Gaglione and other SEs that he supervised in Syracuse, Gaglione stated that this justification was a mere pretext.   The primary function of SEs was to lend technical and sales support to CAMs.   By moving to Syracuse, these SEs would be split from the CAMs in Buffalo that they otherwise supported. Furthermore, with numerous clients in Buffalo, on whose projects these SEs worked, these SEs would lose hours every day traveling between Buffalo and Syracuse to meet with clients and CAMs.   (Ex. S ¶ 18).

10

At a meeting, conducted December 3, 2004, at which this plan was announced, the SEs were given 3 options: report to Syracuse; find a new position within Vz; or accept a severance package.   However, Vz offered no details regarding the terms and conditions in the severance package.  (PCF ¶ 191-192).   Faced with a Hobson's choice, Moll chose to transfer to Syracuse. Byrne left ESG and found a new position within Vz.   (PCF ¶ 194).

Shortly after starting work in Syracuse, Moll began having pressure exerted on her to be in the Syracuse office when she was not meeting with clients.   Historically, SEs had been permitted to work from home for short periods of time before or after out-of-office client meetings.   Now, however, Moll was being pressured to be in the Syracuse office when she wasn't meeting with clients.   She began receiving e-mail directives from Gaglione and Dixon to be in the Syracuse office when not meeting with clients.   However, no other SE was subjected to this requirement.   Randy Longhenry, an SE who lived in the Rochester area but worked in Syracuse, frequently would work from home when he was meeting with clients, and Gaglione admitted as much.   The rules for Moll were different than they were for other employees. Finally, Moll was given the directive to be at her desk in Syracuse a minimum of 24 hours per week.   She had never before been saddled with this requirement. (PCF ¶ 202). As an aside, and contrary to the conclusory and unsupported claims of Vz, Moll was travelling to Syracuse on a regular basis.   She testified that when she wasn't meeting with clients, she was in Syracuse. Ex. DDD, pp. 79-82.

In July, 2005, Gaglione and Dixon created a ratings and rankings list of all of the SEs under Gaglione's supervision.   Rather than relying upon prior performance appraisals, Dixon and Gaglione created a vague and subjective list of 9 categories by which to rank the SEs. These categories included categories such as passion, sincerity, teamwork, and ingenuity, among others.   Moll was rated as the least desirable of all of the SEs working for Gaglione.   One of the purposes of this list was for use in an impending reduction in force.   This would have subjected Moll to being terminated. However, several SEs in the Albany office were terminated for cause

in the interim, and Chase resigned, obviating the need for a reduction in force.   However, Moll was told of the ratings and rankings. (PCF ¶209-210).

    As a result of the overwhelming stress and anxiety which Moll experienced over this period of time, her psychiatrist, Dr. Nickolova, removed her from work on a disability leave. While Vz has claimed that this disability was fraudulent because Dr. Nickolova, as a psychiatrist, was limited to the subjective complaints of Moll to make a diagnosis and treatment plan, Dr. Nickolova consistently testified that her diagnosis and treatment plan was based upon the symptoms exhibited by Moll and her experience and expertise as a psychiatrist.   In other words, she did not solely rely upon Moll.   (PCF ¶ 218-238).   It also suggests that if Moll could attend a college class one night per week, a study group another night per week, and volunteer for an hour or two a week, she wasn't disabled.   Yet both Dr. Nickolova and Moll's counselor were aware of her activities, encouraged them, and still found her to be disabled.   (PCF ¶ 236).

    In February, 2006, Gaglione called Moll to advise her that, due to a merger with MCI, her job at Vz was changing, and she would no longer be required to work in the Dixon reporting structure.   Rather, she was being transferred back to the Buffalo office and would work with a new manager, Mark Witte (hereinafter "Witte").   Witte had joined Vz as part of its merger with MCI.   Moll was permitted to choose her work location, either downtown Buffalo at 65 Franklin Street or the office in Amherst.   She chose the 65 Franklin Street address because she was aware that Dixon and Irving worked in the Amherst office.   Thus, she hoped to avoid contact with them.   Feeling relief as a result of her continuous medical treatment, as well as the news that she would no longer be working for Dixon, Moll was released to work in March 2007.   (PCF ¶ 231-232, 234).

    This arrangement worked well until approximately September, 2006, after Witte advised Moll that she would have to report to the Amherst office.   Moll immediately began to relive her experiences while working for Dixon and Irving, began to cry, and asked Witte to reconsider this requirement and permit her to continue to work at the Franklin Street address.   She told him that she had this lawsuit pending in which Dixon and Irving were primary actors and that it would be

12

uncomfortable for her to be in that office.   At a minimum, Moll requested the opportunity to
work in the "shell" office that Witte used when Witte was not there.   Witte denied both requests.
(PCF ¶ 243-247).   Yet, Witte did not require male SE Greg Shelton to report to the Amherst
office.   He was permitted to work in the Syracuse office.   PCF¶ 246.

In September, 2006, Witte set a goal for Moll to add 10 new accounts by the end of the
year.   SEs had never been required to solicit new customers before this time.   Account
managers had, as part of their duties, the job of soliciting new business.   Interestingly, Gaglione,
who continued to supervise SEs in Syracuse, had not been given any instructions to require the
SEs who reported to him to add new accounts.   (PCF ¶ 251).   Furthermore, neither Witte nor
Dixon assigned her as a primary or backup SE to work with any corporate account manager.
This significantly damages her ability to develop customer relationships, since this was normally
facilitate through either the corporate account manager or the SEM.   PCF¶ 244-245, 251.
During this time, Moll also had accounts assigned to other SEs that normally would have been
assigned to her.   The large National Fuel Gas account, which normally would have been an
account for Moll to handle, given her product specialty, was assigned to an SE in Syracuse, Greg
Shelton (hereinafter "Shelton").   Dixon assigned Shelton to this account.   By assigning Shelton
to this account, and not her, Dixon made it more difficult for Moll to achieve her personal sales
objectives, and based upon his management experience within Vz, he would have known that.
(PCF ¶ 244).

Yet Moll still found success with her work.   She was asked to assist Vz to resolve
significant problems with the large and prestigious M&T Bank account which was otherwise
going to result in the loss of significant sales opportunities.   After she was able to successfully
resolve these issues, which neither Shelton (the primary SE on the account) nor Dixon were able
to resolve, M&T agreed to a large purchase from Vz, since it had recently taken over a number
of Citibank branches.   The director of telecommunications for M&T Bank was so pleased with
Moll's efforts he asked to have her assigned to his account on a full-time basis.   Witte refused.
(PCF ¶ 248).

13

Nonetheless, in February, 2007, Witte announced to Moll that a reduction in force was occurring at Vz and she would be the one SE under his supervision to be terminated.   Witte excluded two male SEs from consideration for the RIF, one who had been hired only months before the RIF.   He never sat down with Moll to determine what she could or could not do, nor spoke with her prior supervisor about her abilities.   He admitted that he did not know if she could do voice CPE, add to the ILEC portfolio, or was able to learn how to design IP based services, despite the fact that he considered those skills to be most valuable.   In fact, she did voice CPE (and had been doing it since 2001), had added to the ILEC portfolio and was able to design IP services.   He never attended any customer presentation that she gave. PCF¶ 253. Witte stated that Moll was selected for termination because her skills set was unsophisticated and largely focused on traditional phone services, and her job performance and results trailed those of the other SEs in his group.   Yet, he has offered no facts in support of that conclusion.   Moll had the same skills set, largely focused on traditional telephone services, as Shelton, who was not terminated. Shelton was rarely in Buffalo although his corporate account managers and accounts were located in Buffalo.   Unlike Moll, he also had completed CISCO training, which would have provided him with the ability to design IP services. PCF¶253, Ex. KKK

The only documentation suggesting that Moll's results trailed those of any other SE in her group (all of whom were male) was a vague and subjective Personnel Grading Sales Engineer chart.   Not only was Moll's rating inconsistent with her performance, knowledge, relationship and team (the categories ranked by Witte) as reflected in her mid-year evaluation and daily performance, Witte admitted that he didn't know why he scored her ratings that way and he admitted it was not accurate.   Further, Chris Sacco, a former Branch SEM, stated that standard, objective criteria should have been used in a RIF, and Gaglione stated that he was instructed to use objective criteria, including annual appraisals, when determining who to terminate.   PCF¶ 253.

Moll's termination occurred only 5 months after she told Witte about this lawsuit and only 2 months after she appeared at 11 depositions, including depositions of both Dixon and

Irving.   With no objective criteria to support his decision, Witte, according to Gaglione, was proud that he was the person who terminated Moll.   (PCF 253,256).

**POINT I:    GENUINE MATERIAL ISSUES OF FACT EXIST**

A moving party is not entitled to summary judgment unless there are "no genuine issue[s] as to any material fact," and "the moving party [must be] entitled to a judgment as a matter of law."  *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (citing FED. R. CIV. P. 56(c)).   The moving party must demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).   Once the moving party meets that burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Witter v. Abell-Howe Co.*, 765 F. Supp. 1144, 1147 (W.D.N.Y. 1991).   The Court must view all evidence in the light most favorable to the nonmoving party.   *See Buttry v. General Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir. 1995).   The Second Circuit has noted that summary judgment is ordinarily inappropriate in a discrimination case because intent and state of mind are in dispute.   *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000).   Rather, evidence must be scrutinized for circumstantial evidence of discrimination.   *See Ponticelli v. Zurich American Insurance Group*, 16 F. Supp. 2d 414, 424 (S.D.N.Y. 1998) (citing *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1224 (2d Cir. 1994)).

Vz's Motion should be denied in its entirety.   Looking at the facts most favorable to Moll, genuine issues of material fact exist as to whether: (I) Vz subjected Moll to an actionable hostile work environment based on gender; (II) Vz retaliated against Moll for engaging in protected activity; and (III) Vz discriminated against Moll on the basis of gender.

Vz suggests that the related case, *Byrne v. Telesector Resources Group*, 339 Fed. Appx. 13 (2nd Cir. 2009) should control the outcome of this case.   Yet Vz neglects to add that the Court explicitly declined to offer any opinions on Moll's claims when it wrote that "[w]e express no view on the ultimate merits of employee Cindy Moll's pending Title VII action..."   Further, while the two cases share some facts, they do not share all facts.   In particular, Byrne did not receive unwelcome sexual advances from Irving; did not receive unwelcome comments from

15

> **Commented [JS1]:** Only cert denied if the case is less than 2 years old.

Irving about "looking great and smelling great"; did not receive unwelcome notes from Irving

stating that he thought of her in the shower or hated when they were interrupted; was not

required to physically appear before Irving to discuss any work related matter with him, so that

she could be reminded of his unwelcome sexual advances.   In short, *Byrne* is not controlling in

this case and has no res judicata or collateral estoppel effect.

**I.      THE COURT SHOULD DENY DEFENDANT'S MOTION WITH RESPECT TO MOLL'S HOSTILE WORK ENVIRONMENT CLAIMS.**

Both Title VII and the New York Human Rights Law provide Moll a cause of action for

gender-based hostile work environment.   *See Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d

Cir. 2004); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 309-311 (2004).   Under that

framework, Vz's Motion should be denied with respect to Moll's gender-based hostile work

environment claims because she demonstrates questions of fact on whether (A) "[t]he workplace

was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter

the conditions of . . . her work environment, and [(B)] that a specific basis exists for imputing the

conduct that created the hostile environment to the employer."   *Petrosino*, 385 F.3d at 221

(internal quotation marks omitted).

> [W]hether an environment is "hostile" or "abusive" can be
> determined only by looking at all the circumstances. These may
> include the frequency of the discriminatory conduct; its severity;
> whether it is physically threatening or humiliating, or a mere
> offensive utterance; and whether it unreasonably interferes with an
> employee's work performance. The effect on the employee's
> psychological well-being is, of course, relevant to determining
> whether the plaintiff actually found the environment abusive. But
> while psychological harm, like any other relevant factor, may be
> taken into account, no single factor is required.

*Harris v. Forklift Sys., Inc*., 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993).

**A.      Questions of Fact Exist as to Whether Defendant Subjected Moll to Severe or Pervasive Gender-Based Intimidation and Harassment.**

A hostile work environment is not only discriminatory behavior directed at a plaintiff, but

also includes "discriminatory behavior not directed at plaintiff" of which she was aware, because

this behavior "can still contribute to the creation of an overall hostile work environment."

16

*Patane v. Clark*, 508 F.3d 106, 114 (2d Cir. 2007); *see Cooper v. John D. Brush & Co.*, 242 F. Supp. 2d 261, 270 (W.D.N.Y. 2003) (holding that statements not directed at plaintiff can be evidence of hostile environment).

Moll has set forth in the Statement of Facts, pp. 2-15, evidence demonstrating a multitude of serious acts which establish questions of fact on the severity or pervasiveness of her hostile work environment claim.   These acts are set forth in list form, and attached hereto, as Exhibit A for the convenience of the Court and also as Exhibit MMM in Plaintiff's Counter-Statement of Facts.   These incidents violated Vz's corporate policies which were intended to prohibit discrimination and harassment.   These policies required, among other things, that:   "all people with whom [an] employee may come into contact will be treated with respect, dignity, and honesty"; Vz would not "tolerate any discriminatory slurs, remarks, jokes, or conduct that encourages or permits an offensive or hostile work environment"; Vz "strictly prohibited any form of sexual harassment in the work place … unwelcome sexual advances, verbal or physical conduct of a sexual nature, gender harassment, or display of sexual suggestive objects or pictures"; "sexual harassment includes threatening either explicitly or implicitly that an employee's submission to or rejection of sexual advances will in any way influence any decision regarding that employee's terms and conditions of employment"; employees "must not engage in behavior that ridicules, belittles, intimidates, or otherwise threatens or demeans coworkers — harassment can include racist, sexist, or ethic comments and jokes"; conduct to be avoided includes "sexual propositions, remarks, jokes using pet names (honey or babe) — suggestive gestures, leering, staring, offensive cartoons, emails or graphic images, posters".   Exhibit BBB.

Irving admitted that these acts would violate these policies, including telling co-workers and others that your fax number is 25-PENIS; joking about using whipped cream in bed; about using pet names such as "hottie"; leaving notes for female co-employees; and telling a female co-employee that you think of her in the shower. PCF ¶ 144.

Evidence of these acts is sufficient to survive summary judgment on Moll's gender-based hostile work environment claim because questions of fact exist as to "whether the harassment

17

[wa]s of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*."  *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (internal quotation marks omitted) (emphasis in original) ("caution[ing] against setting the bar too high" in hostile work environment cases); *see Castagna v. Luceno*, 558 Fed. App'x 19, 21 (2d Cir. 2014) (quoting *Petrosino*, 385 F.3d at 223); *Leifer v. New York State Div. of Parole*, 391 Fed. App'x, 32, 36 (2d Cir. 2010) (cautioning against considering each incident of alleged harassment without considering the cumulative effect of all incidents); *Patterson v. County of Oneida*, 375 F.3d 206, 277 (2d Cir. 2004) (requiring that hostile work environment claims be considered based on the totality of the circumstances).

Additionally, a finding that Moll creates questions of fact would comport with the well-established principle that "[t]he severity and pervasiveness evaluation [of a hostile work environment claim] is particularly unsuited for summary judgment because it is quintessentially a question of fact."  *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 958 (10th Cir. 2012) (internal quotation marks omitted); *see Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) ("[H]ostile work environment claims present mixed questions of law and fact that are especially well-suited for jury determination." (internal quotation marks and alterations omitted)); *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997).

Moreover, Vz frames its argument in a manner expressly rejected by the Second Circuit. *See* Def.'s MOL at 7-8 (comparing the facts to the facts in *Alfano v. Costello*, 294 F.3d 365 (2d Cir. 2002) and other cases).   Specifically, instead of conducting the necessary fact-specific analysis of whether or not Vz subjected Moll to a hostile work environment, Vz uses *Alfano* to establish a baseline that Moll must establish to survive summary judgment.   The Second Circuit, however, has rejected this *Alfano*-based argument.   *See Leifer*, 391 Fed. App'x at 36 ("[T]he frequency and severity of harassment demonstrated in prior cases does not mandate a specific level of harassment that future plaintiffs must demonstrate to avoid summary judgment against them."); *see Schiano*, 445 F.3d at 606 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)) (holding that facts from one case do not set a baseline for other cases).   Vz's "not as bad as

18

*Alfano*" argument, therefore, fails to carry Vz's summary judgment burden.

In fact, Moll has set forth sufficient evidence that creates material questions of fact regarding the severity and pervasiveness of Vz's conduct.   Spencer perhaps best described the severity and pervasiveness of Vz's conduct.   When asked why he did not report Finnegan's use of 25-PENIS as a fax number, he testified that:

> I mean, everybody knew Mike, everybody knew what was going on.   I was probably the quietest one there.   So me saying that is just minor compared to other things that were always said every day… I should have reported it, but like I said, the office atmosphere, that one statement, and it keeps coming up, the one statement, was nothing compared to what went on" (Spencer EBT, pp. 23-25).

**B.    Questions of Fact Exist as to Whether Defendant Is Vicariously Liable for This Hostile Work Environment.**

Moll also demonstrates that this harassing conduct must be imputed to Vz.   First, the harassing conduct of Moll's manager, Irving, is presumed imputed to Vz.   *See, Gorzynski v. JetBlue Airways Corp*, 596 F.3d 93, 103 (2d Cir. 2010); *Sarkis v. Ollie's Bargain Outlet*, No 10-CV6283, 2013 WL 1289411, at *11 (W.D.N.Y. Mar. 26, 2013).

Moll also demonstrates bases to impute non-managers' harassing conduct to Vz by showing "'that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action.'"   *Sarkis*, 2013 WL 1289411, at *11 (quoting *Fairborhter v. Marrison*, 412 F.3d 39, 48-49 (2d Cir. 2005)); *see Petrosino*, 285 F3d at 225. Managers such as Irving and McGowan were present, if not actively participating, in the harassing conduct.

Furthermore, Moll actively complained to Vz's EEO investigator, Antoinette McDermott. She complained on at least three occasions: November 2002, June 2003 and August 2003.   She provided McDermott with notes and emails regarding her complaints, including a note from her manager, Irving, that read: "I hate being interupted [sic] when we are talking – people are so rude – yes I know the 23rd was unplanned & I was <u>definitely</u> thinking about the possibilities!! You look & smell great today … Call me?"   Yet, McDermott has no other notes, interviews or other information from any potential witness or perpetrator such as Irving despite the fact that

19

she would ordinarily take and keep notes of interviews that she conducted.   This leads to the inexorable conclusion that either McDermott never spoke to anyone regarding Moll's complaints or that any such notes were never maintained.   Furthermore, from the time that McDermott first spoke to Moll in November 2002, she never made any determination or recommendation regarding Moll's complaints. PCF ¶ 31

An employer is liable for harassment when it knows, or should know, of the harassing conduct unless it can show that it took immediate and appropriate corrective action.   The failure to perform an appropriate investigation creates a material question of fact.   "A reasonable fact-finder could conclude this … investigation was a perfunctory and inappropriate response to [plaintiff's] hostile work environment allegations, which [defendant] arguably should have investigated…"   *Williams v. Consolidated Edison Corp.*, 255 Fed. Appx. 546 (2d Cir. 2007). "Where 'the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate.' " (citation omitted) *Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 250 (W.D.N.Y. 2011).

In light of the fact that Moll's manager was the perpetrator of much of the harassment and hostile work environment, his actions are imputed to the Vz.   The failure of Vz to perform a legitimate investigation into Moll's subsequent complaints simply reinforces the material questions of fact for a jury to answer.

**C.   The Evidence Demonstrates the Moll Perceived the Harassment and Hostile Work Environment to be Abusive.**

Vz argues that because Moll could not have subjectively perceived the environment to be abusive because she didn't immediately complain about every incident of harassment.   To argue that Moll did not complain to Vz about the harassment and hostile work environment to which she was subjected is just plain false.   Male CAM James Keller knew that she complained about these incidents.   Exhibit VV, pp. 290-291.   She complained to Vz's EEO investigator, McDermott, on three separate occasions.   PCF ¶ 22.   She complained to her about the harassment and hostile work environment.   She provided a copy of Irving's note to McDermott.

20

PCF ¶ 25-26. She also complained to her manager, Gaglione, about Irving's unwanted sexual advances and told him about the notes. PCF ¶ 31.

The failure to complain about every event is not sufficient to presume that a plaintiff did not perceive the environment to be abusive.  *Bentivegna v. People's United Bank*, No. 2:14-cv-599, 2017 WL 3394601, at *14 (E.D.N.Y. Aug. 7, 2017), finding a question of fact when plaintiff felt humiliated, embarrassed and ashamed, informally complained, and filed a formal complaint; *cf. Chansamone v. NRG*, No. 10-CV-0147, 2012 WL 1232083, at *10 (W.D.N.Y. April 12, 2012), ruling that no subjective perception of abusive work environment existed when plaintiff completed an exit interview in which he stated he would recommend Vz as a good place to work.

Furthermore, in June of 2004, Moll began to receive psychiatric treatment and counseling for the discrimination and harassment at work.   PCF ¶ 219.   As the Supreme Court in *Harris* noted, "[t]he effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive."   *Id.* at 23.

Not only has Vz failed to meet its burden on this issue, Moll has affirmatively raised material questions of fact to deny Vz's Motion.

**POINT II:   THERE ARE GENUINE ISSUES OF MATERIAL FACT WITH REGARD TO PLAINTIFF'S DISPARATE TREATMENT AND RETALIATION CLAIMS**

The New York Court of Appeals in *Ferrante v. American Lung Association*, 90 N.Y.2d, 623, 629 (1997) ruled that claims under the New York Human Rights Law will be decided in the same manner as Title VII.

The Supreme Court, in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), defined the "burden-shifting" approach upon which all subsequent Federal sex discrimination and New York State Human Rights Law decisions have relied.   In the absence of direct evidence of discrimination or retaliation, i.e. a "smoking gun" admission, the plaintiff has "the initial burden to prove by a preponderance of the evidence a prima facie case of discrimination." *Ferrante*, 90 N.Y.2d at 629; *McDonnell Douglas Corp.*, 411 U.S. at 802; *Trans World Airlines, Inc., v.*

21

*Thurston*, 469 U.S. 111, 121 (1985).   A plaintiff makes out a *prima facie* case by showing:   (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) the ultimate filling of the position by a person not of the protected class.   *Reimer v. Heritage Asset Management*, No. 97-CV-0565, 1999 WL 409513 (W.D.N.Y. 1999), *citing, McDonnell Douglas*, 411 U.S. at 802.   The court in *Reimer* noted that:   The fourth factor may also be satisfied by a showing that adverse employment action took place under circumstances which would give rise to an inference of discrimination or that a similarly situated male was treated differently.   *Reimer,* 1999 WL 409513, at *3, *citing, Montana v. First Fed. S & L of Rochester*, 869 F.2d 100 (2d Cir. 1989).

Once this *prima facie* showing has been met, the burden then shifts to the defendant to rebut the presumption of discrimination by introducing legitimate, independent, and nondiscriminatory reasons to support its employment decision. *Ferrante*, 90 N.Y.S.2d at 629.

If the trier of fact believes the plaintiff, and the defendant has offered nothing to rebut the presumption, then judgment must be for the plaintiff.   If there is a genuine issue of fact raised by the defendant, however, then the presumption of discrimination is dropped.   *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507. Should the presumption be dropped, the burden then shifts back to the plaintiff, who must show that the reasons proffered by the defendant are only a pretext for discrimination.

Retaliation claims are also evaluated under the burden shifting rules established by the Supreme Court in *McDonnell Douglas v. Green.   Id.*   The Second Circuit in *Richardson v. New York Dept. of Correctional Service*, 180 F.3d 426, 443 (2d Cir. 1999), ruled that a plaintiff must show participation in a protected activity that is known to the defendant; an employment decision or action disadvantaging the plaintiff; and a causal connection between the protected activity and the adverse decision.   Should the Plaintiff do so, then the Defendant must come forward with proof of a legitimate non-retaliatory reason for the adverse action.   If it does, the burden shifts back to the Plaintiff to demonstrate that the reason is a pretext for impermissible retaliation. *Richardson, supra*.

Further, Vz's argument that the so-called favorable treatment received by Moll breaks the causal link between its actions and the adverse employment actions fails.   While courts may consider favorable treatment in establishing a causal link, any possible inference of retaliation based on timing is not destroyed in light of favorable treatment before the retaliatory act. Evidence of favorable treatment goes to the third prong of a retaliation claim: "the employer subjected the employee to a material adverse employment action."   *Feder v. Bristol-Myers Squibb Co.*, 33 F. Supp. 319, 339 (S.D.N.Y. 1999).   Favorable treatment may be "an effort to avert or undermine a claim of retaliation.   *Id.* (holding salary increase, bonus, new title, and new reporting relationship after filing charge and having a major portion of reporting duties removed entitled trier of fact to infer favorable treatment was intended to mask retaliatory motive). Furthermore, favorable treatment may be a stopgap to ensure continued benefit to a company until it is convenient to carry out retaliation.   *Meyers v. Medco Health Solutions, Inc.*, No. 09 Civ. 09216(RKE), 2012 WL 4747173, at *9 (S.D.N.Y. Oct. 4, 2012) (holding favorable performance review, salary increase, $40,000 bonus, and additional stock options could have been sequence of events to insure Plaintiff's cooperation in litigation when company fired her after its conclusion).   While Vz, predictably, points to the *Byrne* case in support of its argument, the favorable treatment in *Byrne* was a promotion.   In this case, the only favorable treatment which it points to is annual pay raises, which she received even before she was subjected to discrimination.   Thus, Vz at best creates a question of fact.   Most importantly, as was pointed out in *Byrne*, the only time in which this may be a consideration is if no direct evidence of discrimination or retaliation exists.   In this case, Moll has direct evidence.   Therefore, any pay raised received by Moll do not break the causal connection between Vz's discriminatory actions and its adverse employment actions.

In the instant case, numerous questions of fact exist with respect to whether the conduct to which Moll was subjected was discriminatory and retaliatory.

**Transfer to Syracuse:**   In this case, the evidence that Moll was transferred to Syracuse in retaliation for her protected activity is overwhelming.   First, she has the "smoking gun" direct

23

evidence of retaliation.   The Declaration of Moll's former direct supervisor, Gaglione, specifically stated that, "The primary factor for this decision was an effort to retaliate against both Moll and Byrne for the continuing complaints of discrimination and retaliation" and that "Mr. Dixon and Mr. Van Hoesen wanted to make life as difficult as possible for Ms. Moll and Ms. Byrne and stated that they believed that this action would force them to leave ESG." Gaglione goes on to state that the business justification proffered by the Vz for this job transfer was a mere pretext.   "We justified this transfer with the pretext that all SEs and Project Managers . . . should work together" and "since I was the Sales Engineer Manager and was located in Syracuse, the decision was made to force them to travel to Syracuse."   While this Court, on Vz's first Motion for Summary Judgment, declined to credit this statement, the Second Circuit Court of Appeals explicitly stated that "[i]f defendant files a second motion for summary judgment, we direct the district court to consider Gaglione's second sworn statement in his declaration.   *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 206 (2d Cir. 2014).

Additionally, when Vz was permitted to conduct a non-party deposition of Gaglione on May 10, 2017 to attempt to discredit his statements, he reinforced the proof of retaliation.   He testified that Van Hoesen wanted to settle this thing and be done with it but was advised that sort of thing was not a great strategy so Dixon came up with a plan that he thought was great.   Dixon said "like I have an idea-I can make this go away.   I can end it once and for all, you know?   I can make our business get back to normal."   ESG management, including Van Hoesen, Dixon, and Gaglione, thought the various complaints of discrimination and retaliation by Moll and Byrne were very disruptive to the business operation of the management of ESG.   Dixon and Van Hoesen wanted to make life as difficult as possible for Moll and Byrne and stated they believed this would action force them to leave. The purpose of developing a plan from Dixon's standpoint what to get them to leave. They all knew Moll and Byrne would not move to Syracuse. It was not a possibility.   Everyone knows that it's hard in a short period of time to find another job within the company. Dixon and Van Hoesen were counting on them not moving. They wanted them out. PCF ¶190.

24

Vz, realizing that it cannot escape from retaliatory actions, instead argue that Moll wasn't adversely affected by their retaliatory actions.   But, Courts have recognized that a distant transfer can be an adverse employment action even without a demotion.   *Russo v. Trifari, Krussman & Fishel, Inc.*, 837 F.2d 40 (2d Cir. 1988); *Keeton v. Flying J, Inc.* 429 F.3d 259 (6th Cir. 2006); *Maglietti v. Nicholson*, 517 F.Supp.2d 624, 628 (D.Conn. 2007), finding transfer to facility which increased the commute time by two hours was adverse employment action; *Weeks v. Michigan Dept. of Community Health*, 2:08-CV-15124, 2010 WL 3906894, at *5 (E.D.Mich. Sept. 30, 2010), citing *Keeton* in holding that "a jury could reasonably find that Plaintiff's 90-mile transfer constituted an adverse employment decision.   A genuine issue of material fact therefor exists as to whether Plaintiff's relocation constituted an adverse employment decision."

Furthermore, it argues, falsely, that she was working from home and not Syracuse. Moll, however, explicitly testified that she was required to be in Syracuse, and when she wasn't meeting with clients in Buffalo, she was working in Syracuse.   Exhibit DDD, pp. 79-81.   Vz has produced no evidence that Moll ever worked from home.   At best, it has provided the conclusory (and unsupported) statements that she "never actually reported to Syracuse."   (See Defendant's MOL, Dkt. 217, p. 23). But Gaglione never said that.   He said that he didn't pay attention to when she was there, that he encouraged her to schedule as many appointments possible out of the office, but that she was a rule-follower and didn't heed his recommendation. Exhibit AAA, pp. 80-82.   In fact, Dixon and Gaglione eventually required her to be at her desk in Syracuse 8 hours a day, 3 days a week.   She could not meet with clients on those days.   No other sales engineer ever had that requirement.

Further, Vz's contentions that she didn't work in Syracuse after she went on disability leave, so there was no adverse action against Moll, are preposterous.   The evidence indicates that Moll went on disability leave **because** of their retaliatory acts, discrimination, and harassment culminating in her transfer to Syracuse.   It can't benefit from its retaliatory actions which cause an employee to take a disability leave for emotional distress, and then claim that she wasn't adversely affected because she wasn't coming to work.

25

Lastly, to the extent that Vz relies on the prior ruling of this Court which granted, in part, the prior Motion for Summary Judgment, it fails to consider that the Second Circuit Court of Appeals vacated the prior Order.   The effect of the vacatur is to treat the case as if there had never been an Order in the first place.   *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950).   The Second Circuit vacated the entire Decision and Order; it has no precedential value.

While it was true that Moll was given several options, either find a different job at Vz, accept a "blind" severance package in which she had no idea what the terms would be until after she accepted it (reminiscent of the old game show Let's Make a Deal), or transfer to Syracuse, Gaglione, Dixon and Van Hoesen intended to get rid of Moll, one way or the other, because she had complained of discrimination.   That is the very definition of retaliation.

In light of the admission by Gaglione that Vz intended to retaliate against Moll by transferring her to Syracuse, Moll has raised significant questions of fact so as to deny the Motion.   Even if the Court does not accept the "smoking gun" admission, the circumstantial evidence strongly suggests that the decision to transfer Moll was retaliatory.   She was told, on December 3, 2004, that her job, along with the job of another woman who had commenced a legal action against the Vz for sexual discrimination and retaliation (and two other individuals) would be transferred from the Buffalo office to the Syracuse office.   Almost one month to the day before this announcement was made, Vz was served with the Federal Court Complaint of Moll alleging her own allegations of sexual discrimination and retaliation.   Less than two months before that time, on August 9, 2004, Moll had received a Notice of Right to Sue from the Equal Employment Opportunity Commission.   Vz, through its counsel, had received a copy of the Notice of Right to Sue.   And, less than two months before that time, on July 14, 2004, Moll had filed an Amended Charge of Discrimination with the Equal Employment Opportunity Commission against the Vz.

In *Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County*, 252 F.3d 545, 554   (2d Cir. 2001), the Court found that a causal connection to support a discrimination or retaliation claim can be shown by demonstrating that a protected activity was closely followed in

26

time by an adverse employment action.   The Court also said no bright line exists to define the outer limits of the temporal relationship.   Yet the court wrote that "[w]e are particularly confident that five months is not too long to support such an allegation where plaintiffs have provided evidence of exercises of free speech and subsequent retaliatory actions occurring between December 1997 and April 1998." *Id*. at 555.   This Court, in *Stephens v. State University of New York at Buffalo*, 11 F.Supp.2d 242, (1998) found that an eight month time gap was sufficient to allow a jury to conclude that the employer had a retaliatory motive.

**Discipline:** On March 12, 2002, Irving placed Moll on a Disciplinary Counseling Plan. This was discriminatory and retaliatory.   The Counseling Plan was purportedly because Moll had been unresponsive to a a Vz business office representative who had a question on behalf of a client regarding a post-sale question and an RFP on which she had worked and had been submitted to the Rochester City School District was not up to her capabilities.   Irving implemented this plan after Moll had repeatedly refused his sexual advances; the last of which had been at the end of January, 2002 when she refused to come back to the office at night to work alone with Irving.

Yet, the evidence indicates that this was a pretext.   Irving implemented this plan after Moll had repeatedly refused his comments, notes, and sexual advances; the last of which had been at the end of January, 2002 when she refused to come back to the office at night to work alone with Irving.   Further, the discipline was unwarranted.   The question posed by the business office representative had been about post-sale implementation questions, which would normally be handled by that representative's supervisor.   Likewise, the RFP that Irving complained about had been prepared by Moll with as much information as she had.   However, she was waiting for Irving and Gayle Halstead to provide pricing information to her.   They provided the pricing information to her very near the deadline to submit the RFP.   Thus, Moll was not able to complete it at the time that Irving wanted it completed, although it was submitted to the Rochester City School District in a timely fashion.   While the bid for the Rochester City School District was won by a competitor, Moll learned that the bid was won, not on the basis of any

27

incomplete information contained in the RFP, but rather solely on price.   A competitor of Vz, Ronco, had simply out bid them.   The Counseling Plan remained in Moll's personnel file and was able to be used by Vz to supplement any discipline that it wished to impose upon her.

Further evidence of the pretext is the disparate manner in which Vz meted out discipline. Other male employees were not subjected to discipline when their conduct of performance merited far more severe penalties.   Finnegan openly told others that his home, business fax number, installed by Vz, was "25PENIS."   Finnegan suffered no adverse employment action as a result of this egregious behavior.

Other SEs faced no ramifications when they failed to complete RFPs.   For instance, David Winley, around Easter of 2003, failed to timely complete a large RFP for the National Fuel Gas account.   Gaglione and others had to complete the RFP.   Nonetheless, he received no discipline for this failure.   Similarly, in November 2003, Dean, who was a primary SE for the BOCES account, was not required to prepare an RFP for that account.   Then, in the following month, Dean left for vacation without completing another RFP for the Buffalo Board of Education.   Dean, like Winley, was not disciplined for his failure to complete the RFPs.

Furthermore, following her repeated rejections of his sexual advances, he gave her an appraisal in March 2002 for year 2001 in which, for the first time in her career as an SE, she received ratings of Needs Improvement.   Prior to that, her annual ratings, both overall as well as in various sub-categories, had been either Meets or Exceeds Expectations.   For the 2001 appraisal performed by Irving.   Irving rated her as Needing Improvement in both the sub-category of Leadership Focus and Results Focus.   Results Focus, in particular, helped drive annual merit increases.   In that year, she received a merit increase of only 1.87%.   Conversely, Spencer received a rating of very effective, even though they should have had the same rating because they had a team goal, and had an increase of 7.9% in January and 4.36% in April. Thus, Irving adversely impacted her earnings by his retaliatory Performance Appraisal and Counseling Plan.

28

**Removal from SUNY Account:** Following complaints that Moll made regarding the conduct of CAM Ray Brogan in connection with the SUNY at Buffalo account, she was removed from handling that account.   In May 2004, Moll, Brogan and another SE were at a meeting at SUNY Buffalo during which Brogan asked the representative from SUNY, Fred Wood, to back date the agreement on which they were working by three months, and Brogan also told Wood that Vz would waive monthly mileage charges for their PRI service.   Moll told Brogan that she believed he could not back date the agreement nor could he waive the mileage charges.   Brogan was livid. Moll, thereafter, complained to her supervisor, Gaglione, his supervisor, Dixon, Brogan's supervisor, Don Donohue, and the Ethics Hotline.   Moll was removed as SE on this account in August 2004.   Vz claims that Moll was removed from this account because another representative of SUNY, Mark Duell, stated that he was unhappy with Moll's work on the account.   However, Moll and Duell had never met.   Moll's contact had been solely with Fred Wood.   This removal constituted an adverse employment action, since it was less likely that Moll could meet her sales objective set for the year that was set by Vz.   *See, Hyland v. Xerox Corp.*, 380 F.Supp. 2d 705, 711 (D.Md. 2005).

**Requirement to Add New Accounts:**   In September 2006 Witte required Moll to add ten new accounts to her module.   SEs had never been required to solicit new accounts. Soliciting new customers was not part of the job requirements of an SE.   CAMs had, as part of their duties, the requirement to solicit new business on the part of Vz.   Moll, in her entire career as an SE, had never been required to solicit new accounts, until Witte added this to her job duties in September 2006.   Gaglione, who was supervising SEs in Syracuse at the time, had received no directive that any SEs under his supervision should have this requirement, nor did he ever insist that an SE under his supervision add new accounts to their module.   Nor would SEs be permitted to just cold-call customers to attempt to establish a relationship.

Since Moll (and no other SE) had ever previously been required to add new accounts to her module, and she was now required to do so within the last three months of the year, Vz created an unattainable goal in an effort to set her up to fail.   *See, Willnerd v. First National*

29

*Nebraska, Inc.*, 558 F.3d 770, 779 (8th Cir. 2009).   This was even more true since neither Witte nor Dixon assigned her to work with any CAM as a primary or backup SE.   Without having a CAM, she had no ability to add customers or increase relationships. PCF ¶ 251.

**Delayed Promotion:**   Moll was entitled to a promotion as early as the Spring of 2001, from the position of SE I to SE II. Gaglione reported that she was ready to be assessed in March 2001.   Moll began asking for the right to assess and to be promoted in the Summer of 2001, and continued to ask Irving up until the time that he left as her supervisor at the end of 2002. Irving had made repeated sexual advances to Moll, all of which she rejected.   The last of these was in April 2001, when he left a note at her desk telling her he thought about her while he was in the shower.   Thereafter, he denied her this promotion to which she was entitled.   He either ignored her requests or told her that Vz had a freeze on promotions.   Nonetheless, during the time that Defendant claimed to have a freeze on promotions, two SEs from Albany, Mark Connors and Sean Brown, were assessed and promoted to the position of SE III.   Despite Irving's protestations to her that a promotional freeze was in place, Connor and Brown were promoted in October 2002.   Furthermore, the fact that they were promoted in October 2002 means that they had to assess before that time.   Thus, Irving knew, or should have known that the purported promotional freeze had ended.   Nonetheless, he refused to promote her.   As this Court found in *Byrne v. Telesector Resources Group*, Civ. No. 04-CV-0076, 2007 WL 962, 929, 910 (W.D.N.Y. 2007) a claim of retaliation can exist, and in that case, did exist, for delaying Byrne's promotion under identical circumstances.

**Personal Contact:** After Moll's repeated refusals of Irving's unwelcome sexual advances, Irving required Moll to personally meet with him to discuss work related issues. Beginning in June 2001, and continuing through the end of 2002, Moll was not permitted to email him or to telephone him with such questions.   In fact, Irving went so far as to follow Moll around to a client meeting without any justification for this.   This was intimidating and threatening to Moll.   While Irving asked all of the SEs to "cool the e-mails" to him, Vz offers no justification for requiring Moll to not call him but to meet with him in person.   He did not

require any other SEs to meet with him in person (rather than communicate through email or telephone) nor did he follow any other SEs to client appointments.

**Perquisites:**   Moll was also not provided with the opportunity to entertain Vz's clients with hockey tickets or at corporate golf events.   It was common knowledge that Irving would purchase season tickets for Buffalo Sabres hockey games and would offer a group of these tickets to the male SEs to take corporate clients.   Moll was denied opportunities to succeed which were granted to other males in her department.   A list of available games was provided by Irving to Spencer, yet, neither Moll nor Byrne were offered this opportunity.   Irving took a client, BOCES, to an annual golf event.   In 2004, Moll was the SE assigned to the BOCES Account.   Irving refused to invite her.   Rather, he invited Dean.   However, Dean was no longer employed by Vz when Irving invited him.

**Work at Home:** Following Moll's repeated refusals of Irving's unwelcome sexual advances, Irving required Moll to come to the office instead of periodically work from home in the event of a sick child beginning in May 2002.   When Moll objected, asking whether this requirement was going to apply to the men in the office, like Finnegan, Irving replied that he would decide who this requirement would apply to. This was yet another effort on the part of Irving to control Moll's location at work and keep her near him.   Vz can point to no justifiable reason why this requirement would apply to Moll but not to the men.

**Sales Manipulation:**   When male employees were having difficulty meeting sales objectives, Irving made it clear that he would be willing to "manipulate" the system on their behalf.   In November 2002, when Dean was far short of his objective, Irving indicated that he was prepared to manipulate a sale to benefit Dean because "the poor guy wasn't making his objective."

Likewise, Moll was denied credit for sales which were improperly credited to Winley in 2003.   While this may not have been the result of an intentional act on the part of the Defendant, the Defendant never took any action to correct it.   She never received proper credit for this sale which was improperly credited to Winley.   This action impacted her ability to meet her sales

objective for the year, and thus impacted on her performance appraisal, which would have impacted the merit raise for the following year.

Finally, pay and sales credits were manipulated to benefit the male SEs. Moll was the lowest paid SE for every year that she was employed by Defendant. Both she and Spencer started in SE positions (then known as Systems Analysts) in 1997. Spencer left the SE position in 2004. Moll, despite the "generous" raises that Defendant suggests that she received over the years, did not earn as much in her final year as a SE as did Spencer in his first. Yet, they performed the same job, designing telecommunications systems and preparing price estimates for these systems, for this entire period of time.

**Termination:** Vz discriminated and retaliated against Moll by terminating her in February 2007 as a result of a Reduction in Force. Much like the evidence of Moll's retaliatory transfer to Syracuse, Moll has a "smoking gun" admission of retaliatory intent. Witte, 5 months after learning that Moll had a lawsuit against Vz for discrimination and retaliation, and less than 2 months after the start of 11 depositions in her case, terminated her and was heard to brag that he was proud to be the one to finally get rid of Moll. PCF ¶259. See, e.g. *Trans World Airlines, Inc.*, *v. Thurston*, 469 U.S. 111, 121 (1985). Witte's bragging of being the one to be proud to finally terminate Moll, especially taken in the context of the ongoing litigation, is compelling evidence of his retaliatory animus.

Even if this evidence is not considered to be a "smoking gun", the circumstantial evidence creates multiple questions of fact of the discriminatory and retaliatory animus behind Moll's termination. In September 2006, Witte told her that she would need to change office locations from 65 Franklin Street in downtown Buffalo to Amherst. Moll knew that three of the people that she believed had discriminated against her, Dixon, Irving, and Brogan, worked out of the Amherst office. When Witte told this to Moll, she immediately broke down and began to cry. She spoke to Witte and asked him to permit her to continue working in downtown Buffalo. She explained to Witte that she had this lawsuit pending in which they were primary actors. She made it clear she wanted to avoid contact with them. Witte, however, refused to relent. He

32

required that she come to the Amherst office more frequently, putting her in close physical proximity to them.

Then, beginning in November, 2006, depositions began to be conducted in her case. Dixon testified on December 7, 2006 and Irving on January 19, 2007.   Nine other depositions were conducted throughout November, December, and January.   Within weeks of the commencement of depositions, and within five months of complaining to Witte about being in proximity with these two individuals, Witte chose Moll as the sole SE within his group to be terminated pursuant to the Reduction in Force.   Witte, in conclusory fashion, states that Moll's skills set and work performance were the reasons for her termination.   The skill set and product specialty maintained by Moll, traditional voice, long distance and telephone services, was the same skill set maintained by another SE within Witte's group, Greg Shelton.   Shelton was not terminated during this Reduction in Force.

Sacco testified that he would have expected the use of objective criteria to make this determination and Gaglione stated that he was told to use objective criteria, including annual appraisals. PCF ¶ 253. Yet, Vz produced no documentation regarding the RIF or the decision to terminate Moll.   "[W]e note that the failure to keep records of the reduction in force that resulted in Moll's termination may itself constitute evidence that the reduction in force was pretextual." *Moll v. Telesector Res. Grp., Inc.,* 760 F.3d at 204.

In fact, the only comparison of SEs which Vz has produced is a Personnel Grading Sheet prepared by Witte (Exhibit HHH), which he testified that he did not rely on for the RIF; he could not say when it was created; it was not related to Moll's mid year review; but he believes he prepared it as a slide as part of a PowerPoint presentation to management.   Furthermore, he stated that this ranking sheet was inaccurate.   It was just a subjective document, he didn't know why he scored it that way and didn't recall how it was put together. PCF ¶ 253.

Witte admitted that he excluded two male SEs from consideration from the RIF: Tom Elks and Kyle McMinn.   He also claimed that he selected Moll, who he knew had a lawsuit against Verizon, based on his own objectives.   One of these objectives, he claimed, was to have

33

engineers that could do complicated CPE work.   He did not know whether Moll could do CPE work.   He also claimed that the focus was on actually adding to the ILEC portfolio and being able to learn how to design IP-based services.   However, he didn't know whether she could do that.   In fact, Ms. Moll had been designing voice CPE systems since 2001; had Nortel voice training; had taken Cisco training to be able to design IP based services.   In contrast, Shelton had not yet taken any Cisco training to be able to design IP based services and Maragliano had limited knowledge of the ILEC group and the toolset used by Verizon.   PCF ¶ 253.

Thus, Moll has set forth a prima facie case that her termination was discriminatory and in retaliation for her engaging in protected activity.   While Vz has offered no documentary proof that her termination was related to any legitimate business reason.   The only reasons offered are unsupported, conclusory opinions which, based on their inherent contradictions, are evidence of pretext.

As such, Plaintiff has set forth a *prima facie* case of disparate treatment and retaliation, and significant questions of material fact exist with respect to any purported business reason offered by the Vz.

**POINT III:       SIGNIFICANT QUESTIONS OF FACT EXIST REGARDING MS. MOLL'S CLAIMS UNDER THE EQUAL PAY ACT**

In *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Circ., 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 542 U.S. 742, (1998)*,* the Second Circuit ruled that the test to use for an EPA claim is that a plaintiff must show that the employer pays higher wages to a man over a woman; they perform work requiring equal skill, effort, and responsibility; and the jobs are performed under similar working conditions. The *Tomka* Court went on to note that ". . . the standard under the Equal Pay Act is job content and not job title or description . . . " *Tomka*, 66 F.3d 1295, 1310.

Moll was consistently paid less than were the other male SEs, while performing the same work, particularly Spencer and Winley.   As confirmed by Gaglione, while the SEs may have been designated with a different numerical status, these designations meant little in practice.   All of the SEs were expected to be able to assist CAMs in designing telecommunication systems for

34

customers and perspective customers.   They were all expected to be able to design and implement such systems and to be able to present their design proposals.   The main distinction between them was that they were each asked to concentrate on different telecommunication areas, such as data systems, voice systems, or telephonic systems.   Gaglione found no distinction between the level of skill, effort and responsibility between Winley, Spencer and Moll.   In fact, when Winley, who had the designation of SE IV, left Vz, his job responsibilities were filled by Michael Chase, an SE II.

The pay disparity between these individuals is astounding.   When Spencer was hired in the position which was a precursor to the Sales Engineer Position, his starting salary base pay was $61,300. Moll, who was hired into a similar position in the same year, had a starting base pay of $47,400.   Her salary was 22.7% less than Spencer's salary.   Spencer transferred out of the Sales Engineering position in 2004.   At that time, Moll was earning $61,500.   Thus, in 7 years of doing the same work that Spencer performed, Moll had yet to earn the same base salary that Spencer had started at, 7 years earlier.

Even if Spencer started at a greater salary than Moll, in an effort to entice him to work in this department, the 7 year interval of performing the same work should have closed this pay gap.   An employer's inability to correct wage discrepancies in a timely manner removes any bonafide status to such a defense.   *See, Molden v. U.S. 11 Cl. Ct.*, 604, 613 (1987), *See, also, EEOC v. Maricopa County Community College District*, 736 F.2d 510 (9th Cir. 1984). This is even more compelling when, in 2003, Moll was promoted to the position of SE II, the same position as Spencer.   As such, Plaintiff has set forth a *prima facie* case of a violation of the Equal Pay Act and questions of fact exist as to whether the Vz has provided a defense.

## CONCLUSION

For the reasons set forth above, the Motion of the Defendant should be denied in its entirety.

Dated: Buffalo, New York
          September 22, 2017

Respectfully submitted,

 s/Josephine A. Greco
Josephine A. Greco, Esq.
GRECO TRAPP, PLLC
Duane D. Schoonmaker, Esq., of Counsel
*Attorneys for Plaintiff, Cindy L. Moll*
1700 Rand Building
14 Lafayette Square
Buffalo, New York 14203
Telephone: (716) 856-5800
E-mail Address: *jgreco@grecolawyers.com*

36

# EXHIBIT "A"

## LIST OF ACTS

- During a 1998 phone conference in which numerous CAMs were participating, male co-worker Michael Finnegan stated to a female co-worker of Moll's, Sara DeLena, who was working from home that day: "Sara, are you at home, because I can hear the bedsprings creaking." PCF ¶ 20.

- In or about April, 1999, one evening during a multiple day training seminar in Marlboro, Irving called Moll repeatedly asking her to come to his hotel room. Moll repeatedly refused. His phone calls stopped only after she took the phone off the hook. PCF ¶ 21.

- Beginning in or about 1998 Irving repeatedly made unwanted comments to Moll in the workplace in which he said that she looks and smells great today. PCF ¶ 20.

- Irving also left inappropriate notes on Moll's desk at work on at least three occasions. The first note that she recalls said that he was unhappy when conversations between them would be interrupted by other people. PCF ¶ 24.

- Irving left a note on her desk telling her that she looked good and smelled nice. Specifically, the note said: "I hate being interupted [sic] when we are talking – people are so rude – yes I know the 23rd was unplanned & I am <u>definitely</u> thinking about the possibilities!! You look & smell great today … Call me?" (Exhibit YY). She knew that Irving left this note because she recognized his handwriting. PCF ¶ 26.

- He continued to make these comments through late 1999 until Moll was pregnant and started to show. PCF ¶ 28.

- In January, 2000, Moll requested company tickets to take some customers from one of her accounts to a professional hockey game. Her Sales Manager at the time, Michael McGowan, told her that he gave the tickets to Daniel Irving because she was pregnant, and he thought she would be too tired. PCF ¶ 28, 33.

- DeLena told her that Finnegan, in 2000, told DeLena to "come sit on my lap." PCF ¶ 28.

- Upon Moll's return to work from her maternity leave, Finnegan, began to call both DeLena and Moll a "hottie". He continued to call Moll a "hottie" every month or two during the time they worked together, which was through 2003 or 2004. PCF ¶ 28.

- DeLena told Moll, several days after the office Christmas Party in December, 2000, that DeLena was standing in the buffet line next to Michael Finnegan and their supervisor, Michael McGowan. Finnegan announced that he had asked the restaurant to keep the whipped cream for her to take home so she could have a "hot time with Tony," referring to her husband. PCF ¶ 28.

- In or about Christmas time 2000, Michael Finnegan rented a van in which all of the members of the ESG Group in Buffalo were going to use to travel to the casino in Niagara Falls. When DeLena entered the van, Moll heard Finnegan stated, "now we have two old bags in the van." PCF ¶ 28.

- Irving stated that Moll had the keys to McGowan's house, suggesting that she must be having an affair with McGowan. PCF ¶ 28.

- Irving questioned Moll whether she had anything going with McGowan or another male co-worker, Al Grant. PCF ¶ 28.

- In or about 2000, Moll was subjected to a conversation between Michael McGowan and Michael Finnegan regarding the new President of the Sales Division, Veronica Polizzi. Finnegan commented that she was not "too bad looking." McGowan responded by stating that she "had a lot of miles on her", suggesting that she was "older than old" and unattractive. PCF ¶ 28.

- In or about January 2001, DeLena attended a sales kickoff meeting at Jiminy Peak Resort. Shortly thereafter, DeLena told Moll that prior to leaving for the meeting, Michael Finnegan came into her office and asked her if she had a room alone. When she indicated that she did, he told her that he was going to come knocking on her door in the middle of the night. This incident reminded Moll of the incident in which Irving continuously called her room at the Marlboro training conference, asking her to come to his room. PCF ¶ 28.

- DeLena also told Moll that, prior to that same meeting at Jiminy Peak Resort, Michael Finnegan stated, "how are we going to get Sara in the hot tub? Hopefully without a suit." PCF ¶ 28.

- McGowan regularly made comments about women's appearance. He also regularly made comments that referred to women as objects. This included, but was not limited to, comments such as, "women should smell like vanilla because it would make them more appealing;" and "women should smell like bacon and eggs." PCF ¶ 28.

- When Moll was back working full time in late April or early May 2001, Irving left a note on her desk stating that he thought about her when he was taking a shower, and that she looked good and smelled nice. PCF ¶ 30.

- Beginning in approximately June 2001, Irving began to require Moll to see him personally with questions that she might have. She was not permitted to send him e-mails nor was she permitted to leave him messages on his voice mail. She had to physically see him for each such question. She was the only Sales Engineer who had this requirement. In fact, Irving required her to see him, rather than send him e-mails or leave him voice mails, until the time that he left as SEM in December 2002 or January 2003. Every time that Moll had to go into Irving's office to see him, she was reminded that he left a note on her desk that he thought of her in the shower. PCF ¶ 66.

- In January 2002, Irving asked Moll to come back to work with him at night to be alone in the office to finish work on a project that needed only several minutes to complete. PCF ¶ 82.

- In February or March, 2002, a group of workers were standing in an area of the office talking near Moll at an informal luncheon. Irving walked up to Sara DeLena, looked at her breasts, and said "hooters." At that point, Scott Ruddy, a Manager from the Albany Office, laughed and stated "you said hooters, I can't believe you said that." PCF ¶ 116.

- David Winley was a Technical Support Specialist who was hired in April, 2002. DeLena told Moll that he also regularly made comments with regard to her

appearance. In particular, he repeatedly referred to DeLena as a "Bond woman," referring to the sexy and provocative female co-stars of the James Bond movies who had names such as "Pussy Galore", "Holly Goodhead", "Plenty O'Toole", and "Xenia Onatopp". Moll Decl. ¶58.

- In May 2002, in addition to having to physically go into Irving's office to talk with him, Irving stopped approving any requests that Moll had to work from home, requiring her to be in the office so he could see her. PCF ¶ 118.

- During one point in 2002, DeLena told Moll that Donald Donohue, who was then DeLena's manager, said that he thought she should start exercising and seeing a personal trainer, implying that she was overweight and needed to lose weight. Moll Decl. ¶ 65.

- On another occasion in 2002, DeLena told Moll that she was at a meeting with a client and Sales Engineer, Kevin Dean told the client, in front of DeLena, "I don't work for her, and she'll be working for me before I work for her." Moll Decl. 65.

- In October 2002, Irving followed Moll to a client lunch with Sara DeLena. The meeting was scheduled for Moll to attend with DeLena to meet with representatives of Niagara Falls Memorial Medical Center. Irving showed up at the restaurant unexpectedly. He had not been scheduled to attend. He did not follow any other sales engineers around to client luncheons. When Moll asked him why he was following her, he said that he wanted to "develop" her. PCF ¶ 125.

- In or about early 2003, Michael Finnegan, and David Jager, a Specialist (a.k.a. Service Manager), were having a conversation near Moll's desk about the fact that David's wife had recently given birth. Moll heard them talking about Jager not having sexual intercourse with his wife for a period of six weeks. Finnegan said that any guy who had to go that long without sex would be in "an upright and locked position". PCF ¶ 144.

- On April 10, 2003, Antoinette McDermott, from Defendant's Equal Employment Opportunity Office, conducted an informational meeting regarding training about discrimination, retaliation and harassment. Moll's former SEM, Irving, was one of the attendees of the meeting. One of the reasons for this meeting was that females in the office had previously complained of discrimination within the office. Gaglione recognized that there was a problem and unhealthy environment in the office and set up the training (Gaglione EBT pp. 95-98). Irving, during the presentation, laughed and joked during the vignettes set forth by McDermott. Byrne and Moll both complained to Gaglione and McDermott about this behavior. Moll sent an email to McDermott itemizing her complaints of harassment and discrimination (Exhibit Z). Verizon never responded to these complaints. PCF ¶73.

- Shortly thereafter, during 2003, Moll learned Michael Finnegan was giving out his work and fax number as "25-PENIS" and that he specifically asked for this fax number back in 1998 and had been using it since then. PCF ¶ 144.